UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
_____

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| **EMMONS-SHEEPSHEAD BAY** | : | Case No. 12-46321 (ESS) |
| **DEVELOPMENT LLC,** | : |  |
|  |  |  |
| Debtor. |  |  |

_____

# SECOND AMENDED DISCLOSURE STATEMENT FOR SECOND AMENDED PLAN OF REORGANIZATION OF EMMONS-SHEEPSHEAD BAY DEVELOPMENT LLC

**THIS IS NOT A SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED TO THE BANKRUPTCY COURT FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.**

**ROBINSON BROG LEINWAND GREENE GENOVESE & GLUCK P.C.**
**Attorneys for the Debtor**
875 Third Avenue, 9th Fl.
New York, New York 10022
(212) 603-6300

**Of Counsel: A. Mitchell Greene, Esq.**
**Lori A. Schwartz, Esq.**

**Dated:** New York, New York
March 1, April 5, 2013

**SUMMARY**

A glossary of terms frequently used in this disclosure statement ("Disclosure Statement"), is set forth in Article 1 of the plan of reorganization filed with the Bankruptcy Court.

The Debtor, **Emmons-Sheepshead Bay Development LLC** (the "Debtor"), has filed its *Second Amended Plan of Reorganization dated ~~March 1,~~April __, 2013* (the "Plan"), with the United States Bankruptcy Court for the Eastern District of New York (the "Bankruptcy Court"). This *Second Amended Disclosure Statement for Second Amended Plan of Reorganization of Emmons-Sheepshead Bay Development LLC* (the "Disclosure Statement") has been approved by the Bankruptcy Court for use in connection with the solicitation of acceptances of the Plan from holders of Claims against the Debtor pursuant to section 1125 of title 11 of the United States Code (the "Bankruptcy Code").

In the Debtor's opinion, the treatment of Claims under the Plan provides a greater recovery for Creditors than that which is likely to be achieved under other alternatives for the reorganization or liquidation of the Debtor.

**Accordingly, the Debtor believes that Confirmation of the Plan is in the best interests of Creditors, and recommends that you vote to accept the Plan.**

**THE DEBTOR**

The Debtor is the owner of the real property located at 3122-3144 Emmons Avenue, Brooklyn, New York (the "Property") and the sponsor of the condominium development at the Property known as The Breakers at Sheepshead Bay Condominium.  The condominium offering plan was accepted by the New York State Attorney General's Office on February 8, 2006.  Amendments were thereafter submitted on February 27, 2006; February 6, 2007; September 26, 2007; May 13, 2008; March 9, 2009; December 7, 2009; and June 4, 2010, each of which were accepted.  One additional amendment was submitted on December 2, 2011 which has not yet been reviewed or accepted.  The Debtor currently owns 49 unsold residential units, 43 parking spaces and a marina at the Property.  The Property was originally owned by Emmons Avenue LLC, an affiliate of the Debtor.  Emmons Avenue LLC and the Debtor were parties to a lease dated December 29, 2004, which provided the Debtor with an option to purchase the Property.  Pursuant to ACRIS records and certain definitive documents, the lease and memorandum of lease were terminated and the Property conveyed to the Debtor in 2008.  Both Emmons Avenue LLC and the Debtor are obligated on the various loans extended by TD Bank, N.A. ("TD") in connection with the acquisition, construction and development of the Property and the condominium project.  TD was the Debtor's secured lender as of the Petition Date and the plaintiff in a series of litigations, including mortgage foreclosure proceedings, against, amongst other defendants, the Debtor in connection with the various loans that were extended for the

acquisition, development and construction of the Property.  On or about October 16, 2012, TD sold and assigned its various mortgages and related loan documents to SDF 17 Emmons LLC ("SDF" or "Lender").   On or about the time of SDF's acquisition of the mortgages and related loan documents, Hurricane Sandy caused substantial flood and other damage to the Property. SDF immediately engaged work crews on an emergency basis to repair the damage at the Property and agreed to advance certain funds to the Debtor in order to restore and complete the Property to a marketable condition.  In accordance with the foregoing agreement with the Lender, the Debtor sought approval for post-petition financing in order to fund necessary repair work at the Property which was granted on an interim basis which Interim Financing Order (as defined below) was entered on January 14, 2013.  A final hearing on the Debtor's request for financing was held on March 5, 2013 and the terms of the final financing were approved on the record of the hearing.  A form of order authorizing the final financing has been circulated for approval and once the terms are agreed to will be submitted to the Court for approval and entry.  The repair work is scheduled to continue for approximately 180 days in order to return the Property to pre-hurricane condition and complete any remaining construction not yet completed by the Debtor. The foregoing restoration work also includes repairs and restoration to the common areas of the condominium project in order to make the Property marketable.  As set forth in the Interim Financing Order, and as will be included in the language in the final financing order, the funds expended by the Debtor with respect to repairs and restoration to the common areas, as funded by SDF, will be an offset first to post petition common charges allocated to and accrued against Debtor until paid in full and thereafter to reduce pre-petition common charge arrears, if any.  In addition, in connection with the final financing the Court approved an advance from SDF to the condominium association in the amount of $35,000, which will be offset in the same manner. Once the Property is restored, the unsold units will be marketed and any sale proceeds will be utilized to pay down the SDF secured claim.

## THE PLAN

The Plan provides for the reorganization of the Debtor.  Except as otherwise set forth herein, payments to holders of administrative claims, subject to offset as set forth in the Plan, will be made by the Lender on the Effective Date.  The Lender has also agreed to establish on the Effective Date an unsecured creditors fund in the amount of $100,000 for pro-rata distribution to holders of allowed general unsecured claims.  All of other plan payments, including payments to the Lender, shall be funded through the sale proceeds of the Debtor's 49 currently unsold condominium units, parking spaces and marina unit.  Proceeds of the sale from each unit shall be distributed in the following order:

1.       payment of any and all reasonable and ordinary closing costs associated with the sale of each unit, including but not limited to legal fees, title fees, real estate taxes, post-petition common charges (subject to offset), utility charges, broker commissions and other such expenses that would ordinarily be required to be paid at closing to deliver clean title of the unit to a purchaser;

2.      reimbursement of expenses advanced post-confirmation by SDF per each unit;

3.      payment to SDF for accrued interest on its secured claim;

~~3.~~4.    payment to SDF of the principal of its secured claim, including any amounts for protective advances made pursuant to the existing loan documents and in accordance with the Interim Consent Order (I) Authorizing and Approving Debtor's Post Petition Financing and (II) Granting Related Relief( ECF doc. no. 40)(the "Interim Financing Order") and the final financing order (ECF doc. no. ___);

~~4.~~ 5. payment to SDF on account of its administrative claim for advances made in accordance with the Interim Financing Order and the Final Financing Order.

~~5.~~ 6. in the event that there are excess proceeds from the sale of the units after payment is made to 1 - ~~4~~5 above, the balance of proceeds shall be distributed pro-rata to holders of allowed unsecured claims, including the Lender's deficiency claim.

The selling price for the units will be determined at the sole discretion of SDF after completing a marketing analysis for the Property.

Equity interests in the Debtor shall be canceled upon the Effective Date. Equity in the reorganized debtor will be issued to and held by a post-confirmation trust or alternatively, a plan administrator. Jeffrey Schwartz, Esq. of Wolf Haldenstein Adler & Herz LLP shall be appointed as the trustee of the post confirmation trust or the plan administrator and shall receive a $20,000 retainer ~~on~~upon the earlier of his court authorized retention as real estate counsel to the Debtor or the Effective Date with all further fees to be paid from the sale of units as set forth in item 1 above. The Plan Administrator's fees shall be capped at $~~150,000.~~75,000.

After the Effective Date, pursuant to a consulting agreement (the "Consulting Agreement") with Jacob Pinson, the managing member of Yachad Enterprises, LLC, the managing member of the Debtor, Jacob Pinson, will be engaged by the Reorganized Debtor to assist with the development, construction, marketing and sale of the condominium units for a two (2) year period. In connection with the work Pinson performs as a consultant, he shall receive a monthly consulting fee of $10,000 during the two (2) year term of the consulting agreement.

In addition, ~~Pinson shall be entitled to certain bonus compensation related to sales at the Property. If~~in the event SDF receives net ~~sale~~ proceeds of no less than the aggregate ~~of $15,000,000, Pinson shall be entitled to $100,000~~amount of $25,000,000, the unsecured creditors fund shall be supplemented by an additional $50,000; if SDF receives net ~~sale~~ proceeds of no less than the aggregate ~~of $17,500,000, Pinson shall be entitled to an additional $100,000; if SDF receives net proceeds of no less than the aggregate of $20,000,000, Pinson shall be entitled to an additional $100,000; if SDF receives net proceeds of no less than the aggregate of $22,500,000, Pinson shall be entitled to an additional $100,000~~amount of $27,500,000, the unsecured creditors

fund shall be supplemented by an additional $50,000; and if SDF receives net sale proceeds of no less than the aggregate of $25,000,000, Pinsonamount of $30,000,000, the unsecured creditors fund shall be entitled to an additional $100,000. supplemented by an additional $200,000.  Each time the unsecured creditors fund is supplemented, the distribution shall be made pro-rata within 30 days of SDF's receipt of the threshold amount of the net sale proceeds.  Notwithstanding the foregoing, any payments made to unsecured creditors under this paragraph shall not be credited against or be offset against the secured claim of SDF.

All compensation, including accrued compensation to Pinson in connection with the Consulting Agreement shall be paid by SDF after receipt by SDF of net sale proceeds from the sale of units.  Notwithstanding the foregoing, Pinson shall be entitled to $10,000 per condominium unit sold regardless of the accrual of payments due under the Consulting Agreement, with a maximum aggregate payment of $240,000.  By way of example, if only 4 condominium units are sold and 6 months have elapsed since the Effective Date of the Plan, Pinson shall only be entitled to $40,000 of compensation under the Consulting Agreement.  A copy of the Consulting Agreement is attached hereto as Exhibit A.

The table below provides a summary of the classification and treatment of Claims under the Plan.  The figures set forth in the table below represent the Debtor's best estimate of the aggregate amount of Claims in the Case.  These estimates have been developed by the Debtor based on an analysis of the Schedules filed by the Debtor, the Proofs of Claims filed by Creditors, and certain other documents of public record.  There can be no assurance that Claims will be allowed by the Bankruptcy Court in the amounts set forth below.  The aggregate amount of Allowed Claims may be significantly lowered from the amounts set forth below as the result of objections to claims which may be brought by the Debtor or through stipulations which may be negotiated with various creditors.

| Class and Estimated Amount | Type of Claim or Equity Interest | Summary of Treatment |
|---|---|---|
| $10,000.00[1] (estimated) | Administrative Claims (excluding Claims for Professional Compensation and Reimbursement, but including Post-petition ordinary course liabilities and Post-petition Tax Claims.) | **Non-Voting.**  Subject to the provisions of article 8 of the Plan with respect to Disputed Claims, each Administrative Claim, to the extent not previously paid, shall be paid by the Disbursing Agent in Cash in full on (i) the later of the Effective Date, the date payment of such Claim is due under the terms thereof or applicable law, or three business days after such Claim becomes an Administrative Claim or (ii) as may be otherwise mutually agreed in writing between the Debtor and the |

---

[1]    Amount does not include amount of SDF Administrative Claim.

| Class and Estimated Amount | Type of Claim or Equity Interest | Summary of Treatment |
|---|---|---|
| | | holder of such Claim; *provided, however,* that any Administrative Claim incurred by the Debtor in the ordinary course of its business shall be paid in full in accordance with the terms and conditions of the particular transaction giving rise to such Administrative Claim and any agreements relating thereto. |
| Estimated to be $~~150,000~~250,000 | Administrative Claims for Professional Compensation and Reimbursement[2] | **Non-Voting.** No later than three days prior to the Confirmation Date, each Professional shall provide the Debtor and SDF with an estimate of the total amount of compensation and expenses for which such Professional expects to seek final compensation pursuant to section 330 of the Bankruptcy Code. Such estimates shall include estimated sums for the preparation and prosecution of any application for final compensation. On the Effective Date SDF shall deliver to the Disbursing Agent, and the Disbursing Agent shall segregate sufficient cash to pay all such estimated compensation and expenses in full unless otherwise agreed to by the Debtor, SDF and such Professionals; *provided, however,* that the failure of a Professional to provide such an estimate shall relieve SDF of its obligation to segregate funds for the payment therefore, but shall not relieve the Debtor of the obligation with respect to any allowed compensation and expense reimbursement. All Professionals shall file final applications for approval of compensation and reimbursement of reasonable and necessary expenses pursuant to section 330 of the Bankruptcy Code no later than 60 days following the Effective Date. Any such application timely filed shall be deemed to be an Administrative Claim, subject to the entry of a Final Order by the Bankruptcy Court approving such application. Objections to any Professional's application for compensation or reimbursement must be timely filed and served upon such Professional, and upon the Debtor and the Disbursing Agent in accordance with the |

---

[2]       Any agreement with respect to the waiver and/or modification of fees will be disclosed to the Court and the Office of the United States Trustee.

| Class and Estimated Amount | Type of Claim or Equity Interest | Summary of Treatment |
|---|---|---|
| | | Bankruptcy Rules.  Any such objection not timely filed and served shall be deemed to have been waived.  Notwithstanding anything to the contrary, set forth herein, Professional Fees shall be capped at the amount of $250,000 and SDF shall only be required to pay athe sum no greater than $200,000of $250,000 for Professional Compensation. |
| unknown Estimated to be less than $1,000 | Priority Tax Claims | **Non-Voting.**  Subject to the provisions of Article 8 of the Plan with respect to Disputed Claims, in full satisfaction, release and discharge of Priority Tax Claims, and except as may be otherwise mutually agreed in writing between the Debtor and such Governmental Units, all Priority Tax Claims shall be paid by the Disbursing Agent in Cash in full on the Effective Date. |
| Class 1 $2,600.00 | Priority Claims (other than Priority Tax Claims and Administrative Claims) | **Unimpaired.**  Subject to the provisions of Article 8 of the Plan with respect to Disputed Claims, and only to the extent a condominium closing with respect to a pre-petition contract of sale does not occur, in full satisfaction, release and discharge of the Priority Claims, the holders of Priority Claims shall receive the following treatment:  on the Effective Date, or as soon as practicable after such Claims become Allowed Claims, each holder of a Priority Claim shall receive payment from the Disbursing Agent, (1) in Cash, in the full amount of its Priority Claim, or (ii) as may be otherwise agreed in writing between the Debtor and the holder of such Claim. |
| Class 2 Estimated to be $368,875 | New York City Secured Tax Claims | **Unimpaired.**  Subject to the provisions of Article 8 of the Plan with respect to Disputed Claims, and only to the extent New York City Secured Tax Claims were not paid and satisfied by protective advances made by SDF prior to the Effective Date, on the Effective Date, in full satisfaction, release and discharge of the New York City Secured Claims, the holder of the New York City Secured Claims shall receive cash in the full amount of its Allowed Secured Claims. |
| Class 3 Filed in the amount of $33,094,638.97 | SDF17 Emmons LLC Secured Claim | **Impaired.**  Subject to the provisions of Article 8 of the Plan with respect to Disputed Claims, in full satisfaction, release and discharge of the SDF Secured Claim in the amount of $28,000,000, and afterAfter payment is made |

| Class and Estimated Amount | Type of Claim or Equity Interest | Summary of Treatment |
|---|---|---|
| Secured Claim to be fixed in the amount of $28,000,000 per agreement between SDF and the Debtor | | in full to holders of administrative and priority claims, and the Unsecured Creditors Fund is established in the initial amount of $100,000, SDF shall receive payment in the full amount of its secured claim ~~inclusive of~~in the principal sum of $28,000,000 with interest accrued thereon from the sale proceeds of the Debtor's 49 unsold condominium units, 43 parking spaces and marina unit, which payments shall be applied first to accrued interest and then to the principal amount of the secured claim, inclusive of protective advances made pursuant to the existing loan documents, pre or post-petition.  SDF's secured claim shall accrue interest at the rate of 8% per annum. The Reorganized Debtor and SDF shall execute an amended and restated mortgage in recordable form and an amended and restated note in the amount of $28,000,000 which note shall mature 24 months from the Effective Date, subject to extension at the sole and absolute discretion of SDF.  On the maturity date, upon the election of SDF, the Reorganized Debtor shall pay the balance due on the note or convey the Property to SDF or its designee in full satisfaction of the SDF Secured Claim. SDF shall receive no repayment on account of its administrative claim for advances made in accordance with the Interim Financing Order and final financing order, which claim shall be deemed subordinate to holders of allowed administrative claims, until the SDF secured claim is paid in full. In the event the sale proceeds are sufficient to satisfy in full SDF's secured claim and subordinate administrative claim, any balance available shall be distributed pro-rata to holders of unsecured claims, including SDF's deficiency claim. In the event SDF receives net sale proceeds of no less than $25,000,000, it shall supplement the unsecured creditors fund by an additional $50,000; in the event SDF receives net sale proceeds of no less than $27,500,000, it shall supplement the unsecured creditors fund by an additional $50,000; and in the event SDF receives net sale proceeds of no less than $30,000,000, it shall supplement the unsecured creditors fund by an additional $200,000. Notwithstanding anything to the contrary, any sums paid to supplement the unsecured creditors under this paragraph shall not be a credit |

| Class and Estimated Amount | Type of Claim or Equity Interest | Summary of Treatment |
|---|---|---|
| | | against or an offset to the amount due and owing under the SDF Secured Claim. In consideration for the treatment contained herein, and upon receipt by SDF of no less than $~~15,000,000~~23,500,000 of net proceeds from the sale of units, SDF shall release Jacob Pinson's personal guarantee of the SDF loan. ~~Upon receipt by SDF of no less than $20,000,000 of net proceeds from the sale of the units, SDF shall release~~ and its mortgage on Jacob Pinson's personal residence. |
| Class 4 $41,839,451.30 in scheduled/filed claims[3], not including SDF's deficiency claim in the amount of not less than $5,000,000 | Unsecured Claims | **Impaired.** Subject to the provisions of Article 8 of the Plan with respect to Disputed Claims, in full satisfaction, release and discharge of all Allowed Unsecured Claims (including deficiency claims), on the Effective Date, each holder of an Allowed Unsecured Claim shall receive payment in cash equal to its pro-rata share of the Unsecured Creditors Fund to be established on the Effective Date in the amount of $100,000 and, in the event net sale proceeds are sufficient to satisfy the SDF Secured and administrative claim, any balance shall be distributed pro-rata to holders of Allowed Unsecured Claims. In the event SDF receives net sale proceeds of no less than $25,000,000, it shall supplement the unsecured creditors fund by an additional $50,000; in the event SDF receives net sale proceeds of no less than $27,500,000, it shall supplement the unsecured creditors fund by an additional $50,000; and in the event SDF receives net sale proceeds of no less than $30,000,000, it shall supplement the unsecured creditors fund by an additional $200,000. SDF's deficiency claim, if any, shall be included in Class 4. SDF has agreed to waive any distribution from the Unsecured Creditors ~~Fun~~Fund on account of its deficiency claim and from any further funding of the unsecured creditors fund unless and until its secured and administrative claims are satisfied in full. |
| Class 5 | Allowed Interests | **Impaired.** On the Effective Date, all Allowed Interests |

---

[3] Aggregate amount of scheduled/filed claims is inclusive of disputed scheduled claim amounts and proof of claim amounts disputed by the Debtor for which Debtor reserves all rights to file motions objecting to claims. Amount is also inclusive of claims filed by contract vendees for contract deposits. Debtor believes the aggregate amount of filed/scheduled claims will be reduced substantially after prosecuting claims objections.

| Class and Estimated Amount | Type of Claim or Equity Interest | Summary of Treatment |
|---|---|---|
| | | in the Debtor shall be extinguished. |

**CONFIRMATION OF THE PLAN**

Pursuant to section 1128 of the Bankruptcy Code, the Bankruptcy Court has scheduled a hearing to consider Confirmation of the Plan, on _____, 2013 at _____ a.m., Eastern Standard Time, in the United States Bankruptcy Court, 271 Cadman Plaza East, Brooklyn, NY.  The Bankruptcy Court has directed that objections, if any, to Confirmation of the Plan be filed and served on or before _____, 2013 at 5:00 p.m., in the manner described under "ACCEPTANCE AND CONFIRMATION -- Confirmation Hearing."

At the Confirmation Hearing, the Bankruptcy Court will determine whether the requirements of section 1129(a) of the Bankruptcy Code have been satisfied, in which event the Bankruptcy Court will enter an order confirming the Plan.  The Debtor intends to seek Confirmation of the Plan at the Confirmation Hearing.  In the event that any impaired Class of Claims does not accept the Plan, the Debtor may seek a "cramdown" Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code.  **The Debtor believes that the Plan satisfies all applicable requirements of section 1129(a) and section 1129(b) of the Bankruptcy Code**.  See "ACCEPTANCE AND CONFIRMATION -- Requirements for Confirmation" for a description of such requirements.

With the entry of the Confirmation Order, pursuant to section 1141(d) of the Bankruptcy Code, except as otherwise provided in the Plan, the distributions provided for in the Plan will be in exchange for and in complete satisfaction, discharge and release of all Claims against the Debtor or any of its assets or properties, including any Claim accruing after the Petition Date and before the Confirmation Date.  As of the Effective Date, all holders of Claims shall be precluded from asserting any Claim against the Debtor or its assets or Property or other interests in the Debtor based on any transaction or other activity of any kind that occurred before the Confirmation Date except as otherwise provided in the Plan.  Confirmation makes the Plan binding upon the Debtor, all Creditors and other parties regardless of whether they have accepted the Plan.

**VOTING INSTRUCTIONS — SUMMARY**

The following discussion summarizes more detailed voting instructions set forth in the section of this Disclosure Statement entitled "VOTING INSTRUCTIONS."  If you have any questions regarding the timing or manner of casting your ballot, please refer to the "VOTING

INSTRUCTIONS" section of this Disclosure Statement and the instructions contained on the ballot that you received with this Disclosure Statement.

      **General**.  The Debtor has sent to all of its known Creditors who are in Classes impaired under the Plan a ballot with voting instructions and a copy of this Disclosure Statement. Creditors may refer to the above chart to determine whether they are impaired and entitled to vote on the Plan.  Creditors should read the ballot carefully and follow the voting instructions. Creditors should only use the official ballot that accompanies this Disclosure Statement.

      The Plan can be confirmed by the Bankruptcy Court and thereby made binding on you if it is accepted by (a) the holders of two-thirds in amount and more than one-half in number of claims in each class who actually vote on the Plan.  In the event the requisite acceptances are not obtained, the Bankruptcy Court may nevertheless confirm the Plan if (i) the Bankruptcy Court finds that the Plan accords fair and equitable treatment, and does not discriminate unfairly, with respect to the class rejecting it and (ii) at least one impaired class of creditors excluding insiders has accepted the Plan.  See "ACCEPTANCE AND CONFIRMATION -- Requirements for Confirmation" and "EFFECT OF CONFIRMATION."

      **As the preceding paragraph makes evident, a successful reorganization depends upon the receipt of a sufficient number of votes in support of the Plan.  YOUR VOTE IS THEREFORE EXTREMELY IMPORTANT.  Creditors should exercise their right to vote to accept or reject the Plan.**

      **Voting Multiple Claims and Interests**.  A single form of ballot is provided for each Class of Claims.  Any Person who holds Claims in more than one Class is required to vote separately with respect to each Class in which such Person holds Claims.  However, any Person who holds more than one Claim in one particular Class will be deemed to hold only a single Claim in such Class in the aggregate amount of all Allowed Claims in such Class held by such Person.  Thus each Person need complete only one ballot for each Class.

      **Deadline for Returning Ballots**.  The Bankruptcy Court has directed that, to be counted for voting purposes, ballots for the acceptance or rejection of the Plan must be received by the Debtor, no later than 5:00 p.m., Eastern Standard Time, on _____, 2013 at the following address:

      Robinson Brog Leinwand Greene Genovese & Gluck P.C.
      875 Third Avenue
      9th Floor
      New York, New York 10022
      Attn: Lori A. Schwartz, Esq.

**Voting Questions**. If you have any questions regarding the provisions or requirements for voting to accept the Plan or require assistance in completing your ballot, you may contact Lori A. Schwartz, Esq. at (212) 603-6334.

**NOTICE TO HOLDERS OF CLAIMS AND INTERESTS**

This Disclosure Statement and the accompanying ballots are being furnished by the Debtor to the Debtor's known Creditors pursuant to section 1125(b) of the Bankruptcy Code in connection with a solicitation of acceptances of a plan of reorganization by the Debtor.  The Plan is filed with the Bankruptcy Court and is incorporated herein by reference.  Parties in interest may view the Plan on the Internet at http://www.nyeb.uscourts.gov.[4]

The purpose of this Disclosure Statement is to enable you, as a Creditor whose Claim is in a Class impaired under the Plan to make an informed decision in exercising your right to accept or reject the Plan.

**THIS DISCLOSURE STATEMENT HAS BEEN PREPARED BY THE DEBTOR.  THE STATEMENTS AND OPINIONS SET FORTH HEREIN ARE THOSE OF THE DEBTOR, AND NO OTHER PARTY HAS ANY RESPONSIBILITY WITH RESPECT THERETO.**

**THIS DISCLOSURE STATEMENT CONTAINS IMPORTANT INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE PLAN PROPOSED BY THE DEBTOR.  PLEASE READ THIS DOCUMENT WITH CARE.**

**THE PLAN HAS NOT BEEN APPROVED OR DISAPPROVED BY ANY BANKRUPTCY COURT, THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION NOR HAS THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION PASSED UPON THE FAIRNESS OR MERITS OF THE PLAN OR UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT.  ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.**

The historical information concerning the Debtor has been prepared using the Debtor's books and records and certain filings made with the Bankruptcy Court.  The estimates of Claims set forth herein may vary from the final amounts of Claims allowed by the Bankruptcy Court.  While every effort has been made to ensure the accuracy of all such information, except

---

[4]     A password is necessary for access to view documents on the Internet.

as noted in the Disclosure Statement, the information presented herein is unaudited and has not been examined, reviewed or compiled by the Debtor's independent public accountants.

  This Disclosure Statement contains a summary of certain provisions of the Plan and the transactions contemplated thereunder, and may contain descriptions of certain other related documents, if any.  While the Debtor believes that these summaries are fair and accurate, such summaries are qualified to the extent that they do not set forth the entire text of such documents.  Reference is made to the Plan and the documents referred to herein and therein, if any, for a complete statement of the terms and provisions thereof.  In the event of any inconsistency between the terms of the Plan and this Disclosure Statement, the terms of the Plan shall be controlling.  In reviewing the Plan and this Disclosure Statement, the reader should give special attention to "RISK FACTORS."  No statements or information concerning the Debtor or its future business operations, results of operations or financial condition, are authorized by the Debtor other than as set forth in this Disclosure Statement and the exhibits hereto (including the Plan).

  The statements contained in this Disclosure Statement are made as of the date hereof unless another time is specified herein.  The delivery of this Disclosure Statement shall not create, under any circumstances, an implication that there has been no change in the facts set forth herein since the date hereof.

  This Disclosure Statement is intended for the sole use of Creditors to make an informed decision about the Plan.  Each holder of a Claim should review this Disclosure Statement and all exhibits hereto (including the Plan) before casting a ballot.  Holders of Claims or Interests are urged to consult with their own legal and financial advisors.

  No solicitation of votes to accept or reject the Plan may be made except pursuant to this Disclosure Statement and section 1125 of the Bankruptcy Code.  No Person has been authorized to use or promulgate any information concerning the Debtor or its business or the Plan, other than the information contained in this Disclosure Statement and the exhibits hereto.  You should not rely on any information relating to the Debtor or its business or the Plan other than that contained in this Disclosure Statement and the exhibits hereto.

### RECOMMENDATION

  In the Debtor's opinion, the treatment of Creditors under the Plan provides a greater recovery than is likely to be achieved under any other alternatives, including liquidation under Chapter 7.  See "ALTERNATIVES TO THE PLAN."  In particular, the Debtor believes that in a Chapter 7 liquidation, administrative costs will be greater, and only a partial payment will be available to SDF on account of its Secured Claim.  As a result, unsecured creditors would not receive any distribution on account of their Claims.  Further, the Debtor believes that the value of any distribution in a chapter 7 liquidation case will be discounted by the litigation and delays which will precede any such distribution.

**THE DEBTOR BELIEVES THAT CONFIRMATION OF THE PLAN IS IN THE BEST INTERESTS OF CREDITORS AND URGES EACH CREDITOR ENTITLED TO VOTE TO ACCEPT THE PLAN.**

### THE DEBTOR

The Debtor is the owner of the real property located at 3122-3144 Emmons Avenue, Brooklyn, New York (the "Property") and the sponsor of the condominium development at the Property known as The Breakers at Sheepshead Bay Condominium.

### EVENTS LEADING TO CHAPTER 11

The Property was originally owned by Emmons Avenue LLC, an affiliate of the Debtor. Emmons Avenue LLC and the Debtor were parties to a lease dated December 29, 2004, which provided the Debtor with an option to purchase the Property. Pursuant to ACRIS records and certain definitive documents, the lease and memorandum of lease were terminated and the Property conveyed to the Debtor in 2008. Both Emmons Avenue LLC and the Debtor are obligated on the various loans extended by TD Bank, N.A. ("TD") in connection with the acquisition, construction and development of the condominium project. TD was the Debtor's secured lender as of the Petition Date and the plaintiff in a series of litigations, including mortgage foreclosure proceedings, against, amongst other defendants, the Debtor in connection with the various loans that were extended for the acquisition and construction of the Property.

While the Property was for the most part fully constructed, it was not fully sold and its sales were severely impacted by the economic turmoil of the past several years, specifically in the real estate market. The Debtor defaulted in its obligations to TD Bank and as TD pursued various foreclosure litigation against the Debtor, the Debtor sought to preserve the Property through the protections afforded it by the Bankruptcy Code and commenced its chapter 11 case on August 30, 2012.

On or about October 16, 2012, TD assigned its various mortgages and related loan documents to SDF. On or about the time of SDF's acquisition of the various mortgages and related loan documents, Hurricane Sandy caused substantial flood damage to the Property. The Debtor sought approval for post-petition financing in order to fund necessary repair work at the Property which was granted on an interim basis in accordance with the Interim Financing Order and thereafter on a final basis. The repair work is scheduled to continue for approximately 180 days in order to return the Property to pre-hurricane condition and to complete other unfinished construction of the Property. Once the Property is restored, the unsold units will be marketed and any sale proceeds will be utilized to pay down the SDF secured claim.

Repairs at the Property as of April 1, 2013 has been completed as follows:

1.      Water service has been restored and is working throughout all units;
2.      new windows and doors have been installed to all units;
3.      elevator parts have been ordered and SDF is awaiting a permit from the Department of Buildings;
4.      pool parts have been ordered and installation is anticipated to be completed by May 15, 2013;
5.      all drywall has been repaired and installed and painting is set to commence starting the week of April 1, 2013;
6.      the gym is anticipated to be completed by May.

**METROPOLITAN ESTATES**

In or about January 13, 2005, Metropolitan Estates, Inc., ("Metropolitan") and Emmons Avenue LLC entered into an agreement whereby Metropolitan contributed the sum of $1,500,000 to Emmons Avenue LLC (the "LLC") to assist in the development of the condominium project in exchange for a 10% equity interest in the LLC. Metropolitan was to receive a return of its initial contribution as well as an additional $1,500,000 in profits, which amounts were to be paid via commissions from sales of units earned by Wilk Real Estate Ltd. ("Wilk") who was to be engaged as the exclusive broker for the condominium project. Upon receipt of the aggregate sum of $3,000,000, Metropolitan would not be entitled to any further compensation and would relinquish its 10% equity interest in the LLC.

Metropolitan, Wilk and Alex Dikman (collectively, the "Metropolitan Estates Plaintiffs") commenced an action in the Supreme Court of the State of New York, Kings County, Index No. 20525/11 asserting various causes of action, including, but not limited to, breach of contract, breach of fiduciary duty, fraudulent conveyance, unjust enrichment and a constructive trust against the Property as against ~~Emmons Avenue~~the LLC and the Debtor, amongst other defendants. Metropolitan~~ Estates Plaintiffs~~'s cause of action for a constructive trust against the Property was dismissed pursuant to decision and order of the Hon. Gloria Dabiri dated June 15, 2012. The defendants request to cancel the Notice of Pendency was denied. The action is now stayed as a result of the Debtor's bankruptcy filing.

### SIGNIFICANT EVENTS IN THE CHAPTER 11 CASE

On August 30, 2012, the Petition Date, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Eastern District of New York, Brooklyn Division. The following discussion is intended to highlight some of the more significant events which have occurred during the pendency of the Debtor's case.

**RETENTION OF PROFESSIONALS**

Section 327(a) of the Bankruptcy Code provides that a debtor, with the court's approval, may employ one or more accountants or other professional persons that do not hold or represent an interest adverse to the estate and that are disinterested persons to represent or assist the debtor in carrying out its duties under the Bankruptcy Code.  11 U.S.C. § 327(a).

On September 14, 2012, the Debtor sought authority from the Bankruptcy Court to retain the law firm of Robinson Brog Leinwand Greene Genovese & Gluck P.C., as its counsel which application was supplemented on October 15, 2012, and thereafter granted pursuant to an order entered on December 4, 2012.

**BAR DATE**

In accordance with the requirements of section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, on the Petition Date the Debtor filed its Schedules of assets and liabilities, including schedules of all of its known creditors and the amounts and priorities of the Claims the Debtor believes are owed to such creditors.  On November 13, 2012, the Debtor filed its Amended Schedule F and Affirmation Pursuant to Local Rule 1009-1(a).  Pursuant to section 501 of the Bankruptcy Code any creditor may file a Proof of Claim and, unless disputed, such filed Proof of Claim supersedes the amount and priority set forth in the Debtor's schedules.  By order of the Bankruptcy Court, December 18, 2012 was set as the last day for creditors to file proofs of claims in the Debtor's Chapter 11 case.

There can be no assurance that the Allowed Claims as determined by the Bankruptcy Court will be in the amounts and priorities stated in the Schedules filed by the Debtor or the Proofs of Claim filed by the Creditors.

**OPERATING REPORTS**

Pursuant to the requirements of the Office of the United States Trustee for the Eastern District of New York, the Debtor will prepare and file monthly operating reports with the Bankruptcy Court.  Copies of such reports may be obtained (i) from the Bankruptcy Court during normal business hours, (ii) upon written request made to counsel for the Debtor, or (iii) from the Bankruptcy Court's Electronic Case Filing System ("ECF")[5] which may be accessed at the Bankruptcy Court's Internet website at www.nyeb.uscourts.gov, using Netscape Navigator software version 3.0 or higher.

**FINANCING**

---

[5]    Filing documents on the ECF requires a password which an attorney may obtain by contacting the Bankruptcy Court's technical assistance department at (631) 712-6200 ext. 6, Monday through Friday, 9:00 a.m. to 4:00 p.m.

On December 4, 2012, the Debtor filed a motion seeking authority to obtain post-petition financing from SDF in order to, amongst other things, fund repair work required to restore the Property to pre-hurricane condition and complete the construction of the Property to make it marketable for sale. The Office of the United States Trustee and Counsel to the City of New York objected to the financing request. Counsel to Metropolitan Estates, Inc., Albert Wilk d/b/a Wilk Real Estate, Ltd and Alex Dikman joined in the United States Trustee's objection. After a hearing held on January 8, 2013, and a telephonic conference with the Court on January 14, 2013, an Interim Consent Order (I) Authorizing and Approving Debtor's Post-Petition Financing; and (II) Granting Related Relief was entered. The Interim Financing Order further provided that any funds expended to repair and renovate the common areas of the Property shall be offset against post-petition common charged owed or to be owed to the condominium association until paid in full and thereafter to reduce pre-petition common charges arrears, if any. A continued hearing on the financing motion concluded on March 5, 2013 and the final financing was approved on the record of the hearing. A form of order consented to by SDF was circulated to the United States Trustee for their review and approval. The parties are working towards agreement on the terms of the final version of the order and anticipate a resolution in advance of the next status conference in the Debtor's case which is scheduled to proceed on ~~February 26,~~ April 11, 2013.

## METROPOLITAN CLAIMS OBJECTIONS

The Debtor has filed objections to the claims filed by Metropolitan, Wilk, Albert Wilk in his individual capacity and Alex Dikman. The claims objections motions are each returnable on April 11, 2013.

Metropolitan has taken an active role in the Debtor's bankruptcy proceeding, including filing a motion seeking 2004 examinations of the Debtor, Emmons Avenue LLC, Jacob Pinson and TD Bank[6] and objecting to the Disclosure Statement.

## THE MARCH 5 HEARINGS

At the last hearing on March 5, 2013, Michael Delgado, a purported creditor of the Debtor appeared, without counsel, after communicating with the Office of the United States Trustee. The Debtor denies that Mr. Delgado is a creditor of its estate. Mr. Delgado was encouraged to obtain counsel to represent his interests. Debtor's counsel requested that Mr. Delgado provide it with evidence substantiating his claim, but has not received any information or other communication from Mr. Delgado since the March 5 hearing. However, the Debtor has concluded the Mr. Delgado is relying on a claim filed by EK Development, LLC, Claim no 12. The Debtor however is not a party to the settlement agreement attached to the claim. Debtor's counsel has communicated with counsel

---

[6] Debtor is preparing an objection to the 2004 motion on the basis that discovery pursuant to rule 2004 of the Federal Rules of Bankruptcy Procedure is not appropriate. The Debtor is prepared to proceed with discovery pursuant to the Federal Rules of Civil Procedure as the matters between it and Metropolitan are contested matters, however, Metropolitan has not agreed to move forward with discovery other than pursuant to FRBR 2004.

to EK to determine the validity of the claim and the Debtor's relation to the claim.  At most, the claim appears to be a contingent claim against the Debtor.

SUMMARY OF THE PLAN

The following summary of the terms of the Plan is qualified in its entirety by reference to the provisions of the Plan, a copy of which is filed with the Clerk of the Bankruptcy Court and which is incorporated herein by reference.

## CLASSIFICATION OF CLAIMS

Classification of claims is governed, in part, by sections 1122 and 1123(a) of the Bankruptcy Code.  Section 1123(a) requires that a plan designate classes of claims, requires that the plan specify the treatment of any impaired class of claims, and requires that the plan provide the same treatment for each claim of a particular class, unless the holder of a claim receiving less favorable treatment consents to such treatment.  11 U.S.C.§1123(a)(1), (3) and (4).  Section 1122(a) of the Bankruptcy Code provides, subject to an exception for administrative convenience, that "a plan may place a claim or interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class."

Article 3 of the Plan classifies the various Claims against and Interests in the Debtor into four classes of Claims:

> Class 1 -    Priority Claims
> Class 2 -    New York City Secured Tax Claims
> Class 3 -    SDF17 Emmons LLC Secured Claim
> Class 4 -    Unsecured Claims
> Class 5 -    Allowed Interests

As set forth in Article 2 of the Plan, pursuant to section 1123(a)(1) of the Bankruptcy Code, certain Administrative Claims against the Debtor have not been classified.  See "SUMMARY OF THE PLAN -- Treatment of Non-Classified Claims."

Claims in Classes 3 and 4 and interests in Class 5 are impaired under the Plan. Holders of Claims in Classes 3 and 4 are being solicited and are entitled to vote to accept or reject the Plan.  Claims in Classes 1 and 2 are not impaired by the Plan and are deemed to have accepted the Plan.   Allowed Interests in Class 5 are deemed to have rejected the Plan.

**Class 1 - Priority Claims.** Class 1 consists of all Claims, other than Administrative Claims, Priority Tax Claims, or Bankruptcy Fees, to the extent entitled to priority under section 507 of the Bankruptcy Code.   Certain Claims for taxes and the payment of expenses incurred by the Debtor subsequent to the Petition Date are entitled to priority under section 507 of the Bankruptcy Code, and are treated elsewhere as non-classified Claims.  See "SUMMARY OF THE PLAN --

Treatment of Non-classified Claims." One claim has been filed asserting a priority amount of $2,600 pursuant to 11 U.S.C. Section 507 (a)(7) in connection with a pre-petition donw payment made for a condominium unit which transaction has not yet closed. This claim will be entitled to priority up the $2,600 threshold only to the extent the closing does not occur.

        **Class 2 – New York City Secured Tax Claims.** Class 2 consists of the Secured Claims of the City of New York.

        **Class 3 – SDF17 Emmons LLC Secured Claim.** Class 3 consists of the Secured Claim of SDF17 Emmons LLC.

        **Class 4 - Unsecured Claims.** Class 4 consists of all claims against the Debtor not treated elsewhere in Plan. Class 4 does not include Administrative Claims, Bankruptcy Fees, Priority Claims or Secured Claims, but does include the deficiency claim, of SDF, if any. The aggregate number of scheduled or filed, undisputed Claims that fall in this class is approximately $_____. This dollar amount does not include the deficiency claim of SDF, which is otherwise included in this Class 4. SDF has agreed to waive distribution from the Unsecured Creditors Fund on account of its deficiency claim.

**TREATMENT OF CLAIMS CLASSIFIED UNDER THE PLAN**

        Articles 4 and 5 of the Plan provide for the treatment of impaired and unimpaired Claims classified in Article 3 of the Plan as follows:

        **Class 1 - Priority Claims.** Subject to the provisions of Article 8 of the Plan with respect to Disputed Claims, and only to the extent a condominium closing with respect to a pre-petition contract of sale does not occur, in full satisfaction, release and discharge of the Priority Claims, the holders of Priority Claims shall receive the following treatment: on the Effective Date, or as soon as practicable after such Claims become Allowed Claims, each holder of a Priority Claim shall receive payment from the Disbursing Agent, (i) in Cash, in the full amount of its Priority Claim, or (ii) as may be otherwise agreed in writing between the Debtor and the holder of such Claim.

        **Class 2 – New York City Secured Tax Claims.** Subject to the provisions of Article 8 of the Plan with respect to Disputed Claims, and only to the extent New York City Secured Tax Claims were not paid by protective advances made by SDF for advances made in accordance with the Interim Financing Order, on the Effective Date, in full satisfaction, release and discharge of the New York City Secured Claims, the holder of the New York City Secured Claims shall receive cash in the full amount of its Allowed Secured Claims.

        **Class 3 – SDF17 Emmons LLC Secured Claim.** ~~Subject to the provisions of Article 8 of the Plan with respect to Disputed Claims, in full satisfaction, release and discharge of the SDF Secured Claim, and after~~<u>After</u> payment is made in full to holders of administrative and priority claims, and the Unsecured Creditors Fund is established in the amount of $100,000, SDF

shall receive payment in the full amount of its secured claim ~~inclusive of~~in the principal sum of $28,000,000 with interest accrued thereon, from the sale proceeds of the Debtor's 49 unsold condominium units, 43 parking spaces and marina unit, which payments shall be applied first to accrued interest and then to the principal amount of the claim, inclusive of pre and post-petition protective advances made pursuant to the existing loan documents. SDF's secured claim shall accrue interest at the rate of 8% per annum. The Reorganized Debtor and SDF shall execute an amended and restated mortgage in recordable form and an amended and restated note in the amount of $28,000,000 which note shall mature 24 months from the Effective Date, subject to extension at the sole and absolute discretion of SDF. On the maturity date, upon the election of SDF, the Reorganized Debtor shall pay the balance due on the note or convey the Property to SDF or its designee in full satisfaction of the SDF Secured Claim.

SDF shall receive no repayment on account of its administrative claim, which claim shall be deemed subordinate to holders of allowed administrative claims, until its secured claim is paid in full.

In the event the sale proceeds are sufficient to satisfy in full SDF's secured claim and subordinate administrative claim, any balance available shall be distributed pro-rata to holders of unsecured claims, including SDF's deficiency claim.

In the event SDF receives net sale proceeds of no less than $25,000,000, it shall supplement the unsecured creditors fund by an additional $50,000; in the event SDF receives net sale proceeds of no less than $27,500,000, it shall supplement the unsecured creditors fund by an additional $50,000; and in the event SDF receives net sale proceeds of no less than $30,000,000, it shall supplement the unsecured creditors fund by an additional $200,000. Notwithstanding anything to the contrary, any sums paid to supplement the unsecured creditors under this paragraph shall not be a credit against or an offset to the amount due and owing under the SDF Secured Claim.

In consideration for the treatment contained herein, and upon receipt by SDF of no less than $~~15,000,000~~23,500,000 of net proceeds from the sale of units, SDF shall release Jacob Pinson's personal guarantee of the SDF loan~~. Upon receipt by SDF of no less than $20,000,000 of net proceeds from the sale of the units, SDF shall release~~ and its mortgage on Jacob Pinson's personal residence.

After the Effective Date, pursuant to the Consulting Agreement with Jacob Pinson, the managing member of Yachad Enterprises, LLC, the managing member of the Debtor, Jacob Pinson will be engaged by the Reorganized Debtor to assist with the development, construction, marketing and sale of the condominium units for a two (2) year period. In connection with the work Pinson performs as a consultant, he shall receive a monthly consulting fee of $10,000 during the two (2) year term of the consulting agreement. The monthly consulting fee shall accrue and shall only be paid upon condominium sales. A copy of the consulting agreement is attached hereto as Exhibit A.

All compensation to Pinson in connection with the Consulting Agreement shall be paid by SDF after receipt of sale proceeds from the sale of units.

In addition, Pinson shall be entitled to certain bonus compensation related to sales at the Property. If SDF receives net proceeds of no less than the aggregate of $15,000,000, Pinson shall be entitled to $100,000; if SDF receives net proceeds of no less than the aggregate of $17,500,000, Pinson shall be entitled to an additional $100,000; if SDF receives net proceeds of no less than the aggregate of $20,000,000, Pinson shall be entitled to an additional $100,000; if SDF receives net proceeds of no less than the aggregate of $22,500,000, Pinson shall be entitled to an additional $100,000; and if SDF receives net proceeds of no less than the aggregate of $25,000,000, Pinson shall be entitled to an additional $100,000. A copy of the consulting agreement is attached hereto as Exhibit A.

All compensation, including accrued compensation to Pinson in connection with the Consulting Agreement shall be paid by SDF after receipt of sale proceeds from sale of units. Notwithstanding the foregoing, Pinson shall be entitled to $10,000 per condominium unit sold regardless of the accrual of payments due under the Consulting Agreement, with a maximum aggregate payment of $240,000. By way of example, if only 4 condominium units are sold and 6 months have elapsed since the Effective Date of the Plan, Pinson shall only be entitled to $40,000 of compensation under the Consulting Agreement.

**Class 4 - Unsecured Claims.** Subject to the provisions of Article 8 of the Plan with respect to Disputed Claims, on the Effective Date, in full satisfaction, release and discharge of all Allowed Unsecured Claims (including deficiency claims), each holder of an Allowed Unsecured Claim shall receive payment in cash equal to its pro rata share of the Unsecured Creditors Fund to be established on the Effective Date in the amount of $100,000 and, in the event net proceeds are sufficient to satisfy the SDF Secured and administrative claim, any balance shall be distributed pro-rata to holders of Allowed Unsecured Claims.

In the event SDF receives net sale proceeds of no less $25,000,000, it shall supplement the unsecured creditors fund by an additional $50,000; in the event SDF receives net sale proceeds of no less than $27,500,000, it shall supplement the unsecured creditors fund by an additional $50,000; and in the event SDF receives net sale proceeds of no less than $30,000,000, it shall supplement the unsecured creditors fund by an additional $200,000.

SDF's deficiency claim, if any, shall be included in Class 4. SDF has agreed to waive any distribution from the Unsecured Creditors Fund on account of its deficiency claim and from any further funding of the unsecured creditors fund unless and until its secured and administrative claims are satisfied in full.

**Class 5 – Allowed Interests.** On the Effective Date, all Allowed Interests shall be extinguished.

**TREATMENT OF NON-CLASSIFIED CLAIMS**

Pursuant to section 1123(a)(1) of the Bankruptcy Code, the Plan does not classify Administrative Claims entitled to priority treatment under section 507(a)(1) of the Bankruptcy Code or Claims of Governmental Units entitled to priority pursuant to section 507(a)(8) of the Bankruptcy Code. Article 2 of the Plan provides for the manner of treatment of such non-classified Claims.

**Administrative Claims.** Administrative Claims are the costs and expenses of administration of this Case, allowable under section 503(b) of the Bankruptcy Code, other than Bankruptcy Fees. Administrative Claims include Claims for the provision of goods and services to the Debtor after the Petition Date, the liabilities incurred in the ordinary course of the Debtor's business (other than claims of governmental units for taxes or interest or penalties related to such taxes) after the Petition Date, Claims of professionals, such as attorneys, appraisers, and accountants, retained pursuant to an order of the Bankruptcy Court, for compensation and reimbursement of expenses under section 330 of the Bankruptcy Code, and tax claims for the period from the Petition Date to the Effective Date of the Plan.

Subject to the provisions of Article 8 of the Plan with respect to Disputed Claims, each Administrative Claim, other than for Taxes and Professional Fees, to the extent not previously paid, shall be paid by the Debtor in Cash in full on (I) the later of (x) the Effective Date, (y) the date payment of such Claim is due under the terms thereof or applicable law, or (z) three business days after such Claim becomes an Administrative Claim or (ii) as may be otherwise mutually agreed in writing between the Debtor and the holder of such Claim. Notwithstanding the foregoing, the administrative claim of SDF in accordance with the Interim Financing Order and any subsequent post-petition financing order shall be paid after the payment of SDF's secured claim in accordance with the Plan.

Article 2 of the Plan sets a final date for the filing of Administrative Claims against the Debtor. The Administrative Bar Date is the first Business Day which is at least 30 days after the Effective Date.

**Professionals' Fees.** Section 330 of the Bankruptcy Code sets the standard for the determination by the Bankruptcy Court of the appropriateness of fees to be awarded to Professionals retained by a Debtor in a case under the Bankruptcy Code. In general, "bankruptcy legal services are entitled to command the same competency of counsel as other cases. In that light, the policy of this section is to compensate attorneys and other professionals serving in a case under title 11 at the same rate as the attorney or other professional would be compensated for performing comparable service other than in a case under title 11." 124 Cong. Rec. H11091 (Daily ed. Sept. 28, 1978).

With respect to Professionals' Fees, the Plan provides that, subject to the approval of compensation and reimbursement of expenses pursuant to sections 330 and 331 of the Bankruptcy Code, the Debtor shall pay the Administrative Claims held by Bankruptcy Professionals as follows:

No later than three days prior to the Confirmation Date, each Professional shall provide the Debtor and SDF with an estimate of the total amount of compensation and expenses for which such Professional expects to seek final compensation pursuant to section 330 of the Bankruptcy Code.  Such estimates shall include estimated sums for the preparation and prosecution of any application for final compensation.  On the Effective Date SDF shall deliver to the Disbursing Agent, and the Disbursing Agent shall segregate sufficient cash to pay all such estimated compensation and expenses in full unless otherwise agreed to by the Debtor, SDF and such Professionals; *provided, however,* that the failure of a Professional to provide such an estimate shall relieve SDF of its obligation to segregate funds for the payment therefore, but shall not relieve the Debtor of the obligation with respect to any allowed compensation and expense reimbursement. Notwithstanding anything to the contrary set forth herein, Professional Fees shall be capped at the amount of $250,000 and SDF shall only be required to pay a~~the~~ sum ~~no greater than $200,000~~of $250,000 for Professional Compensation.

All Professionals shall file final applications for approval of compensation and reimbursement of reasonable and necessary expenses pursuant to section 330 of the Bankruptcy Code no later than the Administrative Bar Date.  Any such application timely filed shall be deemed to be an Administrative Claim, subject to the entry of a Final Order by the Bankruptcy Court approving such application.  Objections to any Professional's application for compensation or reimbursement must be timely filed and served upon such Professional, and upon the Debtor and the Disbursing Agent in accordance with the Bankruptcy Rules.  Any such objection not timely filed and served shall be deemed to have been waived.

**Administrative Tax Claims.**  Subject to the provisions of Article 8 of the Plan with respect to Disputed Claims, and only to the extent not paid by the protective advances made by SDF in accordance with the Interim Financing Order, all Administrative Tax Claims held by Governmental Units shall be paid, in Cash, in full either (i) on or prior to the Effective Date, or (ii) upon such other terms as may be agreed to, in writing, between the Debtor and such Governmental Units on or before the Confirmation Date.

**Priority Tax Claims**.  Except as may be otherwise mutually agreed in writing between the Debtor and such Governmental Units, all Allowed Claims of Governmental United entitled to priority pursuant to section 507(a)(8) of the Bankruptcy Code, shall be paid in Cash, in full, on the Effective Date.

**Bankruptcy Fees.**  All fees and charges assessed against the Debtor or its Estate under section 1930 of title 28 of the United States Code and any applicable interest thereon shall be paid in Cash in full by the Debtor as required by statute, and until the closing, conversion or dismissal of this case, whichever is earlier, the Debtor shall continue to be responsible for the payment of any such fees and charges

DISPUTED CLAIMS AND INTERESTS

Article 8 of the Plan contains a mechanism for resolving disputes concerning the amount of certain Claims or Interests asserted against the Debtor by any Entity.

**Time to Object.**  Unless otherwise ordered by the Bankruptcy Court, objections to the allowance of any Claim may be filed no later than the later to occur of (i) 30 days after the Effective Date or (ii) 30 days after the date proof of such Claim is filed. Until the earlier of (i) the filing of an objection to a Proof of Claim or (ii) the last date to file objections to Claims as established by the Plan or by Final Order, Claims shall be deemed to be Disputed in their entirety if, (I) the amount specified in a Proof of Claim exceeds the amount of any corresponding Claim listed in the Schedules; (ii) any corresponding Claim listed in the Schedules has been scheduled as disputed, contingent or unliquidated; or (iii) no corresponding Claim has been listed in the Schedules.

## DISTRIBUTIONS UNDER THE PLAN

Article 8 contains provisions governing the making of distributions on account of Claims.  In general, any payments, distributions or other performance to be made pursuant to the Plan on account of any Allowed Claim shall be deemed to be timely made if made on or within five days following the later of (i) the Effective Date or (ii) the expiration of any applicable objection deadline with respect to Disputed Claims or (iii) such other times provided in the Plan.  All Cash payments to be made by the Debtor pursuant to the Plan shall be made by check drawn on a domestic bank.  To the extent that any distribution is not paid on the Effective Date, funds in an amount necessary to satisfy any such unpaid claim shall be maintained in an escrow account for distribution thereafter.

**Disbursing Agent.**  The Debtor's counsel shall be the Disbursing Agent to make distributions under the Plan.  Pursuant to the terms of the Plan, the Disbursing Agent shall post a bond in an amount to be agreed upon by the Debtor and the United States Trustee, or as shall be authorized by the Bankruptcy Court.  The Disbursing Agent shall be entitled to compensation for services rendered under the Plan at its customary fee and reimbursement of all expenses incurred in the performance of its duties.  After the Effective Date, the Plan Administrator shall be the Disbursing Agent.

Distributions shall be made: (1) at the addresses set forth on the Proofs of Claim filed by such holders; (2) at the addresses set forth in any written notices of address changes delivered to the Disbursing Agent after the date of any related Proof of Claim; or (3) at the address reflected in the Schedules if no Proof of Claim is filed and the Disbursing Agent has not received a written notice of a change of address.  If the distribution to the holder of any Claim is returned to the Disbursing Agent as undeliverable, no further distribution shall be made to such holder unless and until the Disbursing Agent is notified in writing of such holder's then current address.  The Debtor shall not be required to attempt to locate any holder of an Allowed Claim.

## UNCLAIMED DISTRIBUTIONS

Any Cash or other property to be distributed under the Plan shall revert to the Debtor if it is not claimed by the Entity entitled thereto before the later of (i) one year after the Effective Date or (ii) one year after an Order allowing the Claim of that Entity becomes a Final Order, and such Entity's claim shall be deemed to be reduced to zero.

### DISTRIBUTIONS WITH RESPECT TO DISPUTED CLAIMS

During the pendency of any objection to any Claim, no distribution under the Plan will be made to the holder of such Claim. However, there will be set aside and reserved on behalf of such disputed Claim such cash or property as the holder thereof would be entitled to receive in the event such Claim was an Allowed Claim on the date of such distribution. The Debtor may seek an order of the Bankruptcy Court estimating or limiting the amount of Cash or property that must be deposited in respect of any such disputed Claims. Cash held in reserve for disputed Claims will be held in trust for the benefit of the holders of such Claims.

Within 15 days after the entry of a Final Order resolving an objection to a Disputed Claim, the Disbursing Agent shall distribute all Cash or other property, including any interest, dividends or proceeds thereof, to which a holder is then entitled with respect to any formerly Disputed Claim that has become an Allowed Claim. To the extent practicable, the Disbursing Agent shall hold such cash in a segregated account in accordance with section 345 of the Bankruptcy Code, and may invest any cash or other property segregated on account of a Disputed Claim, Disputed Interest, undeliverable distribution, or any proceeds thereof; however, the Disbursing Agent shall be under no obligation to so invest such Cash or proceeds and shall have no liability to any party for any investment made or any omission to invest such Cash, other property or proceeds. Any segregated amounts remaining after all Disputed Claims have been resolved will be retained by Debtor.

### SURRENDER OF INSTRUMENTS

Notwithstanding the foregoing, no Creditor that holds a note or other instrument of the Debtor evidencing such Creditor's Claim may receive any distribution with respect to such Claim unless and until the note or other instrument evidencing such Claim is surrendered pursuant to the provisions of section 8.11 of the Plan. That section also contains specific provisions governing lost, stolen, or mutilated notes and instruments, including the requirement that reasonable indemnification be provided to the Disbursing Agent for such exchange.

### COMPLIANCE WITH TAX REQUIREMENTS

In connection with the Plan, the Disbursing Agent shall comply with all withholding and reporting requirements imposed by federal, state and local taxing authorities and distributions under the Plan shall be subject to such withholding and reporting requirements.

## EFFECTIVE DATE

The Effective Date of the Plan shall be the first business day after the Confirmation Order becomes a final order, provided, however that pursuant to Section 8.2 of the Plan, payments, distributions or other performance to be made pursuant to the Plan on account of any claim shall be deemed to be timely made if made on or within five (5) business days following the later of (i) the Effective Date or (ii) the expiration of any applicable objection deadline with respect to such claim or (iii) such other time as provided in the Plan.

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Except for contracts to purchase condominium units, on the Effective Date, all Executory Contracts and Unexpired Leases shall be deemed rejected.

**Rejection Claims**. Allowed Claims arising from the rejection of any Executory Contract or Unexpired Lease pursuant to section 6.1 of the Plan shall be treated as Unsecured Claims.

A Proof of Claim with respect to any Unsecured Claim for damages arising from the rejection of an Executory Contract or Unexpired Lease pursuant to section 6.1 of the Plan shall not be timely filed unless it is filed with the Bankruptcy Court and served so that it is received by the Debtor and the Disbursing Agent within 30 days after the earlier of (i) the date of entry of a Final Order approving such rejection (unless such Final Order expressly provides a Bar Date with respect to such Claim, in which event no Proof of Claim with respect to such Claim shall be deemed timely unless it is filed with the Bankruptcy Court and served in the manner provided in such Final Order), or (ii) the Confirmation Date.  Any such Claim not timely filed and served shall be forever barred from assertion and may not be enforced against the property of the Estate, the Debtor, the Disbursing Agent, or its successors or its Property.

## VESTING OF ASSETS

Except as otherwise provided in the Plan, and except for the SDF17 Emmons Secured Claim and the liens securing the SDF17 Emmons Secured Claim which shall remain in full force and effect on and after the Effective Date, on the Effective Date all of the assets and properties of the Estate shall vest in the Reorganized Debtor, free and clear of all Liens, Claims and encumbrances. On the Effective Date any and all Liens, Claims and encumbrances that have not been expressly preserved under the Plan shall be deemed extinguished as of such date.  Following the Effective Date the Reorganized Debtor may operate, buy, use, acquire, and dispose of the property of the Estate and may settle and compromise any claims, interests and causes of action in accordance with the provisions of the Bankruptcy Code and the Bankruptcy Rules.

## FUNDING

The Plan will be funded by the sale proceeds in conjunction with the amounts to be contributed by SDF to satisfy priority and administrative claims and establish the Unsecured Creditors Fund.

The Debtor shall take all necessary steps and perform all acts to consummate the terms and conditions for the Plan. The Confirmation Order shall contain appropriate provisions consistent with section 1142 of the Bankruptcy Code, directing the Debtor and any other necessary party to execute or deliver or to join in the extension or delivery of any instrument required to affect the Plan or to perform any act necessary to consummate the Plan.

Except as set forth elsewhere in the Plan, all payments required to be made under the Plan shall be made by the Disbursing Agent for disbursement in accordance with the terms of the Plan.

## PRESERVATION OF RIGHTS OF ACTION

Except as otherwise provided herein or in any contract, instrument, release or other agreement entered into in connection with the Plan, the Debtor shall retain, and in accordance with its determination of the best interest of the estate, may enforce any claims, rights and causes of action (i) arising under sections 544 through 550 of the Bankruptcy Code or (ii) belonging to the Debtor as of the Petition Date, or the Estate, and arising under any provision of state or federal law, or any theory of statutory or common law or equity.

Notwithstanding any provision of the Plan to the contrary, definitions and descriptions contained herein respecting pre-Petition Date documents, agreements or claims are provided solely for the purpose of identification and classification thereof and do not constitute an admission by the Debtor of the existence, validity, allowance, or amount of any such claim, document or agreement. The Debtor expressly reserves the right to challenge the existence, validity, allowance, or amount of any such claim, document or agreement.

## TRANSFER TAXES

Pursuant to section 1146(a) of the Bankruptcy Code, the initial issuance, transfer, or exchange of any security and the making or delivery of any instrument of transfer in connection with or in furtherance of the Plan (including, but not limited to the Transfer Documents) shall be exempt and shall not be subject to tax under any law imposing a Transfer Tax, and, to the extent provided by section 1146, if any, shall not be subject to any state, local or federal law imposing sales tax.  This exemption shall apply to each individual unit sale that occurs after the Effective Date, including without limitation, transfer taxes payable to New York City in accordance with the RPT, transfer taxes payable to New York State in accordance with the TP-584, any mansion tax, and all mortgage recording tax payable by purchasers of respective units.

## MODIFICATION AND REVOCATION OF THE PLAN

The Plan may be altered, amended or modified by the Debtor, at any time before the substantial consummation of the Plan, as provided in sections 1101(a) and 1127 of the Bankruptcy Code and Bankruptcy Rule 3019. Section 1127 of the Bankruptcy Code authorizes the proponent of a plan of reorganization to modify such plan at any time prior to confirmation of the plan so long as the plan, as modified, continues to meet certain technical requirements of sections 1122 and 1123 of the Bankruptcy Code with respect to the classification of Claims and Interests and the contents of a plan. Prior to Confirmation, if a proponent files modifications to a plan, pursuant to section 1127(a) "the plan as modified becomes the plan." No order of the Court is required to modify the Plan under the terms of section 1127(a); however, the proponent of a modification to a plan must comply with section 1125 of the Bankruptcy Code with respect to the plan as modified. In other words, if a modification materially alters the treatment of any Creditor who has accepted the Plan, the Debtor will be required to make additional disclosures to those Creditors whose treatment has been materially and adversely altered and give such Creditors an opportunity to change their votes.

The Debtor may revoke or withdraw the Plan at any time prior to entry of the Confirmation Order. If the Debtor revokes or withdraws the Plan, or if no Confirmation Order is entered, the Plan shall be null and void, and nothing contained in the Plan shall constitute a waiver or release of any Claims by or against the Debtor; or prejudice in any manner the rights of the Debtor in any further proceedings involving the Debtor.

### RETENTION OF JURISDICTION

The Plan contains detailed provisions providing for the retention of jurisdiction by the Bankruptcy Court over the Case for the purposes of, *inter alia,* determining all disputes relating to Claims and other issues presented by or arising under the interpretation, implementation or enforcement of the Plan and to determine all other matters pending on the date of Confirmation.

### RISK FACTORS

Although the Debtor believes that it will be able to meet all of the obligations that it is undertaking pursuant to the Plan there can be no assurance that future events will not cause the Debtor to default on one or more of its obligations under the Plan or that all of the condominium units will be sold.

## CONFIRMATION OF THE PLAN

All distributions to Creditors are contingent on the Plan being confirmed by this Court. Otherwise, the Debtor is not obligated, in any way, to make the payments required hereunder.

### RISK OF SUBSEQUENT REORGANIZATION OR LIQUIDATION

Although the Debtor believes that the confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization of the Debtor, there can be no assurance that such liquidation will not occur or that the need for such financial reorganization will not arise.

## VOTING INSTRUCTIONS

A Creditor who is entitled to vote may accept or reject the Plan by executing and returning to the Balloting Agent (as defined below) the ballot (a "Ballot") that was sent out with this Disclosure Statement. See "VOTING INSTRUCTIONS -- Who May Vote." The following instructions govern the time and manner for filing Ballots accepting or rejecting the Plan, withdrawing or revoking a previously filed acceptance or rejection, who may file a Ballot, and procedures for determining the validity or invalidity of any Ballot received by the Balloting Agent.

### DEADLINE FOR RECEIPT OF BALLOTS

The solicitation period for votes accepting or rejecting the Plan will expire at 5:00 p.m., Eastern Standard Time, _____, 2013 (the "Voting Deadline"). A Ballot accepting or rejecting the Plan must be received no later than that date and time or it will not be counted in connection with the Confirmation of the Plan or any modification thereof.

### BALLOTING AGENT

All votes to accept or reject the Plan must be cast by using the Ballot. Executed Ballots should be returned by _____, 2013 at 5:00 p.m. to:

> Robinson Brog Leinwand Greene Genovese & Gluck P.C.
> 875 Third Avenue
> 9th Floor
> New York, New York 10022
> Attn: Lori A. Schwartz, Esq.

(the "Balloting Agent"). A Creditor entitled to vote who has not received a Ballot, or whose Ballot has been lost, stolen or destroyed, may contact the Balloting Agent at the address indicated above, or call Lori A. Schwartz at (212) 603-6334 to receive a replacement Ballot.

### WHO MAY VOTE - IN GENERAL

Claims in Classes 3 and 4 are impaired under the Plan. Holders of Claims in Classes 3 and 4 are being solicited and are entitled to vote to accept or reject the Plan. Claims in Classes 1 and 2 are not impaired by the Plan and are deemed to have accepted the Plan. Allowed Interests in Class 5 are impaired under the Plan and are deemed to reject the Plan.

{00618348.DOC;1 }

**Ballots Executed in a Representative or Fiduciary Capacity**.  Ballots executed by Debtor, executors, administrators, guardians, attorneys-in-fact, officers of corporations or others acting in a fiduciary or representative capacity, must indicate the capacity in which such person executed the Ballot and, unless otherwise determined by the Debtor, must submit proper evidence satisfactory to the Debtor of their authority to so act.

**Voting Multiple Claims**.  A single form of ballot is provided for each Class of Claims.  Any Person who holds Claims in more than one Class is required to vote separately with respect to each Class in which such Person holds Claims.  However, any Person who holds more than one Claim in one particular Class will be deemed to hold only a single Claim in such Class in the aggregate amount of all Allowed Claims in such Class held by such Person.  Thus each Person need complete only one ballot for each Class.

DEFECTS OR IRREGULARITIES

**ANY EXECUTED AND TIMELY FILED BALLOT WHICH DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN SHALL BE DEEMED TO BE AN ACCEPTANCE OF THE PLAN.**

Where more than one timely and properly completed Ballot is received, the Ballot which bears the latest date will be counted.

The Debtor reserves the right to waive any defects or irregularities or conditions of delivery as to any particular Ballot.  Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured prior to the deadline for filing timely Ballots.  Neither the Debtor, the Balloting Agent, nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots, nor will any of them incur any liability for failure to provide such notification.  All questions as to the validity, form, eligibility (including the time of receipt), acceptance and revocation or withdrawal of Ballots will be determined by the Bankruptcy Court, upon motion and upon such notice and hearing as is appropriate under the circumstances.  Unless otherwise directed by the Bankruptcy Court, delivery of Ballots will not be deemed to have been made until such irregularities have been cured or waived.  Ballots as to which any irregularities have not been cured or waived will not be counted toward the acceptance or rejection of the Plan.

REVOCATION OF PREVIOUSLY FILED ACCEPTANCES OR REJECTIONS

Any Creditor who has delivered a valid Ballot for the acceptance or rejection of the Plan may withdraw such acceptance or rejection by delivering a written notice of withdrawal to the Balloting Agent at any time prior to the Voting Deadline.

A notice of withdrawal, to be valid, must (i) describe the Claim, as the case may be, if appropriate, represented by such Claim, (ii) be signed by the Creditor in the same manner as the

{00618348.DOC;1 }

Ballot was signed and (iii) be received by the Balloting Agent on or before the Voting Deadline. The Debtor reserves the absolute right to contest the validity of any such withdrawals of Ballots.

**ACCEPTANCE AND CONFIRMATION**

**CONFIRMATION HEARING**

The Bankruptcy Code requires that the Bankruptcy Court, after notice, hold a hearing to consider confirmation of the Plan. The Confirmation Hearing is scheduled to commence on _____, 2013, at __:___ a.m. in the United States Bankruptcy Court, Eastern District of New York, 271 Cadman Plaza East, Brooklyn, New York 11201. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement made at the Confirmation Hearing.

Any party in interest may object to Confirmation of the Plan by filing a written objection, setting forth their identity and standing and the facts and authorities upon which any objection is based, in the Office of the Clerk of the Bankruptcy Court, no later than the deadline fixed by the Court and by delivering a courtesy copy to the Chambers of the presiding judge. Copies of all objections must also be served so that they are received, as required by the Court upon (i) Robinson Brog Leinwand Greene Genovese & Gluck P.C., 875 Third Avenue, 9th Fl., New York, New York 10022, Attn.: Lori A. Schwartz, Esq., and (ii) the Office of the United States Trustee, 271 Cadman Plaza East, Brooklyn, New York 11201, Attn: Marylou Martin, Esq. Any objection that is not timely filed and served as required by any order of this Court, will not be considered by this Court at the Confirmation Hearing.

**REQUIREMENTS FOR CONFIRMATION**

At the Confirmation Hearing, the Bankruptcy Court will determine whether the requirements of section 1129 of the Bankruptcy Code have been satisfied, in which event the Bankruptcy Court will enter an order confirming the Plan. These requirements include determinations by the Bankruptcy Court that: (i) the Plan has classified Claims and Interests in a permissible manner, (ii) the contents of the Plan comply with various technical requirements of the Bankruptcy Code, (iii) the Debtor has proposed the Plan in good faith, (iv) the Debtor has made disclosures concerning the Plan that are adequate and include information concerning all payments made or promised in connection with the Plan and the Case, (v) the Plan is in the "best interest" of all Creditors, (vi) the Plan is feasible, and (vii) the Plan has been accepted by the requisite number and amount of Creditors in each Class entitled to vote on the Plan, or that the Plan may be confirmed without such acceptances. The Debtor believes that all of these conditions have been or will be met prior to the Confirmation Hearing.

**Best Interest Test.** The so-called "best interest" test requires that each impaired Creditor and impaired Interest Holder either (a) accepts the Plan or (b) receives or retains under the Plan property of a value, as of the Effective Date of the Plan, that is not less than the value such

entity would receive or retain if the Debtor was to be liquidated under chapter 7 of the Bankruptcy Code.

To determine what the holders in each Impaired Class of Claims or Interest would receive if the Debtor was liquidated under chapter 7, the Bankruptcy Court must determine the dollar amount that would be generated from the liquidation of the Debtor's assets and property in a chapter 7 liquidation case. The amount that would be available for satisfaction of Allowed Claims against the Debtor would consist of the proceeds resulting from the disposition of the Debtor's assets, augmented by the cash held by the Debtor at the commencement of the chapter 7 case. Such amount would be reduced by the amount of any Claim or Claims secured by the Debtor's assets, the costs and expenses of the liquidation, and such additional Administrative Claims and Priority Claims that may have accrued. Such value is then juxtaposed against the amount creditors are receiving under the Plan to determine if the value each impaired creditor is receiving is the same or more than such creditor would receive from a chapter 7 liquidation on the Confirmation Date.

The costs of liquidation under chapter 7 would become Administrative Claims with the highest priority against the proceeds of liquidation. Such costs would include the fees payable to a chapter 7 Trustee, as well as those which might be payable to attorneys, financial advisors, appraisers, accountants and other professionals that such a Trustee may engage to assist in the liquidation. In addition, chapter 7 costs would include any liabilities incurred or assumed pursuant to the transactions necessary to effectuate the liquidation. Moreover, claims entitled to administrative priority may arise by reason of any breach or rejection of any executory contracts entered into by the Debtor during the pendency of the Case in chapter 11.

After satisfying Administrative Claims arising in the course of the chapter 7 liquidation, the proceeds of the liquidation would then be payable to satisfy any unpaid expenses incurred during the time the Case was pending under chapter 11, including compensation for attorneys, financial advisors, appraisers, accountants and other professionals retained by the Debtor or any official committee appointed pursuant to section 1102 of the Bankruptcy Code.

After consideration of the effects that a chapter 7 liquidation would have on the proceeds available for distribution including (i) the increased costs and expenses of a chapter 7 liquidation arising from fees payable to a Trustee in bankruptcy and professional advisors to such Trustee, (ii) the erosion in value of the Debtor's assets in a chapter 7 case in the context of the expeditious liquidation required under chapter 7 and the "forced sale" atmosphere that would prevail, and (iii) the potential increases in Claims which would be satisfied on a priority basis or on a parity with the Claims of general Unsecured Creditors, and (iv) the substantial amount of the SDF secured claim, which, the Debtor believes exceeds the value of the Property in its current condition, the Debtor believes that holders of Unsecured Claims would not receive any distribution on account of their claims. Rather, there would be insufficient funds to satisfy chapter 7 trustee fees and the full amount of the SDF secured claim.

**Liquidation Analysis.**  The Debtor has concluded that the Plan provides to each Creditor recovery with a present value at least equal to the present value of the distribution which such person would receive if the Debtor was liquidated under chapter 7 of the Bankruptcy Code. The Plan generally provides for the payment of the Debtor's outstanding indebtedness to SDF over time via the sale of individual condominium units, with the consent of SDF, its senior secured creditor, and the establishing of the Unsecured Creditors Fund on the Effective Date for pro rata distribution to the Debtor's unsecured creditors.  Additional funds for distribution to unsecured creditors may become available under the Plan in the event net sale proceeds exceed $25,000,000.

The Debtor believes that in the event its assets were sold in a chapter 7 liquidation, all of the proceeds would go to pay priority tax claims, chapter 7 administrative claims, bankruptcy fees, and a lesser portion of the secured claim held by SDF.  In such event, no funds would be remaining for distribution to chapter 11 administrative claims and to unsecured creditors. As such the Debtor believes that no Creditors would receive a distribution in a Chapter 7 case which is greater than the one they may be entitled to under the Plan.

The Debtor further believes that the net effect of a conversion of this case to chapter 7 would be to (i) increase the administrative expenses of the estate and (ii) decrease the funds available for non-administrative creditors.

The liquidation values stated herein assume that all assets of the Debtor would be liquidated in the context of a chapter 7 case and assumes the present values of such liquidation values as of ~~February~~April 1, 2013.  The assumptions utilized in the analysis considered the estimated liquidation value of the assets and estimated amount of Claims that would be allowed, together with an estimate of certain administrative costs and other expenses which would likely result during the liquidation process.  While the Debtor believes the assumptions underlying the Liquidation Analysis are reasonable, the validity of such assumptions may be affected by the occurrence of events, and the existence of conditions not now contemplated or by other factors, many of which will be beyond the control of the Bankruptcy Court, the Debtor and any trustee appointed for the Debtor.  The actual liquidation value of the Debtor may vary from that considered herein and the variations may be material.

The Debtor has assumed that the Property would be sold within six months in a chapter 7 liquidation.  It is assumed that cash proceeds of liquidating the Property would total approximately $23,000,000.00 taking into account the negative impact on values attributed to the chapter 7 process as well as the ongoing repair and construction work required at the Property to restore it to pre-hurricane condition in order to be able to market the condominium units on a going forward basis.

The Debtor believes that the total cash which would be administered in a hypothetical chapter 7 case would aggregate approximately $~~20,000,000.00~~23,000,000.00 representing the proceeds of a liquidation sale of the Property.  Upon consultation with its advisors, the Debtor assumes for the purposes of this analysis that the cash would be distributed as follows:

| | |
|---|---:|
| **Available for distribution** | **$23,000,000** |

**To the payment of:**

| | |
|---|---:|
| Priority Tax Claims | $1,000 |
| Chapter 7 Administrative Claims: | |
|       Chapter 7 trustee commissions and expenses (approximately 3% of $23,000,000) | $690,000 |
|       Chapter 7 trustee's professionals (attorneys, appraisers, auctioneers accountants, etc.) ($75,000) | $75,000 |
|       Other Administrative Claims (including Bankruptcy Fees)[6 7] ($20,000) | $20,000 |
|       SDF Secured Claim | $28,000,000 |
|       Chapter 11 Administrative Claims (attorney's fees and expenses and SDF Administrative claim[7 8]) | $735,391.21922,000 |
|       General Unsecured Claims[8 9] | $41,839,451.30 |

**In a liquidation, there would be insufficient funds to satisfy any claim junior to SDF's secured claim and insufficient funds to satisfy the SDF secured claim in full.**

      While the Plan does not provide for payment in full on account of the secured claims held by SDF, which claim was filed in the amount of $33,094,638.97 and which the Debtor and SDF have agreed to fix in the amount of $28,000,000, the Plan does contemplate payment to more classes of creditors than in a chapter 7 liquidation where there would insufficient funds to satisfy the SDF secured claim in full and no funds available for creditors in any junior classes of claims.

---

[6 7]    Post-petition tax claims have not been considered for the purpose of this analysis. Such claims would further reduce the amount available for distribution to Unsecured Creditors.

[7 8]    SDF Administrative Claim amount as of 2 4/1/13 12 13 is $585,391.21 approximately $672,000, but may increase in the event further advances are made in connection with the Debtor's request for interim and/or final financing.

[8 9]    Subject to motion objecting to claims. Amount does not include amount of SDF deficiency claim, which is estimated to be not less than $5,000,000.

Accordingly, the Debtor believes that the Plan provides Creditors with at least as much as they would be entitled to receive in a chapter 7 liquidation. In addition, the Plan provides for vital repair work at the Property which it otherwise would be unable to finance.

**Feasibility.** For the Plan to be confirmed, it must be demonstrated that consummation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor. This Plan calls for payment to holders of claims in classes 1, 2 and 4 on the Effective Date. SDF has agreed to accept payment on account of its secured claim over time via the sale of the individual condominium units. In the event of a future default by the Reorganized Debtor, SDF retains all of the rights it has pursuant to its loan documents. Thus the Plan meets the feasibility requirements of the Bankruptcy Code.

**Confirmation With the Acceptance of Each Impaired Class.** The Plan may be confirmed if each impaired Class of Claims accepts the Plan. Classes of Claims which are not impaired are deemed to have accepted the Plan. A Class is impaired if the legal, equitable or contractual rights attaching to the Claims of that Class are modified other than by curing defaults and reinstating maturities or by payment in full in cash.

Holders of Claims impaired by the Plan are entitled to file Ballots accepting or rejecting the Plan. Holders of Claims not impaired by the Plan, are deemed to accept the Plan, and may not vote to accept or reject the Plan. Holders of Claims that will neither receive nor retain any property under the Plan are deemed to reject the Plan.

The Bankruptcy Code defines acceptance of a plan by a Class of Claims as acceptance by the holders of two-thirds in dollar amount and a majority in number of Claims of that Class. Only those Claims, the holders of which actually vote to accept or reject the Plan, are counted for the purpose of determining whether the requisite number and amount of acceptances have been received.

**Confirmation Without the Acceptance of Each Impaired Class**. In the event that any impaired Class of Claims does not accept the Plan, the Bankruptcy Court may nevertheless confirm the Plan at the Debtor's request if (i) all other requirements of section 1129(a) of the Bankruptcy Code are satisfied, (ii) at least one impaired Class of Claims votes to accept the Plan without regard to any vote cast on account of a Claim held by "insiders" (as defined in the Bankruptcy Code) and (iii) as to each impaired Class which has not accepted the Plan, the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such non-accepting Class. The Debtor believes that the Plan is in the best interest of all Creditors and strongly recommends that all parties entitled to vote cast their ballots in favor of accepting the Plan. Nevertheless, out of an excess of caution, pursuant to the Plan, the Debtor has requested that the Court confirm the Plan over the rejection of any non-accepting class in the event all other elements of section 1129(a) are satisfied.

A plan "does not discriminate unfairly" if the legal rights of a non-accepting class are treated in a manner that is consistent with the treatment of other classes whose legal rights are

intertwined with those of the non-accepting class, and no class receives payments in excess of that which it is legally entitled to receive for its Claims. The Debtor believes that under the Plan all classes of Impaired Claims are treated in a manner that is consistent with the treatment of other classes of Claims with which their legal rights are intertwined, if any, and no class of Claims will receive payments or property with an aggregate value greater than the aggregate value of the Allowed Claims in such class. Accordingly, the Debtor believes the Plan does not discriminate unfairly as to any impaired class of Claims.

Whether the Plan is fair and equitable depends upon the application of the so-called "absolute priority rule." Subject to certain exceptions, this rule, codified in section 1129(b)(2) of the Bankruptcy Code, generally requires that an impaired Class of Claims that has not accepted the Plan must be paid in full if a more junior class receives any distribution under the Plan.

With respect to Secured Claims, the absolute priority rule allows the confirmation of a Plan over the rejection of a class of Secured Claims if the holders of such Claims retain their liens and each holder of a Claim of such class receives on account of such Claim deferred cash payments, totaling at least the allowed amount of such Claim, of a value, as of the Effective Date of the plan, of at least the value of such holder's interest in the property securing its Claim. The Debtor's impaired secured creditor, SDF has provided its consent to the treatment under the Plan to be repaid on account of its secured claim and administrative claim over time and after payments to other classes of claims are made on the Effective Date.

With respect to Unsecured Claims, the absolute priority rule allows the confirmation of a Plan over the rejection of a class of Unsecured Claims if the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the Plan on account of such junior claim or interest any property. There are no classes junior to the class of Unsecured Claims in this case that are retaining any property as Allowed Interests in Class 5 will be extinguished as of the Effective Date.

If the Plan is rejected by Classes 3 or 4, the Debtor requests that the Plan be confirmed under section 1129(b).

## EFFECT OF CONFIRMATION

## INJUNCTION

Except (i) as otherwise provided in the Plan, (ii) as otherwise provided under Final Order entered by the Bankruptcy Court or (iii) with respect to the Debtor's obligations under the Plan, the entry of the Confirmation Order shall forever stay, restrain and permanently enjoin with respect to any claim or interest held as of the Effective Date, (y) the commencement or continuation of any action, the employment of process, or any act to collect, enforce, attach, recover or offset from the Property or property of the Estate that has been, or is to be, distributed under the Plan, and (z) the creation, perfection or enforcement of any lien or encumbrance against the Property or property of the Estate that has been, or is to be, distributed under the Plan.

Except as otherwise provided in the Confirmation Order, the entry of the Confirmation Order shall constitute an injunction against the commencement or continuation of any action, the employment of process, or any act, to collect, recover or offset, from the Debtor, or from the Property or property of the Estate, any claim, obligation or debt that was held by any person or entity as of the Effective Date except pursuant to the terms of the Plan.

## RELEASE

Except as otherwise provided in the Plan, upon the Effective Date, in consideration of the Cash and other property to be distributed to or on behalf of the holders of Claims and Interests under the Plan, the Plan shall be deemed to resolve all disputes and constitute a settlement and release, between and among the Debtor, on the one hand, and each Creditor and Interest Holder, on the other, from any claim or liability, whether legal, equitable, contractual, secured, unsecured, liquidated, unliquidated, disputed, undisputed, matured, unmatured, fixed or contingent, known or unknown, that the Debtor, its Creditors or Interest Holders ever had or now have through the Effective Date in connection with their Claim or Interest (including, without limitation, any claims the Debtor may assert on its own behalf or on behalf of Creditors or Interest Holders pursuant to sections 510 and 542 through 553 of the Bankruptcy Code, any claims Creditors or Interest Holders may have asserted derivatively on behalf of the Debtor absent bankruptcy, any claims based on the conduct of the Debtor's business affairs prior or subsequent to the commencement of the Case or any claims based on the negotiation, submission and confirmation of the Plan), provided however that nothing in the Plan or the Confirmation Order shall effect a release of any claim for any debt owed to the United States Government arising under the Internal Revenue Code; any state, city or municipality arising under any state, city or municipal tax code; any environmental laws or any criminal laws of the United States or any state, city or municipality. Nothing in the Confirmation Order or the Plan shall enjoin the United States or any state or local authority from bringing any claim, suit, action or other proceedings against the Released

Entities for any claim, suit or action arising under the Internal Revenue Code, any state, city or municipal tax code, the environmental laws or any criminal laws of the United States or any state, city or municipality.  Nothing in the Confirmation Order or the Plan shall exculpate any party from any liability to the United States Government or any of its agencies or any state, city or municipality arising under the Internal Revenue Code, any state, city or municipal tax code, the environmental laws or any criminal laws of the United States or any state.

LIMITATION OF LIABILITY

Section 1125(e) of the Bankruptcy Code, commonly referred to as the "safe harbor," protects persons acting in good faith, from civil claims arising in connection with solicitations of acceptances of plans of reorganization or participating in the offer, issuance, sale or purchase of a security under the Plan.  Pursuant to section 1125(e), as set forth in Article 9 of the Plan, neither the Debtor, nor any of its officers, directors, members, general partners, managers or employees (acting in such capacity), nor any professional person employed by any of them shall have or incur any liability to any entity for any action taken or omitted to be taken in connection with or related to the formulation, preparation, dissemination, Confirmation or consummation of the Plan, the Disclosure Statement or any contract, instrument, release or other agreement or document created or entered into, or any other action taken or omitted to be taken in connection with the Plan except in the case of fraud, gross negligence, willful misconduct, malpractice, breach of fiduciary duty, criminal conduct, unauthorized use of confidential information that causes damages, or ultra vires acts.  Nothing contained herein shall limit the liability of the Debtor's professionals pursuant to Rule 1.8(h)(1) of the New York State Rules of Professional Conduct.  From and after the Effective Date, a copy of the Confirmation Order and the Plan shall constitute, and may be submitted as, a complete defense to any claim or liability released pursuant to Article 9 of the Plan.

ALTERNATIVES TO THE PLAN

If the Plan is not confirmed by the Bankruptcy Court the alternatives may include (a) liquidation of the Debtor under chapter 7 of the Bankruptcy Code; (b) the formulation, promulgation and confirmation of an alternative plan of reorganization; or (c) dismissal of the Debtor's case.  In the case of dismissal, SDF would be allowed to proceed with a foreclosure sale of the Debtor's Property.

The Debtor believes that the Plan provides a recovery to all Creditors equal to or greater than would be obtainable in a chapter 7 liquidation.  See Liquidation Analysis.

The Debtor believes that the Plan enables Creditors to realize the most value under the circumstances.

CERTAIN FEDERAL INCOME TAX CONSEQUENCES

The following summary of certain U.S. Federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon the particular circumstances pertaining to each holder of an Allowed Claim. Each holder of an Allowed Claim is urged to consult his own tax advisors. This summary does not cover all potential U.S. federal income tax consequences that could possible arise under the Plan and does not address the Plan's U.S. federal income tax consequences for any holder of an Allowed Claim that is a partnership (or other pass-through entity) or otherwise subject to special tax rules.

The Debtor has not requested any ruling from the Internal Revenue Service or any other taxing authority with respect to such matters nor will the Debtor, with respect to the federal income tax consequences of the Plan, obtain any opinion of counsel. Consequently, there can be no assurance that the treatment set forth in the following discussion will be accepted by the IRS. The Debtor offers no statements or opinions that are to be relied upon by the creditors as to the treatment of creditors' claims under the Plan. Matters not discussed in this Disclosure Statement may affect the tax consequences of the Plan on any particular holder of a Claim or Equity Interest

This summary is based upon the laws in effect on the date of this Disclosure Statement and existing judicial and administrative interpretations thereof, all of which are subject to change, possibly with retroactive effect. Holders of Allowed Claims should consult their own tax advisors as to the Plan's specific federal, state, local and foreign income and other tax consequences.

The tax consequences to Creditor and Interest Holders will differ and will depend on factors specific to each Creditor and Interest Holder, including but not limited to: (i) whether the Claim or Interest (or portion thereof) constitutes a claim for principal or interest; (ii) the origin of the Claim or Interest; (iii) the type of consideration received by the Creditor and Interest Holder in exchange for the Claim; (iv) whether the Creditor and Interest Holder is a United States person or foreign person for tax purposes; (v) whether the Creditor and Interest Holder reports income on the accrual or cash basis method; (vi) whether the Creditor and Interest Holder has taken a bad debt deduction or otherwise recognized loss with respect to a Claim.

**THERE ARE MANY FACTORS WHICH WILL DETERMINE THE TAX CONSEQUENCES TO EACH CREDITOR AND INTEREST HOLDER. FURTHERMORE, THE TAX CONSEQUENCES OF THE PLAN ARE COMPLEX, AND IN SOME CASES, UNCERTAIN. THEREFORE IT IS IMPORTANT THAT EACH CREDITOR AND INTEREST HOLDER OBTAIN HIS, HER OR ITS OWN TAX**

ADVICE REGARDING THE TAX CONSEQUENCES TO SUCH CREDITOR AND INTEREST HOLDER AS A RESULT OF THE PLAN.

THE DISCUSSION HEREIN IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY CREDITOR AND INTEREST HOLDER FOR THE PURPOSE OF AVOIDING TAX PENALTIES THAT MAY BE IMPOSED ON A TAX PAYER. THE DISCUSSION HEREIN WAS WRITTEN TO SUPPORT THE TRANSACTIONS DESCRIBED IN THIS DISCLOSURE STATEMENT. EACH CREDITOR AND INTEREST HOLDER SHOULD SEEK ADVICE BASED UPON THE CREDITOR AND INTEREST HOLDER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

### ADDITIONAL INFORMATION

Requests for information and additional copies of this Disclosure Statement, the Ballots and the other materials delivered together herewith and all deliveries, correspondence and questions, as the case may be, relating to the Plan should be directed to (i) the Debtor's counsel, Robinson Brog Leinwand Greene Genovese & Gluck P.C., 875 Third Avenue, 9th Fl., New York, New York 10022, Attn.: Lori A. Schwartz, Esq., (212) 603-6334.

Copies of all pleadings, orders, lists, schedules, proofs of claims or other documents submitted in these cases are on file in the Office of the Clerk of the United States Bankruptcy Court at 271 Cadman Plaza East, Brooklyn, New York 11201, and are available for public inspection Monday through Friday, between the hours of 9:00 a.m. and 4:00 p.m. and are also available for viewing on the Internet at http://www.nyeb.uscourts.gov.

## CONCLUSION

The Debtor believes the Plan is in the best interests of all Creditors and strongly encourages all holders of Claims against the Debtor to vote to accept the Plan and to evidence such acceptance by promptly returning their Ballots to ensure that they will be received not later than 5:00 p.m., Eastern Standard Time, on _____, 2013.

**DATED:**        New York, New York
~~March 1,~~April 5, 2013

EMMONS SHEEPSHEAD BAY DEVELOPMENT LLC
By Yachad Enterprises, LLC, Managing Member

By: /s/ Jacob Pinson _____
        Jacob Pinson, Managing Member

**ROBINSON BROG LEINWAND GREENE
GENOVESE & GLUCK P.C.**
**Attorneys for the Debtor**
875 Third Avenue, 9th Fl.
New York, NY 10022
(212) 603-6300

By: /s/ A. Mitchell Greene _____
**A. Mitchell Greene**

Document comparison by Workshare Professional on Friday, April 05, 2013 1:48:44 PM

| Input: | |
|---|---|
| Document 1 ID | file://X:\CLIDOCS\100203\0000\~VER\5\00606539.DOC |
| Description | 00606539 |
| Document 2 ID | file://X:\CLIDOCS\100203\0000\00606539.DOC |
| Description | 00606539 |
| Rendering set | standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 97 |
| Deletions | 48 |
| Moved from | 1 |
| Moved to | 1 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 147 |