UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF NEW YORK

Case No. 12-46321-ess

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


EMMONS-SHEEPSHEAD BAY DEVELOPMENT LLC,


          Debtor.


- - - - - - - - - - - - - - - - - - - -x


          United States Bankruptcy Court

          271 Cadman Plaza East

          Brooklyn, New York


          June 27, 2013

          4:56 PM


B E F O R E:

HON. ELIZABETH S. STRONG

U.S. BANKRUPTCY JUDGE

1

2 [3] Adjourned Status Conference

3 Adjourned from: 10/16/12 12/20/12 1/8/13 2/26/13 3/5/13 4/11/13

4 5/28/13

5

6 Confirmation Hearing

7

8 [61] Adjourned Motion to Object/Reclassify/Reduce/Expunge

9 Claims: Claim Number(s): 8 and 9 Filed by Arnold Mitchell

10 Greene on behalf of Emmons-Sheepshead Bay Development LLC

11 Adjourned from:  4/11/13 5/28/13

12

13 [62] Adjourned Motion to Object/Reclassify/Reduce/Expunge

14 Claims: Claim Number(s): 10 Filed by Arnold Mitchell Greene on

15 behalf of Emmons-Sheepshead Bay Development LLC

16 Adjourned from:  4/11/13 5/28/13

17

18 [50] Adjourned Motion for 2004 Examination of the Debtor,

19 Emmons Avenue LLC, Jacob Pinson and TD Bank, N.A.  Filed by

20 Alla Kachan on behalf of Albert Dikman, Metropolitan Estates,

21 Inc., Albert Wilk.

22 Adjourned from:  4/2/13 4/11/13 5/28/13

23

24

25

1

2  A P P E A R A N C E S :

3  ROBINSON BROG LEINWAND GREENE GENOVESE & GLUCK P.C.

4        Attorneys for Debtor

5        875 Third Avenue

6        New York, NY 10022

7

8  BY:   LORI A. SCHWARTZ, ESQ.

9

10

11  UNITED STATES DEPARTMENT OF JUSTICE

12        Office of the United States Trustee

13        271 Cadman Plaza East

14        Suite 4529

15        Brooklyn, NY 11201

16

17  BY:   MARYLOU MARTIN, ESQ.

18

19

20

21

22

23

24

25

1

2 LAW OFFICES OF ALLA KACHAN, P.C.

3     Attorney for Metropolitan Estates, Inc.

4     415 Brighton Beach Avenue

5     2nd Floor

6     Brooklyn, NY 11235

7

8 BY:   ALLA KACHAN, ESQ.

9

10

11 KRISS & FEUERSTEIN LLP

12     Attorneys for SDF17 Emmmons LLC

13     360 Lexington Avenue

14     Suite 1200

15     New York, NY 10017

16

17 BY:   JEROLD C. FEUERSTEIN, ESQ.

18

19

20

21

22

23

24

25

GANFER & SHORE, LLP

    Attorneys for The Breakers at Sheepshead Bay Condominium

    360 Lexington Avenue

    14th Floor

    New York, NY 10017


BY:   RICHARD SHORE (TELEPHONICALLY)

Transcribed by:  Keren Berkovitz

eScribers, LLC

700 West 192nd Street, Suite #607

New York, NY 10040

(973)406-2250

operations@escribers.net

1              P R O C E E D I N G S

2              THE CLERK:  Numbers 101 to 106 on the calendar, all

3    matters regarding Emmons-Sheepshead Bay Development; parties in

4    the courtroom and on the telephone.

5              THE COURT:  All right, come on up.

6              MS. SCHWARTZ:  Good afternoon, Judge.  Lori Schwartz,

7    Robinson Brog for the debtor.

8              MS. KACHAN:  Good afternoon, Your Honor.  Alla Kachan

9    on behalf of Metropolitan.

10             THE COURT:  All right.  Thank you.

11             MR. FEUERSTEIN:  Good afternoon, Your Honor.  Jerold

12   Feuerstein on behalf of the secured creditor SDF17 Emmmons LLC.

13             THE COURT:  All right.

14             MS. MARTIN:  Marylou Martin representing the United

15   States Trustee.

16             THE COURT:  Thank you.

17             MR. SHORE:  On the phone, Your Honor.  Richard Shore

18   of Ganfer & Shore representing Breakers at Sheepshead Bay

19   Condominium.

20             THE COURT:  Thank you, we hear you loud and clear.

21   Especially loud, which is good.

22             All right, the day is long, the hour is late, let me

23   hear from debtor's counsel.

24             MS. SCHWARTZ:  Good afternoon, Judge.

25             Judge we have a number of matters on today's calendar,

1  most importantly is the debtor's confirmation hearing.

2  THE COURT:  Yes.

3  MS. SCHWARTZ:  This has become an urgent matter at

4  this point.  At 3:30 this afternoon we were notified by a

5  representative of the secured creditor that without

6  confirmation of the plan that is on file today as-is, they're

7  going to withdraw their funding, they're going to withdraw

8  their support and they're going to pursue whatever remedies are

9  available, whether that be proceeding in a state court for

10  which stay has already been lifted, or filing a creditors'

11  plan.

12  THE COURT:  The matter's on the calendar today and

13  we're ready to proceed today, so I appreciate the urgency that

14  everyone feels.  It is not second, or it could only be second,

15  I suppose, to the Court's own desire to move things along as

16  promptly as possible.  I will just note in a general way that

17  the -- you -- here in this judicial forum, the idea that a

18  party might consider or suggest that it would set an arbitrary

19  time limit on when a Court must decide something by, would seem

20  to me inappropriately usurping the prerogative of the Court, to

21  manage a long calendar and pay appropriate respect to each and

22  all of the matters and parties before it, so I'm grateful that

23  nothing like that has been invoked.  Let's proceed.

24  MS. SCHWARTZ:  Okay, Judge.  We hear you loud and

25  clear.

1          THE COURT:  Thank you.

2          MS. SCHWARTZ:  Judge, obviously, the parties have been

3     working to try to reach a resolution -- when I say the parties,

4     I mean the debtor and Metropolitan, who's the creditor who's

5     taken a pretty active role in objecting to the various

6     scenarios that have been proposed in the debtor's various

7     plans.  Those settlement negotiations have just broken down to

8     a point where they're not -- it's not feasible to resurrect

9     them, and we are prepared at this juncture to go forward with

10    confirmation.

11         The objection deadline with respect to the plan and

12    the ballots was June 20th.  In response to that objection

13    deadline, we did not receive any objections.  We received

14    several ballots.  Both voting classes did vote to accept the

15    plan, and we have filed a ballot certification as well as an

16    affirmation in support of confirmation that was filed on

17    Monday, June 24th.  The Court may have seen that last evening

18    the Metropolitan Group did file a ballot, also filed an

19    objection to confirmation and a motion to compel with respect

20    to discovery, which is a somewhat unrelated matter having to do

21    with the pending claims objections.

22         Judge, it's the debtor's position that those

23    objections are not timely, the ballot is not timely, and

24    frankly, that they shouldn't be considered at this juncture.

25    Metropolitan has been actively engaged and is aware of all of

1  the deadlines.  The debtor has complied with the deadlines set

2  forth by this Court.  And we don't feel that the debtor should

3  be penalized for doing what it's supposed to be doing in trying

4  to move the case along.

5          I would further suggest, Judge that the confirmation

6  objection that was filed by Ms. Kachan does not set forth

7  anything new, anything different, from the prior objection she

8  filed to the disclosure statement which was overruled at the

9  time the disclosure statement was approved.  It also contains

10  statements that really are a misreading of the debtor's plan

11  with respect to post-confirmation management of the debtor, as

12  well as with respect to the feasibility of the plan.

13          THE COURT:  All right.  Staying for the moment with

14  status, but understanding that confirmation is central to

15  status, would anyone else like to be heard on the status?

16          MS. KACHAN:  Yes, Your Honor.

17          THE COURT:  Ms. Martin, may I hear from you first?  I

18  always like to hear from the Office of the United States

19  Trustee, Ms. Kachan; I know you'll appreciate that.

20          MS. MARTIN:  Your Honor, the only matter we consider

21  of importance with regard to status is the debtor currently

22  owes 1,300 dollars in quarterly fees, we've made requests.  We

23  have been advised today that the money is currently being held,

24  and perhaps Ms. Schwartz can advise the Court of what she

25  advised me this morning.

1       MS. SCHWARTZ:  The money for Trustee fees is going to

2  be advanced by the secured creditor with respect to the other

3  monies they're advancing in support of the plan.  That includes

4  the unsecured creditors' funds and the payment to the other

5  required effective date payments pursuant to the plan, the

6  secured tax claims, administrative fees, United States Trustee

7  fees, and the unsecured creditors' fund.

8       THE COURT:  Okay.  All right, Ms. Kachan.

9       MS. KACHAN:  Yes.

10      Your Honor, with regard to confirmation and with

11  regard to deadlines, as Your Honor knows --

12      THE COURT:  Just speak on status at first, and

13  anything beyond confirmation as to status.

14      MS. KACHAN:  Nothing beyond confirmation and --

15      THE COURT:  All right, then please proceed.

16      MS. KACHAN:  -- and discovery.

17      THE COURT:  All right, well, let's -- perhaps then it

18  makes sense then to turn to the question of confirmation.

19  Let's go back to the debtor.  I invite you to review the

20  elements of confirmation.  I take it that you're prepared to

21  proceed today, and the Court is prepared to proceed as well.

22      MS. SCHWARTZ:  Thank you, Judge.

23      Judge, the debtor has filed a ballot certification and

24  an affirmation of its principal, Jacob Pinson, who is the

25  principal of Yachad Enterprises, that is the managing member of

1    the debtor.  Mr. Pinson is in the courtroom today.  The

2    document numbers I am referring to for the ballot certification

3    is document number 108 and for the confirmation affirmation is

4    document number 109.  We would request that those documents be

5    admitted into evidence and we be authorized to rely on both of

6    those documents in support of confirmation.

7              THE COURT:  Any objection to the reliance upon those

8    documents?

9              MS. KACHAN:  No, Your Honor.

10             THE COURT:  No response, please proceed.

11   (Ballot certification was hereby received into evidence as

12   Debtor's Exhibit, as of this date.)

13   (Confirmation affirmation was hereby received into evidence as

14   Debtor's Exhibit, as of this date.)

15             MS. SCHWARTZ:  Judge, as set forth in the ballot

16   certification the plan has been accepted by the Class 3

17   impaired secured creditor SDF17 as well as the Class 4

18   unsecured creditor class.  As set forth in the confirmation

19   affirmation, pursuant to an order entered on April 13th, 2013,

20   this Court approved the debtor's second amended disclosure

21   statement.  Pursuant to that disclosure statement order we

22   served the plan, the disclosure statement, scheduling order and

23   the appropriate ballot or notification of nonvoting status on

24   all parties, and filed an affidavit of service which was filed

25   on the electronic docket of this case, reflecting that service

1      was made in a timely manner.

2            The disclosure statement order set June 20th, 2013 as

3      the last date for the submission of ballots to vote to accept

4      or reject the plan and for the filing of objections to the plan

5      and scheduled the confirmation hearing for today.  No timely

6      objections were received.

7            Judge, the plan is the votes --

8            MS. KACHAN:  Objection, Your Honor.

9            MS. SCHWARTZ:  -- provides for payments of the New

10     York City secured tax claims, administrative claims, including

11     U.S. Trustee claims, and a funding of 100,000-dollar unsecured

12     creditor fund for pro-rata distribution to holders of allowed

13     unsecured claims.  All of these amounts are being funded by the

14     debtor's secured creditor SDF17.  Any further plan payments,

15     which is with respect to a waterfall where additional funds may

16     be contributed to the unsecured creditor fund, is based upon

17     sale thresholds of the condominium units at the property.

18           Judge, with respect to the plan that is on file, we do

19     submit that it is in the best of the interests of the debtor

20     and its estate and creditors.  As I said before it provides for

21     payment of a substantial amount of claims; it also provides for

22     the secured creditor to continue funding the construction at

23     the property to repair it from the damage that it suffered as a

24     result of Hurricane Sandy, which inures to the benefit of the

25     condominium, as well as to the residents of the condominium,

1  who have been living through this process, and provides the

2  guaranteed fund of 100,000 dollars to the unsecured creditors.

3         Judge, with respect to the impaired Class 5 equity

4  holders, as set forth in the plan, equity is going to be

5  extinguished and is deemed to have rejected the plan.  Post

6  confirmation, the management of the debtor will be in the hands

7  of Jeffery Schwartz, who is the Court-retained real estate

8  counsel to the debtor.  He'll be the plan administrator going

9  forward.  The issue with respect to post-confirmation

10  management, which was set forth in the objection that was filed

11  by the Metropolitan claimants indicates that Jacob Pinson will

12  have some form of managerial role, but that is an incorrect

13  reading of the documents.  The plan is quite clear that post

14  confirmation management is in the hands of Mr. Schwartz.  With

15  respect to the consulting agreement that Mr. Pinson is to

16  become a party to with respect to going-forward sales, that

17  consulting agreement, which was filed with the disclosure

18  statement, is very clear, that he has no binding authority with

19  respect to managerial issues; that he is there simply to

20  consult and assist with going-forward marketing and sales at

21  the property.

22         Judge, as set forth in the confirmation affirmation,

23  the debtor submits the plan complies with the applicable

24  requirements of the Bankruptcy Code including the provisions of

25  Sections 1122, 1123 and 1129 of the Bankruptcy Code.  Barring

1  any questions from Your Honor or from other parties present we

2  would request that plan be confirmed based upon the record of

3  the hearing, the confirmation affirmation and the ballot

4  certification.

5      THE COURT:  All right, let me hear from other

6  proponents of confirmation.

7      MR. FEUERSTEIN:  Your Honor, the secured creditor -- I

8  do have to make this disclosure to the Court.  There was no

9  intention of putting pressure on the Court, or usurping the

10  Court's authority.  The situation is, is that our client went

11  to the property yesterday, went to the property today, and

12  there's some significant flooding and new issues with respect

13  to the property.  As a result thereof, our client had to report

14  back to its investors, and its investors said, we don't know if

15  we want -- we are concerned about funding this plan and we're

16  concerned about moving forward.  Our client's investors came

17  back and said to our client, if the plan is not confirmed by 5

18  o'clock today, then therefore we have no interest in funding

19  this plan, no interest in putting more money into this, and

20  we'll just continue with foreclosure.  As it stands now, the

21  plan is not confirmed by five, I would have to call my client,

22  at this point in time, if the Court would confirm, to see if my

23  client is still interested in funding the plan.

24      I mean, as far as the plan is concerned, assuming our

25  client agrees to it, I mean, I wrote this speech before I spoke

1    with -- before my client came back to me at 3:30, the plan is

2    fair, reasonable, and equitable; it is to the benefit of all

3    creditors.  A very important component of the plan is the fact

4    that it will allow this condominium to survive, and therefore

5    it's equitable, because our client will complete the

6    renovations, enable the sale of units, and the sale of those

7    units will certainly help the condo which is a creditor in this

8    particular case.  And the condo, as far as I know is a

9    proponent of the plan.

10            If our client is forced to foreclose, there'll be no

11    more fun -- there's potentially no more funding of condo fees,

12    there's no more funding potentially of construction, and as a

13    result the plan is certainly in the best interests of all

14    parties, just in the best interests in general, and also

15    satisfying the best interest test, because if our clients do

16    foreclose, the unsecured creditors will get nothing.  But as I

17    said, I suppose we can continue and get the Court, and I'm

18    going to have to go back to my client and say, well, it's after

19    5 o'clock, can you speak to your investors?

20            THE COURT:  Did they specify a time zone?  We did

21    begin the hearing as fast as we could, as we've begun every

22    hearing today as fast as we could --

23            MR. FEUERSTEIN:  I understand, Your Honor.  But in no

24    way --

25            THE COURT:  -- and it was before five.

 1            MR. FEUERSTEIN:  Right.  No, I realize that, Your

 2    Honor.

 3            THE COURT:  It was before five.

 4            MR. FEUERSTEIN:  As I said --

 5            THE COURT:  We've done the best we can.

 6            MR. FEUERSTEIN:  -- no disrespect for the Court,

 7    its -- I have invest -- my client has investors and needs to

 8    abide by the wishes of its investors.

 9            THE COURT:  Understood.  People also need to follow

10    Court orders.  All right.

11            All right, thank you for that.  I take it that subject

12    to the -- that your most recent confirmed direction from your

13    client is that your client supports the plan, including your

14    client's role in the plan, subject perhaps to a need to

15    confirm -- let me pick a different verb -- to communicate with

16    your client to be sure nothing has changed.  But I would trust

17    that would be the case.  All right.

18            And would anyone else like to be heard in favor of

19    confirmation?  What is that sound?

20            MR. SHORE:  Yes, Your Honor --

21            THE COURT:  Oh just what we need.

22            MR. SHORE:  -- again this is Richard Shore, counsel to

23    the Breakers condominium --

24            THE COURT:  Excuse me, we have --

25            MR. SHORE:  Can you hear me okay?

1          THE COURT:  No we cannot, we must ask you to --

2          MR. SHORE:  Can you hear me now?

3          THE COURT:  No, one moment please.  Please stand by.

4     We're going to go off the record.

5          (Recess from 5:10 p.m. until 6:37 p.m.)

6          THE COURT:  Good afternoon, please be seated.

7          THE CLERK:  Third call Emmons-Sheepshead Bay.

8          THE COURT:  All right, let's hear from debtor's

9     counsel.

10         MS. SCHWARTZ:  Thank you, Judge.  And thank you for

11    indulging what I know has turned into a very late evening.

12         After a lot of phone calls in the hallway, we have

13    reached a resolution, and Mr. Feuerstein I hope will confirm

14    what I'm putting on the record.

15         THE COURT:  Okay.

16         MS. SCHWARTZ:  This is going to be a -- an agreement

17    by the secured creditor to fund the plan to the extent we are

18    able to confirm the case today with a modification to the plan

19    that we don't believe is a modification that requires any re-

20    solicitation or anything in that matter, in fact we believe it

21    actually goes to something that Ms. Kachan had raised in her

22    objection.

23         The change is at the plan at section 5.1 with respect

24    to the secured creditor's treatment --

25         THE COURT:  Um-hum.

1        MS. SCHWARTZ:  -- Class 3 SDF17 Emmons' secured claim,

2   and that is that the consulting agreement that was to go into

3   effect on the effective date is no longer going to be in play.

4   That's going to be removed entirely so that Mr. Pinson will no

5   longer be acting as a consultant and will no longer be entitled

6   to those fees.

7        THE COURT:  Okay.

8        MS. SCHWARTZ:  In addition, in the event SDF receives

9   net sale proceeds of no less than twenty-two million dollars --

10  that's a change from twenty-three-and-a-half million dollars,

11  they will release Mr. Pinson's personal guarantee of the loan

12  and the mortgage on his residence.

13       THE COURT:  Okay.

14       MS. SCHWARTZ:  So while he's giving up the 240,000 in

15  consulting fees, they've agreed to reduce the threshold with

16  respect to the release of the guarantee and mortgage on his

17  personal residence.

18       THE COURT:  All right.  All right, thank you.  It

19  sounds like you were able to be quite productive with the time,

20  and I am grateful for your efforts.  Shall we pick back up with

21  confirmation?

22       MS. SCHWARTZ:  Judge, I believe the debtor had

23  completed its presentation with respect to confirmation.

24       THE COURT:  Okay.

25       MS. SCHWARTZ:  And the Trustee had --

1          THE COURT:  And then I had asked to hear from other

2    proponents of confirmation, and then the fire drill test

3    occurred.  Right.  Right.  And we have our telephonic

4    participant back online, is that right?

5          MR. SHORE:  Yes, Your Honor.

6          THE COURT:  Okay, all right.

7          May I hear from the proponents of confirmation in

8    addition to the debtor, would you like to confirm what's been

9    stated Mr. Feuerstein?

10          MR. FEUERSTEIN:  Yes, Your Honor, I'd like to confirm

11    exactly what Ms. Schwartz said.  The secured creditor will

12    agree -- I'm going to give you some background as to why it

13    happened.

14          THE COURT:  Okay.

15          MR. FEUERSTEIN:  I disclosed to the Court before that

16    over -- I'm sorry -- that over the last twenty-four hours or so

17    it came to light that there were significant additional

18    remediation necessary at the property.  As you know, this

19    property was ravaged by Hurricane Sandy; and every day, it

20    seems like there's a new plug to hole -- a hole to plug at this

21    property.  So as a result thereof, our client became concerned

22    about putting additional dollars into the property.  So the

23    resolution in order to get it done was to get rid of the

24    consulting fee, which saved at least a portion of the

25    additional remediation costs.  Otherwise, the secured creditor,

 1    also subject to -- and also the additional consideration for

 2    that to the principal of the debtor is a lower release price

 3    for the mortgage on his personal residence and the guarantee in

 4    connection with that.

 5         THE COURT:  It seems like a sensible balance of

 6    adjustments on both sides.

 7         MR. FEUERSTEIN:  Right.  So as a result, for the

 8    arguments that I made before, the secured creditor supports

 9    confirmation of the plan, subject to the revisions as stated on

10    the record.

11         THE COURT:  All right.  Any other proponents of

12    confirmation?

13         All right, opponents of confirmation?

14         MR. SHORE:  Your Honor?

15         THE COURT:  On the phone.

16         MR. SHORE:  Can you hear me?

17         THE COURT:  Yes.

18         MR. SHORE:  We support -- the condominium supports the

19    confirmation of the plan as well.  As we mentioned there are

20    real issues with respect to the property, and my clients are

21    the ones who -- we've been through this process.  These are

22    working-class families.  They -- this is their home.  Our

23    estimate (indiscernible) the common charges for this year

24    alone.  And without the (indiscernible) I understood the client

25    (indiscernible) their continuing to accrue debt on a

1  (indiscernible).  It would particularly be the case.  And we

2  support the (indiscernible) and (indiscernible) if possible,

3  the units (indiscernible) the condominium (indiscernible) the

4  budget.

5  THE COURT:  All right, the connection is a bit

6  imperfect but I take it that in substance, your clients, who

7  are perhaps most directly affected day in, day out by all these

8  proceedings, as the residents, support confirmation for the

9  reasons that have previously been indicated by yourself on

10  their behalf on the record and as you also note now.  Is that a

11  fair summary?

12  MR. SHORE:  That is certainly fair, Your Honor.

13  THE COURT:  Okay, all right.  Ms. Kachan, over to you.

14  Thank you very much.

15  MS. KACHAN:  Good afternoon, or good evening, Your

16  Honor.

17  THE COURT:  Good evening.

18  MS. KACHAN:  I don't know already which one.  Your

19  Honor --

20  THE COURT:  Well, let me restate, I'd like to hear

21  from anyone who opposes confirmation and then I'll go through

22  and review the record.  Of course support and opposition is

23  part of the picture, but the Court's determinations will be

24  controlling.

25  MS. KACHAN:  Your Honor, this has been a long road.  I

1    do posit that it is my client's position that we are not at all

2    ready, notwithstanding, and we appreciate the immediacy put

3    forth by the debtor and the secured creditor, but we do

4    question the validity of that immediacy, but more importantly

5    we feel that because the plan, according to many factors that I

6    will discuss today was not, has not been proposed in good

7    faith, the plan, and it cannot be confirmed today.

8           THE COURT:  So your objection is specifically with

9    respect to whether the debtor can satisfy 1129(a)(3) that the

10   plan must be --

11          MS. KACHAN:  Yes.

12          THE COURT:  -- proposed in good faith and not by any

13   means forbidden by law.

14          MS. KACHAN:  Yes, Your Honor and --

15          THE COURT:  All right, please proceed.

16          MS. KACHAN:  -- in furtherance of that, when we

17   started this process we had requested 2004 party and nonparty

18   examinations and production of documents.  We didn't get very

19   far at all in the discovery process.  We got very, very

20   deficient -- as seen in my motion to compel -- responses from

21   the debtor.  And I think even more crucial, and something that

22   Ms. Schwartz omitted today when she spoke of my opposition was

23   that -- and something very new to my opposition that wasn't

24   there before, was a factor that only came to light recently as

25   we were beginning the process of discovery; there has been

1    documents that came to light, that there was at least one

2    closing that we know of for sure which we have checks and

3    evidence of, there was money taken, what's called under the

4    table, meaning that the amount indicated in the contract and

5    the amount that was actually paid were different.  And that is

6    indicated by the checks that were -- once my clients discovered

7    it, that were later additionally paid to my client, and of

8    course, also admitted to my clients.  But --

9            THE COURT:  All right --

10           MS. KACHAN:  But the checks indicate --

11           THE COURT:  -- did you put in any evidence --

12           MS. KACHAN:  -- we have --

13           THE COURT:  --of that?  Ms. Kachan?

14           MS. KACHAN: -- we have actually sent -- yes, we have

15   actually sent a request, an additional --

16           THE COURT:  I asked you a very precise question.  I

17   see no -- I have your objection, but I have no affidavits.  Do

18   you have any evidence of --

19           MS. KACHAN:  Your Honor, the additional documents --

20           THE COURT:  -- assuming it relates to good faith.

21           MS. KACHAN:  Yes.  The additional document requests,

22   together with these checks were sent over to Ms. Schwartz, we

23   never received a response.

24           THE COURT:  That's still not responsive to my -- so

25   you have no evidence.

1    MS. KACHAN:  We do have the checks.  We did not attach

2 them to the opposition; we do have them.  And we did submit

3 them to debtor's counsel, as a request for further production

4 of documents and contracts and did not get -- receive a

5 response to that.  As we were --

6    THE COURT:  I invite you to put on your evidence with

7 respect to the absence of good faith.  Do you have a witness?

8    MS. KACHAN:  We have the checks.  We have -- and I can

9 propose my clients as witnesses because they were the ones who

10 received the additional compensation in response to the demand

11 that they made of why this went on.  They were paid additional

12 checks.  We have the copies of those checks; we have the

13 closing statement.  We do not have the contract, as it was not

14 produced by debtor's counsel.

15    THE COURT:  So your position is that your clients

16 received or paid --

17    MS. KACHAN:  No, no.  What I'm saying --

18    THE COURT:  -- money under the table --

19    MS. KACHAN:  -- is there was a closing --

20    THE COURT:  -- to use your phrase.

21    MS. KACHAN:  -- of title for one of the apartments.

22 The price on the closing sheet, on the deal sheet, was, I

23 believe something like 900,000 dollars.  The true --

24    THE COURT:  Ms. Kachan, it's not necessary or

25 appropriate for you to testify.

1          MS. KACHAN:  Your Honor --

2          THE COURT:  All right?

3          MS. KACHAN:  You had asked me

4          THE COURT:  Yes.

5          MS. KACHAN:  I am stating what I know.

6          THE COURT:  So here's my question, you've indicated

7    that you can test one element of confirmation, which is whether

8    this is -- the plan --

9          MS. KACHAN:  Good faith.

10          THE COURT:  -- has been proposed in good faith.

11          MS. KACHAN:  Yes.

12          THE COURT:  You've indicated, and I'll -- you'll need

13    to help me connect the dots here, but the question of good

14    faith or not is informed by whether payments in connection with

15    a sale were made directly or indirectly in the amount reflected

16    in the contract.  And I don't yet see the connection

17    necessarily between that and whether this Chapter 11 plan is

18    proposed in good faith.  And you've indicated that you have

19    witnesses in the form of your clients who are prepared to

20    testify --

21          MS. KACHAN:  Yes.

22          THE COURT:  -- to that effect.  And I'll ask you to

23    make a proffer as to what their testimony -- first of all, who

24    the witness is, and what his testimony would be.

25          MS. KACHAN:  Okay.  The witness would be Alexander

1  Dikman --

2          THE COURT:  Yes.

3          MS. KACHAN:  -- and the testimony would be to the best

4  of my knowledge that when the question was posed to Mr. Pinson

5  of why the original amount contracted for and the amount on the

6  deal sheet and the amount supposedly cleared from the closing

7  statement paid at the closing, why they differed.  They were

8  told, okay yes, there was really 300 or whatever, more paid

9  than, really paid at the closing, that was paid on paper --

10         THE COURT:  But your client --

11         MS. KACHAN:  -- than appears from the closing

12 statement.  And we -- and since they were being paid brokerage

13 fees from those amounts, they were told we will pay you that

14 additional brokerage fee off of that amount, and we have the

15 checks to evidence that.  But that is only one closing that we

16 actually learned about.

17         MR. FEUERSTEIN:  Your Honor --

18         THE COURT:  And just to be clear, Mr. Dikman will

19 testify as to what a person not in court -- as to the statement

20 of another person, a person not present, said asking the Court

21 to rely on the truth of the matter asserted?

22         MS. KACHAN:  Actually this is Mr. Benten (ph.) who is

23 the principal and who is present, but we are talking that we do

24 have checks, copies of checks, evidencing these additional

25 payments.

1        THE COURT:  How does this connect to whether or not
2    the debtor's plan is proposed in good faith?
3        MS. KACHAN:  Your Honor, we initially asked for
4    discovery because my clients felt --
5        THE COURT:  Stay with my question, Ms. Kachan.
6        MS. KACHAN:  I am explaining that monies were being
7    siphoned from closings.  This just shows one example of how
8    monies were siphoned from closings.
9        THE COURT:  How did the --
10       MS. KACHAN:  Because they -- my clients learned of
11   this one instance.  They just don't have evidence of further
12   instances, but they do know but they don't have the checks to
13   evidence it.  They do have the checks to evidence this one
14   instance.  And what I -- and what we were asking for discovery
15   for, and the reason that we asked that the debtor produce
16   financial statements clos -- complete closing statements.  And
17   this is not the only factor, Your Honor.  There are several
18   others that I will explain that we also have learned about.
19       THE COURT:  You need to explain them --
20       MS. KACHAN:  Okay.
21       THE COURT:  -- as efficiently as possible --
22       MS. KACHAN:  Okay.
23       THE COURT:  -- in view of the hour and the fact that
24   we're going to conclude the hearing today.
25       MS. KACHAN:  Okay.  Well, another question was, and

1    the reason that we asked for discovery, and the reason that we

2    asked for the closing statements, for all the debtor's

3    financials during the course of the closings to be produced, is

4    because we're also aware that there was a construction company

5    that was being paid out of every closing.  There -- the

6    principal of the construction company was present.  None of

7    these payments were reflected in any of the closing statements.

8    That is the second instance.

9          My clients have asked why when there were sales of

10   about twenty million dollars the secured claim had come to

11   thirty-three million dollars.  We had asked, again, for

12   nonparty discovery of the bank.  In our initial discovery

13   request we said that we were seeking to understand how these

14   amounts were arrived at.  We were seeking to understand where

15   the monies from closings went and how they were distributed and

16   were they distributed in good faith, where did it -- was there

17   any fraudulent dealings in these monies being distributed?  And

18   we actually do have evidence now that they were possibly

19   fraudulent dealings.

20         We have not received any discovery with respect to any

21   of this, and this is what we were seeking.  In order to confirm

22   this plan today, we need to understand if this plan was indeed

23   filed in good faith.  And it is our position, Your Honor, that

24   we could not go forth with voting on a ballot when we were not

25   fully informed on whether this plan was filed in good faith and

1    whether this plan really can be confirmed, and --

2            THE COURT:  All right, well I have a sense --

3            MS. KACHAN:  -- under the circumstances.

4            THE COURT:  -- I think I have a sense of your

5    objection.  And it's also very helpful for the Court to

6    understand that there's only one element of confirmation as to

7    which you have an objection.  I'd like to run through -- I'd

8    like to consider the other elements of confirmation of the plan

9    under Section 1129 of the Bankruptcy Code.

10           Beginning with Section 1129(a)(1), whether the plan

11   complies with the applicable provisions of Title 11.  I'm

12   satisfied based on the entire record, statements that have been

13   made, and the fact that while many the matters in the case have

14   been contested from time to time, this is uncontested, that the

15   plan complies with the applicable provisions of Title 11, and

16   the claims-in-interest have been appropriately classified and

17   alike.  Based on the entire record these are some, not all of

18   the grounds of course that warrant that finding.

19           Under 1129(a)(2)is the Court is required to determine

20   whether the plan proponent has complied with the applicable

21   provisions of Title 11.  I'm satisfied that this has been

22   complied with.  We have approved filings made quite recently, a

23   record that complies with the requirements of this provisions

24   including the certification of ballots, and the like.

25           Again, I note that this is uncontested with respect to

1      Section 1129(a)(3).  I pass for the moment because this is

2      contested, to 1129(a)(4).

3            The approval of costs and expenses, that all fees and

4      costs to be paid by the debtor, must either have been approved

5      by the Court or subject to such approval.  I'm satisfied on the

6      record that this element of confirmation has been satisfied.

7            With respect to disclosure of officers and directors

8      of the reorganized directors and insiders to be employed

9      subject to the modifications set forth on the record, to the

10      extent that they are implicated by 1129(a)(5), I am persuaded

11      that this element of confirmation has been satisfied.

12            Moving to 1129(a)(6), which is regulatory approvals.

13      I am satisfied that this is not implicated by the matter that

14      is before the Court in that there are no rate changes or other

15      types of matters subject to the jurisdiction of a government

16      regulatory commission, and so this not an applicable term.

17            The best interest of creditors test contained in

18      Section 1129(a)(7), this has been -- I'm satisfied by the

19      record that this has been met as well, including for the

20      reasons set forth in the Pinson affidavit at paragraph 33 and

21      the disclosure statement's liquidation analysis.

22            Moving to acceptance of the plan, 1129(a)(8), I am

23      satisfied that we have basis to proceed here, based on the

24      deemed rejected status under -- of Class 5.  And that will take

25      us to our cram-down analysis in a moment.

1    Priority claims, 1129(a)(9), I'm satisfied that they

2  are appropriately treated by the plan, that administrative

3  claims, allowed priority claims and all other priority claims

4  are appropriately treated and addressed by the plan.

5    1129(a)(10), the questions whether one impaired class

6  has accepted the plan; and this has been satisfied because the

7  debtor's certification of ballots indicates that SDF, the

8  impaired secured creditor, has accepted the plan along with

9  four of the impaired unsecured creditors in Class 4.

10    The question of feasibility, sometimes a very

11  contested issue, not contested here.  Section 1129(a)(11),

12  requires the Court to find that confirmation is not likely to

13  be followed by liquidation, indeed, further financial

14  reorganization of the debtor, unless such is proposed in the

15  plan.  The question is whether there is reasonable assurance of

16  success, I am persuaded that this has been met.

17    Moving to the question of payment of fees to the

18  United States Trustee, Section 1129(a)(12), this has been taken

19  care of, addressed in the plan, because the plan provides for

20  payment in full of these fees.  Were it otherwise I'm sure we

21  would have heard from the Office of the Unites States Trustee.

22    1129(a)(13), retiree benefits doesn't seem to be

23  applicable here.  Avoidance of taxes, 1120 -- excuse me,

24  1129(d), provides that a plan may not be confirmed if the Court

25  finds that the principle purpose of the plan is the avoidance

1     of taxes or the avoidance of the application of registration

2     requirements of Section 5 of the Securities Act of 1933.  This

3     does not -- neither of these is an impediment or an issue with

4     respect to confirmation here.

5               1129(b), the question of cram-down.  Having gotten to

6     the point subject to the Court's determination with respect to

7     good faith, determining whether this test is met, I'm -- I

8     guess will set for the moment, to the side following path that

9     we should get to this question only after concluding that all

10    the other requirements of confirmation are met.

11              That brings me back to the question of good faith.

12              And Ms. Kachan you can call your first witness.

13              MS. KACHAN:  Yes, Your Honor.  We feel, once again,

14    when we began --

15              THE COURT:  Maybe -- can I ask you to speak from the

16    podium?

17              MS. KACHAN:  Sure.

18              THE COURT:  It will be more helpful, because that way

19    everyone's going to be able to see.

20              MS. KACHAN:  Your Honor, from the beginning of this

21    case we were -- we've felt that in order to make a decision on

22    this plan, in order to make any voting decision on this plan we

23    needed to understand several factors of what had transpired.

24              THE COURT:  Ms. Kachan, who's your first witness?

25              MS. KACHAN:  Which is why we had asked for this --

1      THE COURT:  Who's your first witness?

2      MS. KACHAN:  Our first --

3      THE COURT:  Who will you be calling.

4      MS. KACHAN:  Mr. Dikman.

5      THE COURT:  Okay.  I think we've -- it's time to take

6  the evidence, Ms. Kachan.

7      MS. KACHAN:  Okay.

8      THE COURT:  I've heard your concerns, I've heard your

9  concerns about discovery --

10      MS. KACHAN:  There -- I --

11      THE COURT:  The question you raised is whether this

12  plan has been proposed in good faith --

13      MS. KACHAN:  I know.

14      THE COURT:  -- and not by any means prohibited by law.

15      MS. KACHAN:  Okay.

16      THE COURT:  I'd like to hear from you.

17      MS. KACHAN:  Okay.  Okay, Your Honor.

18      THE COURT:  Well, I suppose in the first instance the

19  debtor has the burden, but I'm satisfied by the proffer that

20  we've received and by the entire record, and I suppose we

21  should be absolutely clear that there has been -- that we take

22  a formal proffer on this.

23      MS. KACHAN:  Okay.

24      THE COURT:  May I ask you to --

25      MS. KACHAN:  Yes.

1        THE COURT:  Proffer, debtor's counsel, with respect to

2  the question of good faith.  All right?

3        MS. SCHWARTZ:  I'm sorry, Judge, I didn't hear the

4  last thing you said.

5        THE COURT:  I'm losing my voice, it's been a long day.

6  Here's what I'm going to do, I'm going to give you a minute or

7  two -- I may just stand in the hallway -- to prepare to address

8  the question that is disputed between the parties, the only

9  element of confirmation that is disputed, which is whether the

10 plan has been proposed in good faith and not by any means

11 prohibited by law.

12       MS. SCHWARTZ:  Judge, I'm --

13       THE COURT:  The debtor, as the prep --

14       MS. SCHWARTZ:  -- prepared to address that right now.

15       THE COURT:  The debtor, as the proponent of

16 confirmation, needs to make a record.  You can then -- your

17 argument, it seems to me, you have the opportunity to put on

18 evidence, if you'd like.

19       MS. KACHAN:  Okay.

20       THE COURT:  Call your first witness will be my

21 direction to you.

22       MS. KACHAN:  We will.

23       THE COURT:  And then I'll take argument on that.  But

24 of course the hour is late; so I -- you have all the time you

25 need, but I absolutely don't encourage you to take unnecessary

1   time to repeat unduly things that are on the record.  All

2   right?

3           MS. KACHAN:  Absolutely, Your Honor.

4           THE COURT:  Would you like to take -- would you like a

5   minute or two to get organized or you're ready to proceed?

6           MS. SCHWARTZ:  Judge, I'm prepared --

7           THE COURT:  Please proceed.

8           MS. SCHWARTZ:  I'd like you to know --

9           THE COURT:  Good, thank you.  Please proceed.  All

10  right, Ms. Kachan you can yield the podium.

11          MS. SCHWARTZ:  Judge, with respect --

12          THE COURT:  I'm going to ask you to come to the

13  podium, okay?

14          MS. SCHWARTZ:  Judge, with respect to Section

15  1129(a)(3) of the Bankruptcy Code, the question is whether the

16  plan has been proposed in good faith and not by any means

17  forbidden by law.  Now with respect to what Mr. --

18          THE COURT:  Thank you.

19          MS. SCHWARTZ:  I beg your pardon, what Ms. Kachan, and

20  perhaps Mr. Dikman have to say with regard to that, I don't

21  know.  What I can say is that, the allegations with regard the

22  various closings and what transpired at those closings whether

23  those are bad acts or not I cannot address, but that has

24  nothing to do with whether or not this plan was proposed in

25  good faith.  Those are entirely separate scenarios.

1       This is a plan.  The debtor filed a bankruptcy; the

2  debtor sought financing from its secured lender; and the debtor

3  negotiated the terms of its plan with the secured lender.

4       THE COURT:  And I take it that in substance, if the

5  debtor's principal was called to testify as to those matters,

6  his testimony would be consistent with the statements you're

7  making on the record as to the facts, is that correct?

8       MS. SCHWARTZ:  With respect to the negotiations of the

9  plan, absolutely, Judge.  And that is the plan that has been

10  proposed.  It was modified several times as the Court is aware,

11  as we've gone through the amended disclosure statement, now the

12  second amended plan and disclosure statement, and we are here

13  today to say that this plan was proposed in good faith and that

14  is the debtor's position.

15       THE COURT:  All right.  Is Mr. Pinson present in the

16  courtroom?

17       MS. SCHWARTZ:  Yes, he is.

18       THE COURT:  Mr. Pinson, could I ask you to come to a

19  microphone just so we can make a record.

20       You've heard what counsel for the debtor's indicated

21  with respect the circumstances of the proposing of the plan,

22  and whether it was proposed in good faith and not by any means

23  forbidden by law, and I have already your affidavit before me.

24  Can you swear or affirm on the record that if you were called

25  to testify, placed under oath or affirm that your testimony

1  would be the truth and asked questions on the subjects that

2  your counsel's described -- the debtor's counsel's described,

3  would your testimony be the same as that as has been described?

4  　　　　　THE WITNESS:  Yes, it would.

5  　　　　　THE COURT:  All right, thank you.  Will you like to

6  cross examine?

7  　　　　　MS. KACHAN:  Yes, Your Honor.

8  　　　　　THE COURT:  All right.  Mr. Pinson, we're going to

9  have to put you on the witness stand and we'll have cross-

10  examination.  I want to be clear the cross examination is

11  limited to the scope of the proffer, which concerns the

12  proposing of the plan, all right?

13  　　　　　MS. KACHAN:  May I question regarding the closing that

14  we discussed, Your Honor?

15  　　　　　THE COURT:  It was not part of the presentation, so I

16  think it's outside the scope of the good-faith proffer.  All

17  right, you can -- and I'll say again, timely, for the record,

18  that the question the Court has to answer under Section

19  1129(a)(3) is whether the plan is proposed in good faith, and

20  not by any means forbidden by law.

21  　　　　　MS. KACHAN:  Your Honor, it is --

22  　　　　　THE COURT:  All right.  You have to swear the witness.

23  　　　(Witness sworn)

24  　　　　　THE CLERK:  Please state your name for the record.

25  　　　　　THE WITNESS:  Jacob Pinson.

1          THE CLERK:  Please spell your last name.

2          THE WITNESS:  Jacob Pinson, P-I-N-S-O-N.

3          THE COURT:  Thank you, Mr. Pinson.

4          Ms. Kachan, please come up to the podium and you may

5   inquire.

6          MS. KACHAN:  Your Honor, just --

7          THE COURT:  You may inquire.

8          MS. KACHAN:  Yes, I understand.  I'm asking, whether I

9   may -- my questions have to do, my -- I assert that it was

10  filed -- that the plan was filed in bad faith because we

11  understand that several things took place during closings --

12         THE COURT:  Ms. Kachan, please would you ask the

13  witness a question?

14         MS. KACHAN:  Your Honor, I'm asking you if I may?

15         THE COURT:  If it's objectionable have an objection --

16         MS. KACHAN:  Okay.

17         THE COURT:  -- and I'll rule.

18         MS. KACHAN:  Okay.

19         THE COURT:  Thank you so much.

20         MS. KACHAN:  Okay.

21  CROSS-EXAMINATION

22  BY MS. KACHAN:

23  Q.   Mr. Pinson, to the best of your knowledge, has there ever

24  been, in closings of the units during the time that the units

25  were closing, has there ever been a variance between the price

1 on the contract and the price actually received at closing?

2          MS. SCHWARTZ:  Objection.

3          THE COURT:  Grounds?

4          MS. SCHWARTZ:  Relevancy to proposing the plan in good

5 faith.

6          THE COURT:  Can you connect it to the proposal of the

7 plan?

8          MS. KACHAN:  Yes, Your Honor.  We are discussing that

9 the plan was proposed in good faith and under the law.

10 Obviously if funds were being siphoned from the closings and

11 for the purposes of not reporting them to the IRS, that is and

12 I would say (indiscernible) and automatically reported as

13 borrowed and the amounts reported as owed, therefore we cannot

14 say that the plan is (indiscernible) if the amount -- the

15 amounts that the debtor sets in his plan and the monies that he

16 had borrowed from his creditors of which my clients are seventy

17 percent or eighty percent, actually, as proposed by the

18 debtor's counsel (indiscernible) been borrowed money from.

19 This money was used, monies received from closings may not have

20 been paid to my clients as it was supposed to be according to

21 the agreements because money was being illegally siphoned.

22          And if money was indeed taken, whether under the table

23 or not reported in order to obstruct the tax reporting,

24 obviously that is done in obstruction of the law and that is

25 not in accordance of the law and that is something now for --

1    if we are going by those numbers by those closing statements if

2    the debtor proposed his plan, relying on those closing

3    statements, which are in fact false, then the plan is proffered

4    in bad faith.

5           THE COURT:  I'm going to sustain the objection because

6    as you have set forth the grounds for your interest in the

7    subject, I don't see a sufficient connection, really any

8    connection at all yet to the plan being proposed in good faith.

9    In overruling your obj -- in sustaining the objection, I am,

10    I'll encourage you to refocus your question so that it is

11    directed to the question of whether the plan has been proposed

12    by the debtor in good faith and not by any means forbidden by

13    law.  I don't see the connection -- it sounds perhaps that your

14    clients may have a dispute as to whether they were paid an

15    adequate commission, but I don't yet see the connection to

16    whether the plan was proposed in good faith.

17           So the objection is sustained.  You may ask -- I

18    encourage you to reframe the question so it addresses the

19    question of whether the -- it helps the Court form a conclusion

20    on the disputed issue of whether the plan was proposed in good

21    faith.

22    BY MS. KACHAN:

23    Q.    Mr. Pinson, in formulating the plan, and in formulating

24    the amount owed to your secured and unsecured creditors, did

25    you -- well, rather, did you take into account all of the

1  monies that were paid at closings and all of the lawful

2  expenses that were taken at closings in the unit?

3          MS. SCHWARTZ:  Objection.

4          THE COURT:  I'm going to overrule that -- well,

5  grounds?

6          MS. SCHWARTZ:  Relevancy.  It's not relevant to how

7  the plan was proposed.

8          THE COURT:  Well, the question is did you consider

9  this in connection with the plan.  I think that the debtor's

10  principal can answer that question.

11  A.   Absolutely.  It was all considered.

12          THE COURT:  Okay, next question.

13  Q.   You considered the amounts (indiscernible) inconsistency

14  with the amounts received from all closings of the units and

15  all of the expenses in court in connection with the closings of

16  the units?

17  A.   Absolutely --

18          MS. SCHWARTZ: Objection.

19  A.   -- it was all considered.

20          THE COURT:  Objection is overruled.  I think this

21  is -- I'm drawing a broad -- I'm permitting a broad scope of

22  inquiry here.  The witness has already begun the answer.  And

23  the objection is and would have been an advance of rope.

24          You can continue your answer, Mr. Pinson.

25          THE WITNESS:  I object to this form of questioning in

1  general.

2  THE COURT:  It's not -- I'm sorry, you're the witness.

3  THE WITNESS:  No, no, I just --

4  THE COURT:  You have a fine lawyer --

5  THE WITNESS:  Okay.

6  THE COURT:  -- who will do the objecting.

7  THE WITNESS:  Okay.  I didn't mean in that sense.

8  A.  There were various closings, and I'm not sure what she's

9  referring to as far as avoiding taxes.  That has never been the

10  case, I don't do this.  I don't know -- I have no idea what

11  she's referring to.  There was never any intent along that --

12  along that line of -- of talking.  But there was a number of

13  diff -- of closings, that the contract, and when it came to the

14  closing there were small variations.  Every -- every contract

15  was very specific to the individual.  Sometimes there was a

16  claim that the individual that bought the unit had to have some

17  repairs, sometimes there was a claim about a deficiency about

18  of an appliance.  And at the closing, there was vari -- at

19  various times, some adjustments.

20  So there may have been a variation from the actual

21  contract to when the closing what was paid.  The commissions,

22  though were always paid a hundred percent on this -- on the

23  price of the contracts.  I have no idea what she's referring

24  to.

25  THE COURT:  All right.  Next question, Ms. Kachan.

1    Q.   Mr. Pinson, you're saying that there were variations from

2    closing to closing.  Would you say these variances were in the

3    tens of thousands?  In the thousands?  In the hundreds of

4    thousands?

5    A.   I -- I don't recall, it varied.

6    Q.   Would it be plausible that they were in the hundreds of

7    thousands?

8    A.   Probably not.

9         THE COURT:  Any further questions?

10        MS. KACHAN:  Yes.

11   Q.   Mr. Pinson, in proffering the plan obviously there was --

12   there is a secured creditors' claim.  The secured creditors'

13   claim at this point is thirty-three million dollars.  And as

14   you know that my clients objected partially on the basis that

15   there was a proceeding -- state court action having to do with

16   the transfer of the property, and a major question has been of

17   how this debt really was incurred, besides the fact that we

18   proffered that it should not have been incurred without their

19   consent, but the question -- and the transfer should not have

20   been done without their consent.  The question is all the

21   monies, where -- or do you think you would be able to account

22   for all the monies provided and financed with regard to this

23   project?  Would you say that all of the monies were applied

24   properly?

25        MS. KACHAN:  And, because it would go, Your Honor, to

1  the (indiscernible) secured claim --

2        THE COURT:  Remember, you're posing a qu -- I'm going

3  to ask you to --

4        MS. KACHAN:  Yes.

5        THE COURT:  -- restate your question.

6  Q.   Would you say that all monies borrowed were applied to

7  their rightful usage?

8  A.   Absolutely.  And more than saying that, I was controlled

9  by the bank.  I couldn't do anything that I wanted without the

10  bank's permission, so everything that was spent, everything was

11  there, whatever the thirty-three million dollars, is based on

12  the bank's permission that they allowed, and they okayed.

13  Q.   But at any point did you obtain -- or let me rephrase

14  that, did you obtain the agreement from all of your -- of all

15  of the members of your corporation, of your LLC?

16  A.   Agreement for what?

17  Q.   In incurring financing?

18        THE COURT:  If you don't understand the question, you

19  should simply indicate that you don't understand the question.

20  A.   I don't understand the question.

21  Q.   At the time that you were obtaining financing or

22  additional financing did you at all times obtain the consent of

23  all of the members of your LLC?

24        MS. SCHWARTZ:  Objection.  There's no relevance to

25  that question as it relates to --

1        THE COURT:  I'm going to sustain the objection, I

2  don't see the connection.  If you'd like to try to connect it,

3  please rephrase -- reframe the question.

4  Q.   Mr. Pinson, in the process of funding this project, when

5  you were funding this project, when you were incurring over

6  twenty-five million dollars more further money was incurred, at

7  each time that you incurred or asked for additional financing,

8  did you, in accordance with all your applicable corporate

9  documents and corporate agreements, did you comply with these

10  documents and with these agreements, in obtaining consent of

11  your managing members?

12        MS. SCHWARTZ:  Objection.  Not relevant to proposing

13  the plan in good faith.

14        THE COURT:  Ms. Kachan, I'm going to ask to remember

15  that the question here that you have put in issue is --

16        MS. KACHAN:  Good faith, yes.

17        THE COURT:  -- whether the plan is proposed in good

18  faith and not by any means forbidden by law.  I've indicated,

19  and I have in fact given you a broad --

20        MS. KACHAN:  Okay.

21        THE COURT:  -- range with respect to questioning, but

22  I'm going to sustain the objection.  I think it is not

23  adequately connected to the matter at issue.

24        MS. KACHAN:  I have a further question, Your Honor.

25        THE COURT:  All right.

 1  BY MS. KACHAN:

 2  Q.   Mr. Pinson, as -- would you say that the closing

 3  statements for each closing adequately reflect all of the

 4  expenses paid in connection or at the closings?

 5       MS. SCHWARTZ:  Objection.  Judge, the entire line of

 6  questioning has no relation proposing the plan --

 7       MS. KACHAN:  Your Honor --

 8       MS. SCHWARTZ:  -- in good faith.

 9       THE COURT:  And I think this may have well been

10  covered by some of the broader questions and answers that have

11  already happened.

12       MS. KACHAN:  Your Honor, there's a specific reason --

13       THE COURT:  I'll overrule the objection.  I hope we

14  can move through this fairly quickly.  For -- in order to move

15  this forward, I'll overrule the objection, but I think this at

16  the outer boundary of the outer boundary of what could even

17  conceivably be relevant to the issue before the Court.  You may

18  answer the question.

19       THE WITNESS:  Could you repeat the question?

20       THE COURT:  I'm sorry.

21  BY MS. KACHAN:

22  Q.   Do the closings statements, for each closing, to the best

23  of your knowledge, adequately reflect all of the expenses paid

24  at each closing?

25  A.   Absolutely.  I had a control over myself, which was the

1    bank.  Before any closing could happen, a statement of all the

2    expenses had to be provided by my attorney to the bank.  The

3    bank had to sign off and approve it and release each unit.  I

4    couldn't do anything on my own that I wanted.  Once the bank,

5    with my attorney, approved whatever the closing costs and

6    expenses, they signed off, and that's how the closing happened.

7    Q.   That was not the question that I asked you, Mr. Pinson.  I

8    asked if every closing had in fact -- every closing statement

9    had in fact reflected all of the expenses paid at the time of

10   the closing, if to the best of your knowledge that is the case.

11   A.   Yes, to the best of my knowledge, absolutely.

12   Q.   Okay.  Would you -- are you familiar with a gentlemen by

13   the name of Mr. Lockshen (ph.)?

14   A.   Yes.

15          MS. SCHWARTZ:  Objection.

16          THE COURT:  I have no idea.  I -- could you --

17          MS. KACHAN:  Your Honor, this goes to --

18          THE COURT:  Well the question's been answered.

19          MS. KACHAN:  Well this goes to a statement on the

20   (indiscernible) that the other lawyer --

21          THE COURT:  There's no pending objection, you don't

22   need to argue.  Pose your --

23          MS. KACHAN:  Okay.

24          THE COURT:  -- next question, please.  And could you

25   give me an estimate as to how much longer you'll be

1    questioning --

2              MS. KACHAN:  I think this is the last question, Mr.

3    Pinson, that I will --

4              THE COURT:  Then we'll --

5              MS. KACHAN:  Yeah.

6              THE COURT:  -- have redirect.

7              MS. KACHAN:  Um-hum.

8              THE WITNESS:  I answered.

9              THE COURT:  Would you state your question?

10             MS. KACHAN:  Yes.

11   BY MS. KACHAN:

12   Q.   Do you know a person by the name of Mr. Lockshen?

13   A.   Yes, I do.

14   Q.   And who is Mr. Lockshen?

15   A.   Mr. Lockshen was brought in to help finalize and complete

16   the project that the bank wasn't willing to fund.  Mr. Lockshen

17   independently made a deal with the bank on a certain structure

18   that he would fund the closing and get paid out of closings.

19   Q.   Was the compensation to Mr. Lockshen reflected on the

20   closing statements?

21   A.   Again, in the closings statements -- I wish you would look

22   at one so you would avoid all these questions.

23   Q.   I would -- I did.

24   A.   In the closing statement there is compensation from

25   closings to Mr. Lockshen approved by the bank.  Again, not by

1  me.  They had a separate independent deal, the bank had to see

2  it, the bank saw on every closing how much Mr. Lockshen is

3  receiving, they had their deal and that was based on their

4  deal.  They approved it; had nothing to do with me.

5        THE COURT:  All right.  Anything further

6        MS. KACHAN:  Not of this witness, Your Honor.

7        THE COURT:  Thank you.  Redirect.

8  REDIRECT EXAMINATION

9  BY MS. SCHWARTZ:

10  Q.  Mr. Pinson, in negotiating and drafting the plan of

11  reorganization, do you stand by your affirmation that the plan

12  was proposed in good faith?

13  A.  Yes, I do.

14        MS. SCHWARTZ:  Thank you.

15        THE COURT:  Thank you.  All right.  Any recross?

16        MS. KACHAN:  No, Your Honor.  I would like --

17        THE COURT:  Thank you.

18        MS. KACHAN:  -- a minute with my client before I do my

19  direct, if I may?

20        THE COURT:  All right, you're going to call your

21  client as your next witness?

22        MS. KACHAN:  Yes.

23        THE COURT:  And is this your final witness?

24        MS. KACHAN:  Yes.

25        THE COURT:  All right, you may have a couple of

1  minutes.

2          MS. KACHAN:  Thank you.

3          THE COURT:  We're going to take a short break off the

4  record.

5          You are excused, Mr. Pinson.

6          THE WITNESS:  Thanks.

7          THE CLERK:  All rise.

8      (Recess from 7:18 p.m. until 7:43 p.m.)

9          THE COURT:  Ms. Kachan, are you ready to proceed?

10          MS. KACHAN:  Yes, I am.

11          THE COURT:  Please be seated.

12          MS. KACHAN:  Your Honor, we offer as a witness, Mr.

13  Dikman, principal of Metropolitan Estates.

14          THE COURT:  All right, Ms. Jackson, would you swear

15  the witness please?

16      (Witness sworn)

17          THE CLERK:  Please state your name for the record, and

18  also please spell it.

19          THE WITNESS:  Alexander Dikman, D-I-K-M-A-N.

20          THE COURT:  All right, you may inquire.

21  DIRECT EXAMINATION

22  BY MS. KACHAN:

23  Q.   Good evening, Mr. Dikman.  Mr. Dikman, do you believe that

24  the debtor's plan has been offered in good faith?

25  A.   No, I don't think so, because the number of thirty

1  millions, or about thirty millions dollars owed to the secured

2  creditor, I believe is inflated, because when this number was

3  calculated, not all the numbers paid at the closing was taken

4  in consideration, taken in account.  I think the whole idea of

5  this plan is to inflate this number and make the possibility

6  for unsecured creditors to get their part of money virtually

7  impossible.

8  Q.   Do you think that the plan was proposed with honesty as

9  the standard for proposed in good faith?

10  A.   As I said, I don't think so.

11  Q.   What causes you to believe that the plan and the amounts

12  therein are dishonest?  Was there, at any point, an instance

13  where you believe there was dishonesty involved?

14  A.   Yes.  Unfortunately, I wasn't prepared for this testimony

15  and I don't have all the documents with me and I didn't prepare

16  all --

17  Q.   To the best of you recollection.

18  A.   But just for example, one of them is, that closing when

19  the price, without any prior notice at the closing was dropped

20  almost 300,000 dollars.  I'm not prepared to say exact number.

21  Q.   Okay.

22  A.   This to the best of my knowledge, to the best of my

23  memory.

24  Q.   How did you learn about this?

25  A.   Yeah, Mr. Wilk called me and said that this closing went

1    down three --

2             MS. SCHWARTZ:  Objection, hearsay.

3             MS. KACHAN:  Your Honor --

4             THE COURT:  Well --

5             MS. KACHAN:  -- the witness is --

6             THE COURT:  You're required to testify as to your

7    personal knowledge, what you know, what you said, what you did.

8    You're under oath --

9             THE WITNESS:  It is -- it is at my personal knowledge.

10            THE COURT:  -- so must testify accurately.  I remind

11   you of that.  The objection that has been interposed is a

12   hearsay, and an objection typically would be interposed to a

13   question to the extent that it calls for a hearsay answer.  I'm

14   going to overrule the question, but I note that the hearsay

15   rule serves a number of purposes, but they all flow from the

16   fact that hearsay testimony is often simply unreliable.

17            MS. KACHAN:  Okay.

18            THE COURT:  And so I'll let you answer the question,

19   but I'll just note on the record --

20            THE WITNESS:  Your Honor --

21            THE COURT:  -- that I'm aware of the prospect for the

22   objection to the extent that the witness is testifying about

23   something that is hearsay.  And it will certainly -- often goes

24   to the weight even if it doesn't go to the admissibility.  So,

25   overruled, you can continue to answer.

1          THE WITNESS:  Yeah, so can I finish my testimony?

2          THE COURT:  Yes, you may.

3          THE WITNESS:  Thank you.

4          THE COURT:  Thank you.

5   A.    So, as I said, I was contacted by Mr. Wilk and informed

6   that this closing went 300,000 below the contact.

7   BY MS. KACHAN:

8   Q.    What did you do then?

9   A.    So, I went to Mr. Pinson and I confront him.

10  Q.    And you did that personally?

11  A.    Yes, personally.

12          THE COURT:  Ms. Kachan, please don't interrupt your

13  witness.

14  A.    Yes, I went personally and contacted Mr. Pinson.  And he

15  admitted that 300,000 dollars was taken, I don't how to call it

16  properly, besides the documents, besides the closing statement.

17  I demanded this money would be applied to the offset of the

18  mortgage or to offset debt to myself.  He said he already spend

19  this money for whatever reason, I don't remember, but he agreed

20  to pay me difference on the commission.  And those checks for

21  the difference of the commission, I have separate set of

22  checks, one set of checks for the original commission for about

23  900,000 dollars -- I'm sorry I can mistaken at this point, but

24  I can prove this and bring those checks -- and another set of

25  checks a few days later for the difference on this, on the

1 closing for about 300,000 difference.

2 Q. Why do you say that this difference affects good faith in

3 which -- with which this plan may have been brought?

4 A. Because this difference supposed to be at the closing, by

5 the mortgage rules, supposed to go to the bank, to offset debt

6 to the bank. Which didn't happen.

7 Q. What do you know about a person by the name of Mr.

8 Lockshen?

9 A. I met Mr. Lockshen many times at the site. He was a

10 contractor brought -- actually I don't know, by Mr. Pinson or

11 the bank. But Mr. Lockshen was performing work at the project,

12 and at certain point as we had a negotiation with Mr. Pinson,

13 he showed me the closing statements. He and his lawyer, Mr.

14 Frankel (ph.), showed me the closing statements which are

15 different from the closing statements that we received

16 recently. Those closing statements reflect payments to Mr.

17 Lockshen of about 125,000 dollars per closing. This closing

18 statement we received recently wasn't reflecting that number.

19 Q. When you say recently, please clarify?

20 A. When we received the opposition -- I'm sorry.

21 Q. Just clarify the (indiscernible) you were saying when you

22 received these closing statements.

23 A. This closing, I don't believe we received it from Mrs.

24 Schwartz's office.

25 Q. From the debtor's counsel, correct?

1 A.   Yeah.

2 Q.   Okay.  Why do you think -- well, first of all, do you have

3 suspicions about the accuracy of the closing statements?

4          MS. SCHWARTZ:  Objection.

5          THE COURT:  Sustained.  Whether or not the witness has

6 a suspicion is not --

7          MS. KACHAN:  I understand.

8          THE COURT:  -- the kind of question --

9          MS. KACHAN:  I understand.

10          THE COURT:  -- that seems to me to be appropriate.

11 You may reframe the question.

12          MS. KACHAN:  I'll withdraw the question.

13 Q.   Why do you feel that the discrepancies you described are

14 relevant to whether the debtor proposed his reorganization plan

15 in good faith?

16 A.   Because, again, I don't know, money paid to Mr. Lockshen

17 was those money accounted when they calculated this thirty

18 million debt to the bank or if the payments to Mr. Lockshen was

19 a part of paying off the mortgage or not.

20 Q.   Mr. Dikman, in overall, in seeing the debtor's proposed

21 reorganization plan, and from your personal knowledge, how do

22 you feel that the forgoing affected this plan and whether it's

23 being proposed in good faith and whether it's lawful, whether

24 it --

25          MS. SCHWARTZ:  Objection, asked and answered.

1         THE COURT: It seems so. Would you like to rephrase

2 the question?

3         MS. KACHAN: Yes.

4 Q. The discrepancies described, how do you feel from

5 everything that you have described, how do you feel they affect

6 the lawfulness of the reorganization plan?

7         MS. SCHWARTZ: Objection.

8         THE COURT: This is a fact witness not a -- well I'll

9 ask you to state the grounds for the objection.

10         MS. SCHWARTZ: The witness can't testify with respect

11 to lawfulness.

12         MS. KACHAN: Your Honor --

13         THE COURT: The witness --

14         MS. KACHAN: -- but we are saying --

15         THE COURT: -- has not been offered as --

16         MS. KACHAN: -- that it goes to good faith.

17         THE COURT: - as a legal expert.

18         MS. KACHAN: As a -- no. But --

19         THE COURT: He is here --

20         MS. KACHAN: -- as it goes to good faith.

21         THE COURT: -- as a fact witness. Ms. Kachan, it will

22 go better if you let me speak first, thank you so much.

23 It's -- the question as phrased seeks the debtor's -- excuse

24 me, the witness' fact testimony as to why he feels something

25 affects whether the plan is lawful.

1          MS. KACHAN:  Okay.

2          THE COURT:  The debtor has not been -- I'm so sorry

3     for saying debtor, the hour is late.  For sake of a complete

4     record it's 7:52 in the evening and I apologize for

5     misspeaking.

6          The witness is not here as an expert, not in the law,

7     not on any other matter.  He's been called as a fact witness --

8          MS. KACHAN:  Okay.

9          THE COURT:  -- and his feelings --

10         MS. KACHAN:  Okay.

11         THE COURT:  -- are not --

12         MS. KACHAN:  I will rephrase --

13         THE COURT:  -- likely to be an appropriate subject for

14    testimony on the question of whether the debtor has established

15    that this plan has been proposed in good faith and not by any

16    means forbidden by law.

17         You may ask your next question.

18    BY MS. KACHAN:

19    Q.   Mr. Dikman, to the best of your knowledge, would any act

20    committed, that may be prohibited under the law --

21         MR. FEUERSTEIN:  Objection.

22         MS. SCHWARTZ:  Objection.

23         THE COURT:  I'll sustain the objection.

24         MS. KACHAN:  Yeah.

25         THE COURT:  I think you need to tie that to the

1  proposal of the plan.  I think the question is posed as --

2          MS. KACHAN:  Let me ask you for what -- Your Honor,

3  but that's what I'm trying to say.

4  BY MS. KACHAN:

5  Q.  Were any acts in connection with how the amounts in the

6  plan were arrived at in your -- only to your personal

7  knowledge, were there any unlawful acts committed?

8  A.  Yes.  As I said the -- I believe the thirty-million-dollar

9  debt wasn't calculated properly.  And two facts we've been

10 talking about today is only a fracture (sic) of the information

11 could be discovered if we be allowed to do the proper discovery

12 at a certain -- and look through certain documents.

13 Unfortunately I wasn't prepared for this testimony.  If I would

14 be granted more time to prepare, I will product (sic) more

15 information.

16          THE COURT:  Is your recollection impaired in any way

17 this evening?  Have you taken any medication today so that

18 you're not --

19          THE WITNESS:  No.

20          THE COURT:  -- able to testify accurately?

21          THE WITNESS:  No, it's not.  No, it's not.

22          THE COURT:  Okay.  All right.  Next question.

23 Q.  Mr. Dikman, what you testified to today, do you have

24 personal knowledge of discrepancies that you identified or that

25 you have seen and/or offered test -- and offered testimony in

1  the --

2          MS. KACHAN:  Not testimony, I'm sorry.  I'm sorry,

3  Your Honor, it is very late, and I'm also --

4          THE COURT:  Take a moment and state your question from

5  the beginning.

6  Q.   In your opinion --

7          MS. KACHAN:  May I ask an opinion question?

8  Q.   In your opinion, do you --

9          THE COURT:  In a general way, opinion questions are

10  directed to expert witnesses and fact questions are directed to

11  fact witnesses.

12          MS. KACHAN:  Okay.  I'll will ask him then.

13          THE COURT:  In a general way it's not generally

14  considered appropriate for a fact witness to testify as to

15  their opinion.

16          MS. KACHAN:  Okay.

17  Q.   Mr. Dikman, what --

18          THE COURT:  You can pose any question you want and

19  then we'll see if there's an objection --

20          MS. KACHAN:  Okay.

21          THE COURT:  -- and I'll rule.

22  BY MS. KACHAN:

23  Q.   What discrepancies in closings or occurrences with, in

24  connection with this project that you feel offend good faith of

25  this plan?

1  A.    Should I say again about those two episodes we've been

2  discussing before?

3         MS. SCHWARTZ:  I'm going to object as asked and

4  answered.

5         THE COURT:  As I understand it --

6         MS. KACHAN:  It was very --

7         THE COURT:  -- the witness has enquired of counsel

8  whether he should say something again.  I appreciate that you

9  did take some time to confer and prepare, at the same time I

10  have to emphasize that this is your testimony, what you should

11  say is based on your knowledge and recollection.  Not what you

12  may have been told what you should say.  So you should listen

13  to the question, take the time you need to frame your answer in

14  your mind, give your answer and wait for the next question.

15         THE WITNESS:  Okay.  Just --

16         THE COURT:  But it's not a questions of what you

17  should say, what counsel should -- what counsel wants you to

18  say.

19         THE WITNESS:  Yeah, Your Honor --

20         THE COURT:  It's a question of your testimony.

21         THE WITNESS:  If I may?

22         THE COURT:  Let's have a question, and then you can

23  answer it.

24         THE WITNESS:  If I may?

25         THE COURT:  Let's have -- I am going to ask you to

1    await the next question.  Being a witness is different than

2    anything else.  Ms. Kachan, could you please put a question to

3    the witness?

4            MS. KACHAN:  Your Honor, I was really trying to

5    summarize in asking about everything Mr. Dikman had testified

6    before.  I was asking whether at this --

7            THE COURT:  No, you need to put the question to the

8    witness, not to me.

9    BY MS. KACHAN:

10   Q.   Mr. Dikman --

11           THE COURT:  Thank you.

12   Q.   -- were there, to the best of your knowledge,

13   discrepancies in any occurrences in connection with this

14   proposed plan?

15           MS. SCHWARTZ:  Objection, asked and answered.

16           THE COURT:  I'm going to overrule the objection.  You

17   may answer.

18   A.   Yeah.  I want to emphasize on this again, that this is not

19   only best of my -- to the best of my knowledge, but I talked to

20   Mr. Pinson and he agreed he took those money that's called

21   under the table and he paid me the different checks on this

22   amount and I have copies of these checks.  This is absolutely

23   facts that I know.  This is not something that I heard from

24   anybody.  This is things I know and I have proof for.  Another

25   account are different closing statements which been showed to

1    me personally in the presence of my lawyer, Mr. Mazarisi (ph.)

2    the first time and in the presence of my second lawyer Mr.

3    Shapiro, second time, by Mr. Pinson and his attorney Mr.

4    Frankel.  And this is something I know, I been witness to.

5    This is not something I heard from somebody.

6    Q.    And what were the differences between the closing

7    statements that were presented to you by Mr. Frankel and

8    presented to you in the course of this case?

9    A.    I don't know if it's any different in a general numbers

10   but one line in the closing statements by Mr. Pinson and Mr.

11   Frankel was payment to Mr. -- not to Mr. Lockshen, to some

12   company, I don't remember the name, but I was told this is to

13   Mr. Lockshen of 125,000 dollars per closing statement.  And I

14   didn't see those numbers in the closing statements we received

15   from Mrs. Schwartz's office.

16   Q.    These discrepancies, these differences, do you think that

17   they affect -- or how do think, I'm sorry, not an opinion --

18   how do you think that they affect whether this plan was

19   proffered in good faith?

20   A.    I'm positive those differences wasn't accounted when the

21   thirty-million-dollars debt to secured credit -- creditor was

22   calculated.  So I believe that the debt to secured creditor

23   supposed to be less than thirty million dollars or thirty-one,

24   in the plan.  And this is going to raise the chance for

25   unsecured creditors to receive at least a fracture (sic) of

```
 1    their money.

 2              MS. KACHAN:  Thank you Mr. Dikman.

 3              Nothing further, Your Honor.

 4              THE COURT:  Right.

 5              THE WITNESS:  Can I --

 6              THE COURT:  You need to stay put --

 7              THE WITNESS:  Sure.

 8              THE COURT:  -- because you're going to be cross-

 9    examined.  And I have one question for you as a point of

10    clarification.

11              You were asked a lot of questions and gave a lot of

12    answers about a particular transaction.  Approximately when did

13    that take place?

14              THE WITNESS:  Your Honor, it was probably a couple of

15    years ago.  Maybe more, maybe three --

16              THE COURT:  Was it more than two years ago?

17              THE WITNESS:  Maybe three, I don't remember.  I wasn't

18    prepared --

19              THE COURT:  At least two years ago?

20              MS. KACHAN:  At least two years ago, Your Honor.

21              THE WITNESS:  At least two years ago, yes.

22              THE COURT:  Ms. Kachan, I'm not asking you.

23              MS. KACHAN:  Okay.

24              THE COURT:  Respectfully.

25              THE WITNESS:  At least two years ago, yes.
```

1       THE COURT:  Could it have been before -- two years

2   ago.  Could it have been before February of 2011?

3       THE WITNESS:  I'm sorry, Your Honor, I don't remember.

4   I'm eight years on this project --

5       THE COURT:  Okay.

6       THE WITNESS:  -- so it's so many controversial

7   information received from Mr. Pinson and so many things we can

8   talk about.

9       THE COURT:  No, it's --

10      THE WITNESS:  So I don't remember the date, I'm sorry.

11      THE COURT:  Again, testimony is different from a

12  conversation.  Thank you very much.

13      THE WITNESS:  I know.

14      THE COURT:  You may cross-examine

15      MS. SCHWARTZ:  Thank you, Judge.

16  CROSS-EXAMINATION

17  BY MS. SCHWARTZ:

18  Q.   Mr. Dikman were you aware that there was a mortgage on the

19  debtor's property?

20  A.   Sure.  Yes.

21  Q.   Do you know what amount that mortgage was?

22  A.   I, at the time we first signed the agreement with Mr.

23  Pinson in 2005, mortgage was about -- of course I don't

24  remember exact number -- about twenty-five million dollars.

25  Q.   And do you know if any of that amount was paid down?

1  A.   I only can tell you the facts I know for sure.

2  Q.   Tell me what you know?

3  A.   I know that over the course of maybe seven years, six

4  years of selling of apartments, this total number received at

5  closings was about twenty million dollars.

6  Q.   When you say the total number received at closings, what

7  are you referring to?

8  A.   I'm referring to the price of the apartments.  If you

9  combine the price of all the apartments sold, actually sold,

10  it's going to be about twenty million dollars.

11  Q.   Okay.

12  A.   So subtracted from twenty-five, it's very hard to imagine

13  how it came to thirty million dollars.

14  Q.   Okay.  And was -- you testified that you're a

15  representative of Metropolitan, is that correct?

16  A.   Yes.

17  Q.   Okay.  Was Metropolitan ever paid a commission from any of

18  these closings?

19  A.   Yes.

20  Q.   Okay.  Do you know how much money Metropolitan received

21  from the commissions?

22       MS. KACHAN:  Objection, Your Honor.  I don't see the

23  relevancy to the good faith --

24       THE COURT:  You can respond.

25       MS. KACHAN:  -- aspect.

1    MS. SCHWARTZ:  Ms. Kachan opened up the door in asking

2  questions about the various closings, and I'm following up.

3    THE COURT:  Overruled.

4  A.   I would say, about 6- to 800,000 dollars.

5  Q.   Did you actually attend the closings?

6  A.   No, never.

7    MS. KACHAN:  Objection, Your Honor.

8  A.   Mr. Pinson never --

9    MS. KACHAN:  Irrelevant.

10    THE COURT:  Overruled.

11  A.   Mr. Pinson strictly prohibited us from attending the

12  closings.  We tried many, many times but it was always trouble

13  for us to attend the closings.  I don't know why.

14  Q.   So your answer is no?

15  A.   But if you want to ask me --

16  Q.   You did not attend the closings.

17  A.   -- I don't know why.

18  Q.   That wasn't --

19  A.   Okay?

20  Q.   -- the question.  How did you receive your commission

21  payments?

22  A.   I received a check.

23  Q.   You referenced checks in your testimony before and you

24  said that you would have copies of those checks?

25  A.   Sure.

1   Q.   Were those checks turned over in the discovery that the

2   debtor submitted?

3   A.   I don't understand the question.

4   Q.   Do you recall that Metropolitan was served with certain

5   discovery demands from the debtor?

6   A.   Sure.

7   Q.   Okay.  Did you work with Ms. Kachan in replying to those?

8   A.   Sure.

9   Q.   And did you provide her with the copies of the checks that

10   you referenced?

11   A.   Yes.

12   Q.   And were they turned over to the debtor in response?

13   A.   Of course.

14   Q.   And the closing statements that you claimed were different

15   from the closing statements that were filed with this court --

16   A.   Um-hum.

17   Q.   -- were those turned over in discovery?

18   A.   I didn't have them in my possession.  Mr. Pinson never

19   gave them to me.  I demanded two times in the presence of Mr.

20   Mazarisi, my previous lawyer, and Mr. Shapiro, and Mr. Pinson

21   said that, first of all he never ever going to give us a single

22   piece of document in our hands, and then he showed those

23   closing statements to me.  He didn't let me to touch those

24   closings statements.  He showed me them -- those closings

25   statements from his hands.  That's how much he was concerned

1  about me having those documents in my possession.

2  Q.   But you were still able to testify about their contents?

3  A.   Yeah, I -- by that time my vision was better than now.

4  Q.   I'm sorry --

5  A.   Yes, I saw the closing statements.  I was able to read

6  them, and remember.

7  Q.   And those closings took place when?

8  A.   It was couple of occasions, once in Mr. Wilk's office,

9  maybe four years ago.  Another one at Mr. Frankel's office

10 about the same time.  And one more time, I don't remember

11 where, I'm sorry.  Maybe at Mr. Shapiro's office, I'm not sure

12 about it.

13        MS. SCHWARTZ:  One moment, Judge, if I may?

14        THE COURT:  Take your time.

15        MS. SCHWARTZ:  Nothing further, Judge.

16        THE COURT:  All right.  Redirect.

17 REDIRECT EXAMINATION

18 BY MS. KACHAN:

19 Q.   Mr. Dikman, in preparing discovery, actually answers and

20 demands, as Ms. Schwartz just asked, do you recall making a

21 demand for an explanation of these checks?

22 A.   Yes, of course.

23 Q.   Do you recall if --

24 A.   We made a demand --

25 Q.   Do you recall if an answer was received?

1  A.   As a matter of fact, our first demand for the discovery

2  process or -- I'm sorry, I'm not lawyer -- in return for this

3  demand we received very general information like the mortgage

4  note and the some publically accessible documentation and

5  something -- my personal feeling was they trying not to show me

6  any documentation.

7  Q.   Did -- do you recall making a specific demand for an

8  explanation of the checks discussed in your testimony?

9  A.   Yes.  After receiving this very, I would call it, general

10  answer to our demand, we prepared more detailed, and one of

11  them was demand to explain the nature of this difference in the

12  numbers on that closing.

13  Q.   Do you recall if you provided the physical checks --

14  A.   Sure.

15  Q.   -- for this demand?

16  A.   I did provide the physical checks and they've been

17  attached to the demand and supposed to be sent to the --

18  Q.   Um-hum.

19  A.   -- different --

20  Q.   Do you recall if a response was ever received?

21  A.   No.  No I don't -- we didn't receive any answer.

22  Q.   As to the closing statements that you've testified you

23  know of a discrepancy, did you personally see the closing

24  statements that were --

25  A.   Yes.

1  Q.    -- the actual closing statements at the closing?

2         MS. SCHWARTZ:  Asked and answered.

3         THE COURT:  It seems so, but it's been answered again.

4  Overruled.

5  Q.    Did you personally see the information on those closing

6  statements?

7  A.    Yeah, I saw them, I demand the copies, I was rejected, and

8  I was told specifically by Mr. Pinson and Mr. Frankel in the

9  presence of my lawyer Mr. Shapiro, that they never ever at any

10  circumstances will provide us with any kind of documentation

11  they have.

12  Q.    Do you recall whether these closing statements were a part

13  of the demands made in the course of the discovery process

14  here?

15  A.    Yes.

16  Q.    Was a response every received?

17  A.    No, we didn't receive any response to this request.

18         MS. KACHAN:  Thank you, nothing further, Mr. Dikman.

19         THE COURT:  All right, any recross?

20         MS. KACHAN:  Thank you, Your Honor.

21         THE COURT:  Are we done?  We need to let the lawyers

22  have the opportunity for a recross.

23         THE WITNESS:  Okay.

24         MS. SCHWARTZ:  Nothing on recross.

25         THE COURT:  All right.  You are excused.

1          THE WITNESS:  Thank you.

2          THE COURT:  Thank you very much.

3          THE WITNESS:  Thank you, Your Honor.

4          THE COURT:  Any further witnesses?

5          MS. KACHAN:  No, Your Honor.

6          THE COURT:  Any rebuttal witness?

7          MS. SCHWARTZ:  Judge, I'd like to recall Mr. Pinson.

8          THE COURT:  All right.  Mr. Pinson.

9    FURTHER REDIRECT EXAMINATION

10   BY MS. SCHWARTZ:

11   Q.   Mr. Pinson, a question was asked earlier with respect to

12   an individual named Mr. Lockshen.  Do you recall that?

13   A.   Yes.

14   Q.   Can you explain how Mr. Lockshen was paid?

15   A.   Again, Mr. Lockshen had an agreement with the bank because

16   he invested his own funds to finish the project when the bank

17   wasn't willing to fund the completion.  He had a separate

18   independent deal with the bank that he would get paid from

19   closings with the approval of the bank.  He had a specific

20   dollar amount from every closing that he would get paid for his

21   investment plus some profit that he agreed upon with the bank.

22   Q.   And all of this was approved by the bank?

23   A.   All -- every penny that was distributed from closing had

24   to be approved from the bank beforehand, before the bank would

25   sign off.  Mr. Dikman was well aware of it.  As he mentioned,

1   he spoke to Mr. Lockshen many times, he met him many times, he

2   was well aware that he was funding the project and he was

3   getting paid from closings.

4   Q.   Do you recall how many closings Mr. Lockshen was involved

5   with?

6   A.   Not really.  I do know at the end of the project he was

7   still owed a lot of money and didn't get paid for a couple of

8   years later from the bank.

9          MS. SCHWARTZ:  Nothing further, Judge.

10         MS. KACHAN:  If I may, Your Honor?

11        THE COURT:  Yes.

12   FURTHER RECROSS-EXAMINATION

13   BY MS. KACHAN:

14   Q.   Mr. Pinson, did you provide closing statements to Mr.

15   Dikman and Mr. Wilk?

16   A.   I don't know specifically on the details, but they knew

17   every closing, yes.

18   Q.   That's not what I asked.  Did you provide the actual

19   closing statement?

20   A.   I didn't provide it, I didn't have it, it was from my

21   attorney.

22   Q.   Are you aware if your attorney provided them?

23   A.   I don't know.

24   Q.   Are you aware of the demands made in the course of this

25   litigation?  The demanding for the closing statements?

1  A.   I'm not sure.

2  Q.   Were you informed at any time that demands were made for

3  closings statements?

4          MS. SCHWARTZ:  Objection.

5          MR. FEUERSTEIN:  Objection.

6          THE COURT:  Ms. Kachan, I'm going to overrule the

7  objection, but that may be the seventh or eighth question in a

8  row that went to substantially the same area --

9          MS. KACHAN:  Okay.

10          THE COURT:  -- so I encourage you to explore it as

11  thoroughly as you need to --

12          MS. KACHAN:  Okay.

13          THE COURT:  -- but to be mindful of questions that may

14  have been answered --

15          MS. KACHAN:  Okay.

16          THE COURT:  -- asked and answered in substance more

17  than once already.

18          MR. FEUERSTEIN:  Your Honor, if I may, it's also

19  outside of the scope of the direct examination with respect to

20  the rebuttal witness.

21          THE COURT:  And the re -- and, well, there is that.

22          MS. KACHAN:  Your Honor, Ms. Schwartz, did open the

23  door to it.

24          THE COURT:  I was focusing on the asked and answered

25  aspect of it.  I'm sorry, I should have permitted the counsel

1  to state the grounds.

2        Objection's overruled, question's been answered.

3        Please ask your next question.

4  BY MS. KACHAN:

5  Q.   Okay.  Do you recall the specific closing that we have

6  discussed here today?

7  A.   Not at the moment.

8  Q.   No recollection at all?

9  A.   I have some recollection, but not in details.  I can't

10 answer you.

11 Q.   Do you have any recollection of the conversations

12 regarding that closing with Mr. Dikman or Mr. Wilk?

13 A.   Somewhat.  Not to the extent of the dollar amount that

14 he's referring to.  As I said earlier, every closing -- not

15 every closing -- many closings had differences at the time from

16 the contract to when the actual closing.  There were credits

17 given for different reasons for different opportunities for

18 different work that had to be done.  I believe the specific one

19 that you have in mind if I -- correct me, if my recollection is

20 correct, there was a lot of work in the unit that had to be

21 done.  The individual that bought the unit happened to be a

22 contractor or a plumber himself and ended up doing a tremendous

23 amount of work and was given a specific credit for it.  I don't

24 remember the amount.

25 Q.   So it is your testimony that that discrepancy was for the

1 unit?

2 A. Most, I believe so, as far I can recollect.

3 Q. Do you have a recollection of issuing additional checks to

4 Mr. Dikman and Mr. Wilk in connection with that closing?

5 A. Mr. Wilk and Mr. Dikman got paid different commissions

6 from my attorney because they had more than one entity where

7 the commissions were paid to for various reasons, and they

8 weren't always one specific check. It was sometimes that my

9 attorney paid him two checks or three checks, and maybe not all

10 the same day, a day later. I don't remember specifics.

11 MS. KACHAN: Your Honor, if I may confer with my

12 client for one second? If I may, my client just had something

13 to tell me, is that --

14 THE COURT: All right.

15 Q. Mr. Pinson, was there, to the best of your recollection,

16 any other occasion when you had issued different checks on

17 different -- on one particular closing to Mr. Dikman and Mr.

18 Wilk?

19 A. Possibly, I don't recall.

20 Q. So it's your testimony that this monies has to do with --

21 MS. KACHAN: I'm sorry, I'm going to rephrase, Your

22 Honor.

23 Q. Do you have any recollection of the statements made by Mr.

24 Dikman today -- that you had made to Mr. Dikman in connection

25 to that closing?

1  A.   He made a lot of statements.  I don't know what you're

2  referring to.

3  Q.   Do you have any recollection to the statements you made in

4  connection with the nature of the discrepancy with regard to

5  that closing?

6  A.   Not specific.

7  Q.   Do you have any recollection -- or from your recollection,

8  was there a difference or any discrepancy between the closing

9  statements provided by the closings and the closing statements

10  that are provided in the course of this litigation?

11  A.   I don't understand the question.  I think I just answered

12  it.  It was slightly different.

13  Q.   No this is a different question.  I'm asking you not with

14  regard to any specific closing, I'm asking you with regard to

15  discrepancies in the closing statements that were provided at

16  time of each closing and the ones that were produced in the

17  discovery -- actually not produced, but ordered in the course

18  of this litigation as exhibits or elsewhere?

19  A.   No, not that I know of.

20       MS. KACHAN:  Nothing further.

21       THE COURT:  All right.  Any further questions?

22       MS. SCHWARTZ:  Nothing further, Judge.

23       THE COURT:  You are excused.  Thank you very much.

24  All right.

25       Any further witnesses?  Oh, we're in rebuttal, so the

 1   answer is we're -- are we done -- does the debtor rest?

 2          MS. SCHWARTZ:  Yes.

 3          THE COURT:  Does the --

 4          MS. KACHAN:  Yes, Your Honor.

 5          THE COURT:  All right.  I'm going to take a minute or

 6   two look over my notes and come back and have a decision for

 7   you.  Thanks.

 8          MS. KACHAN:  Thank you.

 9          THE CLERK:  All rise.

10      (Recess from 8:19 p.m. until 8:35 p.m.)

11          THE COURT:  Please be seated.

12          First of all, I want to thank you for your patience

13   this evening.  I know it's been a long hearing, but it's

14   important and necessary to make a full record, and I'm glad

15   that you've had the opportunity to put in the record that you

16   have.  It's been helpful to the Court.  I'm of course very

17   familiar with the record, as we have just made it, and familiar

18   with the record of the case.  I will offer you the opportunity

19   if you'd like to take it to sum up with respect to good faith

20   and any other open issues.

21          Debtor has the burden, you can go first.

22          MS. SCHWARTZ:  Thank you, Judge.  Going back to the

23   debtor's initial case, in the affirmation in support of

24   confirmation the debtor submits that its plan was proposed in

25   good faith.  With respect to the testimony that was taken this

1    evening regarding prior bankruptcy filing acts, we believe that
2    those are not relevant to the analysis with respect to
3    1129(a)(3) and we do submit that the plan was proposed in good
4    faith, is in the best interests of all creditors, is fair and
5    reasonable, and is feasible, and should be confirmed.
6         THE COURT:  All right, and just to be clear, when you
7    say prior bankruptcy filing act, you mean acts prior to the
8    bankruptcy filing, as opposed to some prior bankruptcy filing?
9         MS. SCHWARTZ:  Correct, Judge.
10        THE COURT:  Thank you.  All right, Ms. Kachan.
11        MS. KACHAN:  Your Honor, it is our position that the
12   plan was not -- has not been proposed in good faith and that
13   further discovery is necessary in order to examine the
14   discrepancies.  The Second Circuit's standard for a test that's
15   been proposed in good faith says that the good faith test means
16   that the plan was proposed with honesty and good intentions.
17   We propose, Your Honor, that neither honesty nor good
18   intentions were present in certain acts of the debtor, the
19   debtor's principal.  Therefore that affected the amounts in the
20   plan directly; therefore it affects whether the plan was
21   proposed in good faith and further discovery is needed for that
22   reason.
23        THE COURT:  What case are you referring to when you
24   quote the Second Circuit?
25        MS. KACHAN:  It's Kane v. Johns-Manville Corp. --

 1  Johns dash Manville Corp.

 2          THE COURT:  Could you give a citation?

 3          MS. KACHAN:  Yes.  It's 843 F.2d 636, 649 --

 4          THE COURT:  All right.

 5          MS. KACHAN:  -- (2nd Cir. 1988)

 6          THE COURT:  And --

 7          MS. KACHAN:  And it's also quoting the second page.

 8          THE COURT:  You'll have to remind me, because I read

 9  your brief -- your objection, but I don't have at hand the

10  page --

11          MS. KACHAN:  Page --

12          THE COURT:  -- with that reference.

13          MS. KACHAN:  -- page 3.

14          THE COURT:  Thank you.  All right.  Anything further?

15          MS. KACHAN:  No, Your Honor.

16          THE COURT:  All right.  Anything -- any reply?

17          MS. SCHWARTZ:  No, Judge.

18          THE COURT:  No response.  Any -- all right.  Let's --

19          First of all, thank you again for your time and your

20  arguments and the record you've made, in paper and with the

21  testimony today and this evening.  It's thorough, it's helpful.

22  I'll say the ground that was covered was covered quite

23  thoroughly.  And so it gives me a significant level of comfort

24  in the -- in ruling this evening with respect to the sole

25  disputed issue on confirmation which is whether the requirement

1  of Section 1129(a)(3) that the plan be proposed in good faith

2  and not by any means forbidden by law.

3         As the plain language of the section makes clear,

4  there are two requirements built into Section 1129(a)(3), one

5  positive and the other negative.  The positive requirement is

6  that plan has been proposed in good faith.  The negative

7  requirement is that the plan not have been proposed by any

8  means forbidden by law.  These complement and supplement each

9  other, and I consider them both separately and together.

10        With respect to good faith, no less than authority

11 than the Collier treatise tells us that good faith has served

12 many functions in American bankruptcy law.  I'll say that good

13 faith informs and underlies everything that happens in this

14 court and through these processes.  Every matter that comes

15 into this court does so with the presumption that is being

16 undertaken in good faith.  But that presumption can be upset,

17 on the basis of an appropriate record.  And it does take a

18 record; it generally is not achieved with allegations,

19 adjectives and adverbs, but with evidence.  And you had the

20 opportunity over the course of this case to become very

21 familiar with the record, and this evening to focus, quite

22 particularly over the last couple of hours, with respect to the

23 evidence that the objector wished to put in the record with the

24 respect to the positive and the negative components of the

25 good-faith requirement.

1       The standard for good faith has been described in
2  general ways by a number of courts.  An often referenced source
3  is the decision of the Second Circuit in In re Madison Hotel
4  Associates, a case that has been widely cited, including within
5  this circuit.  And it describes one of the first, and in the
6  view of some, one of the best statements as to what the
7  yardstick of 1129(a)(3)requires.

8       The Second Circuit said, "Though the term good faith,
9  as used in Section 1129(a)(3) is not defined in the Bankruptcy
10  Code, the term is generally interpreted to mean that there
11  exists a reasonable likelihood that the plan will achieve a
12  result consistent with the objectives and purposes of the
13  Bankruptcy Code.  Thus for purposes of determining good faith
14  under Section 1129(a)(3) the important point of inquiry is the
15  plan itself and whether such plan will fairly achieve a result
16  consistent with the objectives and purposes of the Bankruptcy
17  Code."  Continuing the quote, "According to the good-faith
18  requirement of Section 1129(a)(3) the court looks to the
19  debtor's plan and determines in light of the particular facts
20  and circumstances whether the plan will fairly achieve a result
21  consistent with the Bankruptcy Code.  The plan must be viewed
22  in the light of the totality of the circumstances surrounding
23  confection of the plan, and the bankruptcy judge is in the best
24  position to assess the good faith of the parties' proposals."

25       As the Collier treatise states, "Few cases since

1 Madison Hotel Associates have managed to add anything

2 substantive to this description, and many courts have used

3 these words and phrases, more or less, verbatim."

4 So in a general way, I think it's fair to say that we

5 are reminded by Madison Hotel and by many, many, many, many,

6 many other cases as well as the plain text of the Code that the

7 point of this element is, first and last, the plan, and whether

8 the plan was proposed in good faith, and whether the plan has

9 been proposed by means not forbidden by law.

10 So I then turn locally to an interpretation by the

11 Bankruptcy Court of the Southern District of New York in 1981

12 in the Eden Associates case. There the court emphasized the

13 importance of good faith and said, "Good faith, as the sine qua

14 non for the filing and maintenance of a Chapter 11 case, should

15 be proved elastically and on a case-by-case basis. To do

16 otherwise invites unnecessary rigidity in bankruptcy

17 administration, emasculating bright prospects of reorganization

18 by slavish review of pre-petition dealings by debtors with

19 their creditors."

20 That is to say again, the focus of the analysis under

21 Section 1129(a)(3) is first and foremost, though of course not

22 exclusively, the plan, the proposal of the plan, the debtor's

23 conduct and the conduct of the parties-in-interest with respect

24 to the plan.

25 So having that focus, but keeping in mind the big

1    picture as well, I turn to the record before me.  And based on

2    the entire record and the arguments of counsel, and paying

3    close attention to the evidence this evening especially, and

4    having allowed, and appropriately so, a wide berth with respect

5    to admissible evidence by the objector because the process only

6    benefits from a wide consideration of all the issues and

7    potential issues, I'm satisfied that the debtor has carried its

8    burden that the plan was proposed in good faith and not by any

9    means forbidden by law.

10           I find the testimony of the debtor's principal to be

11   both persuasive and credible.  I am satisfied that the

12   opportunity to cross-examine did not undermine in any

13   meaningful way, or any way at all, the persuasiveness of the

14   statements made initially in the affidavit and then in the

15   proffer and then through live testimony to the effect that the

16   debtor has indeed proposed this plan over the course of this

17   case, through to the plan placed before the Court for

18   confirmation this evening, in good faith, consistent with the

19   purposes of the Bankruptcy Code and not by any means forbidden

20   by law.

21           Taking at face value and assuming for purposes of,

22   again, the most searching and thorough consideration of the

23   possible issues that the objector has raised, I'm satisfied

24   that the points of concern, first do not undermine the

25   credibility of Mr. Pinson as the debtor's witness, and second

1  do not suggest, and certainly do not demonstrate, that the

2  debtor has not carried its burden.  And I note plainly that the

3  burden is on the debtor with respect to the requirement that

4  the plan be proposed in good faith and not by any means

5  forbidden by law.

6       I say that based on the record on confirmation.  I say

7  that also based on the entire record of this case before this

8  Court, where the Court has had, and this Judge has had a, in

9  effect, a front row seat, with respect to the long path that

10  has led us from the date of filing of this case to the point of

11  confirmation today.

12       So I am satisfied based on the entire record that the

13  objection with respect to Section 1129(a)(3) should be

14  overruled, and it will be overruled, and I find that the debtor

15  has demonstrated that the plan has been proposed in good faith

16  and not by any means forbidden by law.

17       That brings me back to the questions of whether the

18  requirements of cram-down have been met.  The first is whether

19  all other requirements of Section 1129(a) of the Bankruptcy

20  Code are satisfied, and they are, or to the extent they are

21  applicable, they are.  And next, that at least one of impaired

22  class of votes -- one impaired class votes to accept the plan

23  without regard to any vote cast on account of the claim held by

24  insiders.  And here, too, the element satisfied.

25       And then finally, that as to a dissenting class, that

1  as to each dissenting class, that the plan does not

2  discriminate unfairly, that is that the legal rights of that

3  dissenting class are treated in a manner that is consistent

4  with the treatment of other classes whose legal rights are

5  intertwined with those of the nonaccepting class, and that no

6  class receives payments in excess of what it is legally

7  entitled to receive for its claims.  And I am satisfied that

8  that is the case here.  And that the -- finally, that the plan

9  is fair and equitable with respect to that dissenting class.

10        And this turns on, among other things, the absolute

11  priority rule, requiring that an impaired class that has not

12  accepted the plan must be paid in full before a more junior

13  class can receive or retain any distribution under the plan.

14  To the extent that is implicated here, I am satisfied that that

15  requirement has been met.

16        So for all the reasons reflected in the record I am

17  satisfied that each and all of the statutory requirements and

18  other requirements for confirmation have been met.  I am

19  pleased to confirm this plan.

20        I appreciate the hard efforts of everyone to get us to

21  this point.  It hasn't always been -- hasn't ever been an easy

22  case, but it's been a productive case.  If I'm ruling in your

23  favor, I'm sure you think this is a wise and insightful

24  decision.  If I'm ruling against you, I hope you appreciate

25  that I have done my best to listen carefully to everything

1    you've said and be sure that I'm making a decision on the law

2    before me, on the record before me, that is justified on the

3    law and the facts.

4          So, I'm going to ask the debtor to submit an

5    appropriate proposed order.  I trust that need not be on the

6    docket tonight in order to satisfy all the parties, and we'll

7    do our darndest to get it up on the docket promptly.

8          Is there anything further, except I suspect we need to

9    find an adjourn date for a continued status conference.  Yes?

10          MS. SCHWARTZ:  Judge?

11          THE COURT:  Yes.

12          MS. SCHWARTZ:  I hate to do this, but there is one

13    other matter open and that is the claims objections with

14    respect to Metropolitan and Wilk.  We would --

15          THE COURT:  It may be that we're not able to proceed

16    with that this evening, in view of the lateness of the hour.

17          MS. SCHWARTZ:  Understood.

18          THE COURT:  Is that a nece --

19          MS. SCHWARTZ:  I just didn't want it to remain an open

20    issue.  It does relate to --

21          THE COURT:  It's a good reminder, and I appreciate

22    that it informs a lot of the concerns that have been expressed

23    here.

24          MS. SCHWARTZ:  The claims that are on file, it does

25    relate to the ability to make a distribution, and things of the

1    like.  So they are -- they're matters that obviously dealing

2    with them this evening is probably not the best scenario, but

3    they do need to be addressed.

4          THE COURT:  Of course they do.  And they may be at

5    least as important to the parties.

6          MS. SCHWARTZ:  Correct.

7          THE COURT:  It's a question of confirmation.

8          MS. SCHWARTZ:  So that is something we need to

9    consider and schedule as soon as practicable.

10         THE COURT:  All right, we also have discovery motions,

11   I think, that go to those claim objections.  All right.

12         Having been quite focused the last few hours on the

13   specific questions of confirmation, understanding that that is

14   the context for the remaining issues, no less and no more than

15   the context, I guess here's my question for the parties.  Do we

16   have a -- Ms. Jackson, do we have a next date scheduled?  Or do

17   we need to pick a date?

18         MS. SCHWARTZ:  Today was the last date.

19         THE COURT:  Okay, so we don't have any further dates.

20         MS. SCHWARTZ:  So we need a new date.

21         THE COURT:  All right, so, here's what I'm going to

22   do.  One moment.

23         I'm going to propose that you consider, as I'm

24   considering, whether a referral to one of my colleagues for

25   mediation on the issue of those claim objections would make

1   sense.  You can spend a lot of time and money on litigating

2   them.  And as you can see, I'll take -- I'll do what I need to

3   do whenever it needs to be done.  But it seems to me,

4   especially at this juncture in the case we now have a fairly

5   discrete defined set of issues and it might make sense and I

6   would be prepared to ask one of my colleagues to -- Judge Lord

7   or Judge Craig -- to serve as a judicial mediator and try to

8   bring this last issue to closure.  What do you say?

9          MS. SCHWARTZ:  Judge, conceptually I don't have an

10  issue with it.  I am more concerned with the timing aspect.  I

11  don't want mediating to be something that becomes a --

12         THE COURT:  That delays it.

13         MS. SCHWARTZ:  -- very lengthy, especially in light

14  of the fact that there are other creditors involved whose

15  distribution is going to be held up as a result --

16         THE COURT:  Of course.

17         MS. SCHWARTZ:  -- because this is a pro rata --

18         THE COURT:  Understood.

19         MS. SCHWARTZ:  -- scenario.  If there is a way to

20  schedule something with an outside deadline, perhaps that's

21  something that would make the most sense, if Metropolitan

22  obviously is amendable to that.

23         THE COURT:  It can become somewhat difficult to

24  schedule in the coming weeks because of the requirements of

25  counsels' ancillary obligations, and those kinds of things.

```
 1   Would the parties be available at some point -- do you have
 2   flexibility at some point in July if it turns out that one of
 3   my colleagues is available?
 4              MS. SCHWARTZ:  The debtor does, yes.
 5              MS. KACHAN:  Your Honor, I will be away between the
 6   dates of the -- I will be unavailable between the 16th and the
 7   22nd.
 8              THE COURT:  Okay.  So it would have to be through the
 9   15th, or --
10              MS. KACHAN:  From the 23rd.
11              THE COURT:  -- after the 23rd.  I'll give you a day to
12   get adjusted after the 24th.  Shall I inquire and we'll advise
13   the parties?
14              MS. SCHWARTZ:  Yes, Judge.
15              MS. KACHAN:  Yes, Your Honor.
16              THE COURT:  All right.  I'm going to be an optimist
17   and assume that that will work.  And with respect to -- and
18   you'll be advised.  But it's -- I'm profoundly reluctant to say
19   one of my colleagues, not only I would like you to take this --
20   to consider taking on this mediation in this situation where it
21   could be extremely helpful -- I understand the parties will
22   make a sincere effort to resolve the matter through
23   mediation -- but also, you got to schedule in the next few
24   weeks because people are -- we are a busy court, as you can
25   see.
```

1    Let me see what can be done.  We know your scheduling

2    issues, we'll note them.  Any scheduling issues from the

3    standpoint of the parties, from the bank and the debtor?

4            MS. SCHWARTZ:  No.

5            THE COURT:  It's okay, by the way, I'm -- all right.

6            All right, well let's get to work on that on our end.

7    What other issues -- that, if that can be resolved that would

8    take care of, obviously discovery issues.  Let's get to work on

9    that.

10            All right, so we'll come up with a date.  As a holding

11    date, I'm going to suggest August 2nd.  Ms. Jackson, August 1st

12    or 2nd.

13            THE CLERK:  Not the 1st.

14            THE COURT:  Not the 1st?

15            THE CLERK:  The 1st is the adversaries.  Yes.

16            THE COURT:  August 2nd?  As a holding in I'm going to

17    propose August 2nd at 9 o'clock.

18            MR. FEUERSTEIN:  Your Honor, I don't know if I'll even

19    be involved in the process, but I do have a bankruptcy

20    mediation on August 2nd.

21            THE COURT:  Oh, okay.  I hope it goes well.  I'll --

22    let's pick a different date.  You say not August 1st.

23            THE CLERK:  At 9?  Okay, 9 o'clock, then.

24            THE COURT:  Let's look at -- I don't need to be rigid

25    about that.  We've got a couple weeks, fine.  It's not terribly

1 good for me. August 15th. Do you like that better? If we're

2 going to give the wee -- if we're going to --

3       MR. FEUERSTEIN: That's when I'm going to be on

4 vacation.

5       THE COURT: All right. That's all right. This is

6 what happens this time of year though. It's terrible, just

7 terrible. All right. We'll work on scheduling off the record.

8 Let's go off the record. I don't want to see that roll over to

9 9 o'clock.

10     (Whereupon these proceedings were concluded at 8:55 PM)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          I N D E X

2

3  WITNESS              EXAMINATION BY      PAGE

4  Jacob Pinson         Ms. Kachan          38

5  Jacob Pinson         Ms. Schwartz        49

6  Alexander Dikman     Ms. Kachan          50

7  Alexander Dikman     Ms. Schwartz        64

8  Alexander Dikman     MS. Kachan          68

9  Jacob Pinson         Ms. Schwartz        71

10 Jacob Pinson         Ms. Kachan          72

11

12                      E X H I B I T S

13 DEBTOR'S             DESCRIPTION                    PAGE

14                      Ballot certification            9

15                      Confirmation affirmation        9

16

17

18                         RULINGS

19                                        Page     Line

20 Objection with respect to Section 1129(a)(3) 84      14

21 overruled

22 Plan of reorganization confirmed           85       19

23

24

25

C E R T I F I C A T I O N

I, Keren Berkovitz, certify that the foregoing transcript is a true and accurate record of the proceedings.

_____

KEREN BERKOVITZ

eScribers

700 West 192nd Street, Suite #607

New York, NY 10040

Date:  July 22, 2013

# #

**#607 (1)**
5:22

# A

**abide (1)**
16:8
**ability (1)**
86:25
**able (8)**
17:18;18:19;32:19;
43:21;58:20;68:2,5;
86:15
**absence (1)**
24:7
**absolute (1)**
85:10
**absolutely (10)**
33:21;34:25;35:3;
36:9;41:11,17;44:8;
46:25;47:11;61:22
**accept (3)**
8:14;12:3;84:22
**acceptance (1)**
30:22
**accepted (4)**
11:16;31:6,8;85:12
**accessible (1)**
69:4
**accordance (2)**
39:25;45:8
**according (3)**
22:5;39:20;81:17
**account (5)**
40:25;43:21;51:4;
61:25;84:23
**accounted (2)**
55:17;62:20
**accrue (1)**
20:25
**accuracy (1)**
55:3
**accurately (2)**
52:10;58:20
**achieve (3)**
81:11,15,20
**achieved (1)**
80:18
**Act (3)**
32:2;57:19;78:7
**acting (1)**
18:5
**action (1)**
43:15
**active (1)**
8:5
**actively (1)**
8:25
**acts (6)**
35:23;58:5,7;78:1,

**7,18**
**actual (4)**
42:20;70:1;72:18;
74:16
**actually (14)**
17:21;23:5,14,15;
26:16,22;28:18;39:1,
17;54:10;65:9;66:5;
68:19;76:17
**add (1)**
82:1
**addition (2)**
18:8;19:8
**additional (15)**
12:15;19:17,22,25;
20:1;23:15,19,21;
24:10,11;26:14,24;
44:22;45:7;75:3
**additionally (1)**
23:7
**address (3)**
34:7,14;35:23
**addressed (3)**
31:4,19;87:3
**addresses (1)**
40:18
**adequate (1)**
40:15
**adequately (3)**
45:23;46:3,23
**adjectives (1)**
80:19
**adjourn (1)**
86:9
**adjusted (1)**
89:12
**adjustments (2)**
20:6;42:19
**administration (1)**
82:17
**administrative (3)**
10:6;12:10;31:2
**administrator (1)**
13:8
**admissibility (1)**
52:24
**admissible (1)**
83:5
**admitted (3)**
11:5;23:8;53:15
**advance (1)**
41:23
**advanced (1)**
10:2
**advancing (1)**
10:3
**adverbs (1)**
80:19
**adversaries (1)**
90:15
**advise (1)**
9:24;89:12
**advised (3)**

**9:23,25;89:18**
**affect (3)**
56:5;62:17,18
**affected (3)**
21:7;55:22;78:19
**affects (3)**
54:2;56:25;78:20
**affidavit (4)**
11:24;30:20;36:23;
83:14
**affidavits (1)**
23:17
**affirm (2)**
36:24,25
**affirmation (9)**
8:16;10:24;11:3,
13,19;13:22;14:3;
49:11;77:23
**afternoon (7)**
6:6,8,11,24;7:4;
17:6;21:15
**again (17)**
16:22;28:11;29:25;
32:13;37:17;48:21,
25;55:16;60:1,8;
61:18;64:11;70:3;
71:15;79:19;82:20;
83:22
**against (1)**
85:24
**ago (8)**
63:15,16,19,20,21,
25;64:2;68:9
**agree (1)**
19:12
**agreed (4)**
18:15;53:19;61:20;
71:21
**agreement (8)**
13:15,17;17:16;
18:2;44:14,16;64:22;
71:15
**agreements (3)**
39:21;45:9,10
**agrees (1)**
14:25
**Alexander (2)**
25:25;50:19
**alike (1)**
29:17
**ALLA (3)**
4:2,8;6:8
**allegations (2)**
35:21;80:18
**allow (1)**
15:4
**allowed (5)**
12:12;31:3;44:12;
58:11;83:4
**almost (1)**
51:20
**alone (1)**
20:24

**along (5)**
7:15;9:4;31:8;
42:11,12
**always (5)**
9:18;42:22;66:12;
75:8;85:21
**amendable (1)**
88:22
**amended (3)**
11:20;36:11,12
**American (1)**
80:12
**among (1)**
85:10
**amount (17)**
12:21;23:4,5;
25:15;26:5,5,6,14;
39:14;40:24;61:22;
64:21,25;71:20;
74:13,23,24
**amounts (10)**
12:13;26:13;28:14;
39:13,15;41:13,14;
51:11;58:5;78:19
**analysis (4)**
30:21,25;78:2;
82:20
**ancillary (1)**
88:25
**and/or (1)**
58:25
**answered (12)**
47:18;48:8;55:25;
60:4;61:15;70:2,3;
73:14,16,24;74:2;
76:11
**apartments (4)**
24:21;65:4,8,9
**apologize (1)**
57:4
**appears (1)**
26:11
**appliance (1)**
42:18
**applicable (8)**
13:23;29:11,15,20;
30:16;31:23;45:8;
84:21
**application (1)**
32:1
**applied (3)**
43:23;44:6;53:17
**appreciate (7)**
7:13;9:19;22:2;
60:8;85:20,24;86:21
**appropriate (8)**
7:21;11:23;24:25;
55:10;57:13;59:14;
80:17;86:5
**appropriately (4)**
29:16;31:2,4;83:4
**approval (3)**
30:3,5;71:19

**approvals (1)**
30:12
**approve (1)**
47:3
**approved (9)**
9:9;11:20;29:22;
30:4;47:5;48:25;
49:4;71:22,24
**Approximately (1)**
63:12
**April (1)**
11:19
**arbitrary (1)**
7:18
**area (1)**
73:8
**argue (1)**
47:22
**argument (2)**
34:17,23
**arguments (3)**
20:8;79:20;83:2
**arrived (2)**
28:14;58:6
**as-is (1)**
7:6
**aspect (3)**
65:25;73:25;88:10
**assert (1)**
38:9
**asserted (1)**
26:21
**assess (1)**
81:24
**assist (1)**
13:20
**Associates (3)**
81:4;82:1,12
**assume (1)**
89:17
**assuming (3)**
14:24;23:20;83:21
**assurance (1)**
31:15
**attach (1)**
24:1
**attached (1)**
69:17
**attend (3)**
66:5,13,16
**attending (1)**
66:11
**attention (1)**
83:3
**Attorney (8)**
4:3;47:2,5;62:3;
72:21,22;75:6,9
**Attorneys (2)**
4:12;5:3
**August (7)**
90:11,14,16,17,20,
22;91:1
**authority (3)**

13:18;14:10;80:10
**authorized (1)**
11:5
**automatically (1)**
39:12
**available (3)**
7:9;89:1,3
**Avenue (2)**
4:4,13;5:4
**avoid (1)**
48:22
**Avoidance (3)**
31:23,25;32:1
**avoiding (1)**
42:9
**await (1)**
61:1
**aware (9)**
8:25;28:4;36:10;
52:21;64:18;71:25;
72:2,22,24
**away (1)**
89:5

**B**

**back (11)**
10:19;14:14,17;
15:1,18;18:20;19:4;
32:11;77:6,22;84:17
**background (1)**
19:12
**bad (3)**
35:23;38:10;40:4
**balance (1)**
20:5
**ballot (10)**
8:15,18,23;10:23;
11:2,11,15,23;14:3;
28:24
**ballots (5)**
8:12,14;12:3;
29:24;31:7
**bank (25)**
28:12;44:9;47:1,2,
3,4;48:16,17,25;49:1,
2;54:5,6,11;55:18;
71:15,16,18,19,21,22,
24,24;72:8;90:3
**Bankruptcy (20)**
13:24,25;29:9;
35:15;36:1;78:1,7,8,
8;80:12;81:9,13,16,
21,23;82:11,16;
83:19;84:19;90:19
**bank's (2)**
44:10,12
**Barring (1)**
13:25
**based (12)**
12:16;14:2;29:12,
17;30:23;44:11;49:3;
60:11;83:1;84:6,7,12

**basis (4)**
30:23;43:14;80:17;
82:15
**Bay (4)**
5:3;6:3,18;17:7
**Beach (1)**
4:4
**became (1)**
19:21
**become (4)**
7:3;13:16;80:20;
88:23
**becomes (1)**
88:11
**beforehand (1)**
71:24
**beg (1)**
35:19
**began (1)**
32:14
**begin (1)**
15:21
**beginning (4)**
22:25;29:10;32:20;
59:5
**begun (2)**
15:21;41:22
**behalf (3)**
6:9,12;21:10
**below (1)**
53:6
**benefit (2)**
12:24;15:2
**benefits (2)**
31:22;83:6
**Benten (1)**
26:22
**Berkovitz (1)**
5:20
**berth (1)**
83:4
**besides (3)**
43:17;53:16,16
**best (24)**
12:19;15:13,14,15;
16:5;26:3;30:17;
38:23;46:22;47:10,
11;51:17,22,22;
57:19;61:12,19,19;
75:15;78:4;81:6,23;
85:25;87:2
**better (3)**
56:22;68:3;91:1
**beyond (2)**
10:13,14
**big (1)**
82:25
**binding (1)**
13:18
**bit (1)**
21:5
**borrowed (4)**
39:13,16,18;44:6

**Both (5)**
8:14;11:5;20:6;
80:9;83:11
**bought (2)**
42:16;74:21
**boundary (2)**
46:16,16
**break (1)**
50:3
**Breakers (3)**
5:3;6:18;16:23
**brief (1)**
79:9
**bright (1)**
82:17
**Brighton (1)**
4:4
**bring (2)**
53:24;88:8
**brings (2)**
32:11;84:17
**broad (3)**
41:21,21;45:19
**broader (1)**
46:10
**Brog (1)**
6:7
**broken (1)**
8:7
**brokerage (2)**
26:12,14
**Brooklyn (1)**
4:6
**brought (3)**
48:15;54:3,10
**budget (1)**
21:4
**built (1)**
80:4
**burden (5)**
33:19;77:21;83:8;
84:2,3
**busy (1)**
89:24

**C**

**calculated (4)**
51:3;55:17;58:9;
62:22
**calendar (4)**
6:2,25;7:12,21
**call (7)**
14:21;17:7;32:12;
34:20;49:20;53:15;
69:9
**called (6)**
23:3;36:5,24;
51:25;57:7;61:20
**calling (1)**
33:3
**calls (2)**
17:12;52:13

**came (7)**
14:16;15:1;19:17;
22:24;23:1;42:13;
65:13
**can (44)**
9:24;15:17,19;
16:5,25;17:2;20:16;
22:9;24:8;25:7;29:1;
32:12,15;34:16;
35:10,21;36:19,24;
37:17;39:6;41:10,24;
46:14;52:25;53:1,23,
24;59:18;60:22;63:5;
64:7;65:1,24;71:14;
75:2;77:21;80:16;
85:13;88:1,2,23;
89:24;90:1,7
**care (2)**
31:19;90:8
**carefully (1)**
85:25
**carried (2)**
83:7;84:2
**case (25)**
9:4;11:25;15:8;
16:17;17:18;21:1;
29:13;32:21;42:10;
47:10;62:8;77:18,23;
78:23;80:20;81:4;
82:12,14;83:17;84:7,
10;85:8,22,22;88:4
**case-by-case (1)**
82:15
**cases (2)**
81:25;82:6
**cast (1)**
84:23
**causes (1)**
51:11
**central (1)**
9:14
**certain (6)**
48:17;54:12;58:12,
12;67:4;78:18
**certainly (5)**
15:7,13;21:12;
52:23;84:1
**certification (8)**
8:15;10:23;11:2,
11,16;14:4;29:24;
31:7
**chance (1)**
62:24
**change (2)**
17:23;18:10
**changed (1)**
16:16
**changes (1)**
30:14
**Chapter (2)**
25:17;82:14
**charges (1)**
20:23

**check (2)**
66:22;75:8
**checks (50)**
23:2,6,10,22;24:1,
8,12,12;26:15,24,24;
27:12,13;53:20,22,
22,24,25;61:21,22;
66:23,24;67:1,9;
68:21;69:8,13,16;
75:3,9,9,16
**Cir (1)**
79:5
**Circuit (4)**
78:24;81:3,5,8
**Circuit's (1)**
78:14
**circumstances (5)**
29:3;36:21;70:10;
81:20,22
**citation (1)**
79:2
**cited (1)**
81:4
**City (1)**
12:10
**claim (10)**
18:1;28:10;42:16,
17;43:12,13;44:1;
84:23;87:11,25
**claimants (1)**
13:11
**claimed (1)**
67:14
**claims (14)**
8:21;10:6;12:10,
10,11,13,21;31:1,3,3,
3;85:7;86:13,24
**claims-in-interest (1)**
29:16
**clarification (1)**
63:10
**clarify (2)**
54:19,21
**Class (18)**
11:16,17,18;13:3;
18:1;30:24;31:5,9;
84:22,22,25;85:1,3,5,
6,9,11,13
**classes (2)**
8:14;85:4
**classified (1)**
29:16
**clear (9)**
6:20;7:25;13:13,
18;26:18;33:21;
37:10;78:6;80:3
**cleared (1)**
26:6
**CLERK (10)**
6:2;17:7;37:24;
38:1;50:7,17;77:9;
90:13,15,23
**client (22)**

14:10,13,17,21,23,
25;15:1,5,10,18;16:7,
13,13,16;19:21;
20:24;23:7;26:10;
49:18,21;75:12,12
**clients (15)**
15:15;20:20;21:6;
23:6,8;24:9,15;
25:19;27:4,10;28:9;
39:16,20;40:14;
43:14
**client's (3)**
14:16;16:14;22:1
**clos (1)**
27:16
**close (1)**
83:3
**closing (90)**
23:2;24:13,19,22;
26:6,7,9,11,15;27:16;
28:2,5,7;37:13;
38:25;39:1;40:1,2;
42:14,18,21;43:2,2;
46:2,3,22,24;47:1,5,
6,8,8,10;48:18,20,24;
49:2;51:3,18,19,25;
53:6,16;54:1,4,13,14,
15,16,17,17,22,23;
55:3;61:25;62:6,10,
13,14;67:14,15,23;
68:5;69:12,22,23;
70:1,1,5,12;71:20,23;
72:14,17,19,25;74:5,
12,14,15,16;75:4,17,
25;76:5,8,9,14,15,16
**closings (39)**
27:7,8;28:3,15;
35:22,22;38:11,24;
39:10,19;41:1,2,14,
15;42:8,13;46:4,22;
48:18,21,25;59:23;
65:5,6,18;66:2,5,12,
13,16;67:24,24;68:7;
71:19;72:3,4;73:3;
74:15;76:9
**closure (1)**
88:8
**Code (11)**
13:24,25;29:9;
35:15;81:10,13,17,
21;82:6;83:19;84:20
**colleagues (4)**
87:24;88:6;89:3,19
**Collier (2)**
80:11;81:25
**combine (1)**
65:9
**comfort (1)**
79:23
**coming (1)**
88:24
**commission (7)**
30:16;40:15;53:20,

21,22;65:17;66:20
**commissions (4)**
42:21;65:21;75:5,7
**committed (2)**
57:20;58:7
**common (1)**
20:23
**communicate (1)**
16:15
**company (3)**
28:4,6;62:12
**compel (2)**
8:19;22:20
**compensation (3)**
24:10;48:19,24
**complement (1)**
80:8
**complete (4)**
15:5;27:16;48:15;
57:3
**completed (1)**
18:23
**completion (1)**
71:17
**complied (3)**
9:1;29:20,22
**complies (4)**
13:23;29:11,15,23
**comply (1)**
45:9
**component (1)**
15:3
**components (1)**
80:24
**conceivably (1)**
46:17
**conceptually (1)**
88:9
**concern (1)**
83:24
**concerned (6)**
14:15,16,24;19:21;
67:25;88:10
**concerns (2)**
33:8;9;37:11;86:22
**conclude (1)**
27:24
**concluded (1)**
91:10
**concluding (1)**
32:9
**conclusion (1)**
40:19
**condo (3)**
15:7,8,11
**Condominium (9)**
5:3;6:19;12:17,25,
25;15:4;16:23;20:18;
21:3
**conduct (2)**
82:23,23
**confection (1)**
81:23

**confer (2)**
60:9;75:11
**conference (1)**
86:9
**confirm (8)**
14:22;16:15;17:13,
18;19:8,10;28:21;
85:19
**confirmation (51)**
7:1,6;8:10,16,19;
9:5,14;10:10,13,14,
18,20;11:3,6,13,18;
12:5;13:6,14,22;14:3,
6;16:19;18:21,23;
19:2,7;20:9,12,13,19;
21:8,21;25:7;29:6,8;
30:6,11;31:12;32:4,
10;34:9,16;77:24;
79:25;83:18;84:6,11;
85:18;87:7,13
**confirmed (8)**
14:2,17,21;16:12;
22:7;29:1;31:24;78:5
**confront (1)**
53:9
**connect (4)**
25:13;27:1;39:6;
45:2
**connected (1)**
45:23
**connection (18)**
20:4;21:5;25:14,
16;40:7,8,13,15;41:9,
15;45:2;46:4;58:5;
59:24;61:13;75:4,24;
76:4
**consent (4)**
43:19,20;44:22;
45:10
**consider (8)**
7:18;9:20;29:8;
41:8;80:9;87:9,23;
89:20
**consideration (4)**
20:1;51:4;83:6,22
**considered (5)**
8:24;41:11,13,19;
59:14
**considering (1)**
87:24
**consistent (6)**
36:6;81:12,16,21;
83:18;85:3
**construction (4)**
12:22;15:12;28:4,6
**consult (1)**
13:20
**consultant (1)**
18:5
**consulting (5)**
13:15,17;18:2,15;
19:24
**contact (1)**

53:6
**contacted (2)**
53:5,14
**contained (1)**
30:17
**contains (1)**
9:9
**contents (1)**
68:2
**contested (4)**
29:14;30:2;31:11,
11
**context (2)**
87:14,15
**continue (5)**
12:22;14:20;15:17;
41:24;52:25
**continued (1)**
86:9
**continuing (2)**
20:25;81:17
**contract (8)**
23:4;24:13;25:16;
39:1;42:13,14,21;
74:16
**contracted (1)**
26:5
**contractor (2)**
54:10;74:22
**contracts (2)**
24:4;42:23
**contributed (1)**
12:16
**control (1)**
46:25
**controlled (1)**
44:8
**controlling (1)**
21:24
**controversial (1)**
64:6
**conversation (1)**
64:12
**conversations (1)**
74:11
**copies (6)**
24:12;26:24;61:22;
66:24;67:9;70:7
**Corp (2)**
78:25;79:1
**corporate (2)**
45:8,9
**corporation (1)**
44:15
**costs (4)**
19:25;30:3,4;47:5
**counsel (15)**
6:23;13:8;16:22;
17:9;24:3,14;34:1;
36:20;39:18;54:25;
60:7,17,17;73:25;
83:2
**counsels' (1)**

88:25
**counsel's (2)**
37:2,2
**couple (6)**
49:25;63:14;68:8;
72:7;80:22;90:25
**course (20)**
21:22;23:8;28:3;
29:18;34:24;62:8;
64:23;65:3;67:13;
68:22;70:13;72:24;
76:10,17;77:16;
80:20;82:21;83:16;
87:4;88:16
**COURT (306)**
6:5,10,13,16,20;
7:2,9,12,19,20;8:1,
17;9:2,13,17,24;10:8,
12,15,17,21;11:7,10,
20;14:5,8,9,22;15:17,
20,25;16:3,5,6,9,10,
21,24;17:1,3,6,8,15,
25;18:7,13,18,24;
19:1,6,14,15;20:5,11,
15,17;21:5,13,17,20;
22:8,12,15;23:9,11,
13,16,20,24;24:6,15,
18,20,24;25:2,4,6,10,
12,22;26:2,10,18,19,
20;27:1,5,9,19,21,23;
29:2,4,5,19;30:5,14;
31:12,24;32:15,18,
24;33:1,3,5,8,11,14,
16,18,24;34:1,5,13,
15,20,23;35:4,7,9,12,
18;36:4,10,15,18;
37:5,8,15,18,22;38:3,
7,12,15,17,19;39:3,6;
40:5,19;41:4,8,12,15,
20;42:2,4,6,25;43:9,
15;44:2,5,18;45:1,14,
17,21,25;46:9,13,17,
20;47:16,18,21,24;
48:4,6,9;49:5,7,15,
17,20,23,25;50:3,9,
11,14,20;52:4,6,10,
18,21;53:2,4,12;55:5,
8,10;56:1,8,13,15,17,
19,21;57:2,9,11,13,
23,25;58:16,20,22;
59:4,9,13,18,21;60:5,
7,16,20,22,22;61:7,
11,16;63:4,6,8,16,19,
22,24;64:1,5,9,11,14;
65:24;66:3,10;67:15;
68:14,16;70:3,9,19,
21;71:2,4,6,8;72:11;
73:6,10,13,16,21,24;
75:14;76:21,23;77:5,
5,11,16;78:6,10,23;
79:2,4,6,8,12,14,16,
18;80:14,15;81:18;
82:11,12;83:17;84:8,

86:11,15,18,21;
87:4,7,10,19,21;
88:12,16,18,23;89:8,
11,16,24;90:5,14,16,
21,24;91:5
**Court-retained (1)**
13:7
**courtroom (3)**
6:4;11:1;36:16
**courts (2)**
81:2;82:2
**Court's (4)**
7:15;14:10;21:23;
32:6
**covered (3)**
46:10;79:22,22
**Craig (1)**
88:7
**cram-down (3)**
30:25;32:5;84:18
**credibility (1)**
83:25
**credible (1)**
83:11
**credit (2)**
62:21;74:23
**creditor (21)**
6:12;7:5;8:4;10:2;
11:17,18;12:12,14,
16,22;14:7;15:7;
17:17;19:11,25;20:8;
22:3;31:8;51:2;
62:21,22
**creditors (13)**
12:20;13:2;15:3,
16;30:17;31:9;39:16;
40:24;51:6;62:25;
78:4;82:19;88:14
**creditors' (5)**
7:10;10:4,7;43:12,
12
**creditor's (1)**
17:24
**credits (1)**
74:16
**cross (2)**
37:6,10
**cross- (2)**
37:9;63:8
**CROSS-EXAMINATION (2)**
38:21;64:16
**cross-examine (2)**
64:14;83:12
**crucial (1)**
22:21
**currently (2)**
9:21,23

**D**

**damage (1)**
12:23
**darndest (1)**

86:7
**dash (1)**
79:1
**date (15)**
10:5;11:12,14;
12:3;18:3;64:10;
84:10;86:9;87:16,17,
18,20;90:10,11,22
**dates (2)**
87:19;89:6
**day (8)**
6:22;19:19;21:7,7;
34:5;75:10,10;89:11
**days (1)**
53:25
**deadline (3)**
8:11,13;88:20
**deadlines (3)**
9:1,1;10:11
**deal (7)**
24:22;26:6;48:17;
49:1,3,4;71:18
**dealing (1)**
87:1
**dealings (3)**
28:17,19;82:18
**debt (8)**
20:25;43:17;53:18;
54:5;55:18;58:9;
62:21,22
**debtor (50)**
6:7;8:4;9:1,2,11,
21;10:19,23;11:1;
12:19;13:6,8,23;
18:22;19:8;20:2;
22:3,9,21;27:15;
30:4;31:14;33:19;
34:13,15;36:1,2,2;
39:15;40:2,12;55:14;
57:2,3,14;67:2,5,12;
77:1,21,24;78:18;
83:7,16;84:2,3,14;
86:4;89:4;90:3
**debtors (1)**
82:18
**debtor's (33)**
6:23;7:1;8:6,22;
9:10;11:12,14,20;
12:14;17:8;24:3,14;
27:2;28:2;31:7;34:1;
36:5,14,20;37:2;
39:18;41:9;50:24;
54:25;55:20;56:23;
64:19;77:23;78:19;
81:19;82:22;83:10,
25
**decide (1)**
7:19
**decision (6)**
32:21,22;77:6;
81:3;85:24;86:1
**deemed (2)**
13:5;30:24

**deficiency (1)**
42:17
**deficient (1)**
22:20
**defined (2)**
81:9;88:5
**delays (1)**
88:12
**demand (11)**
24:10;68:21,24;
69:1,3,7,10,11,15,17;
70:7
**demanded (2)**
53:17;67:19
**demanding (1)**
72:25
**demands (5)**
67:5;68:20;70:13;
72:24;73:2
**demonstrate (1)**
84:1
**demonstrated (1)**
84:15
**described (7)**
37:2,2,3;55:13;
56:4,5;81:1
**describes (1)**
81:5
**description (1)**
82:2
**desire (1)**
7:15
**detailed (1)**
69:10
**details (2)**
72:16;74:9
**determination (1)**
32:6
**determinations (1)**
21:23
**determine (1)**
29:19
**determines (1)**
81:19
**determining (2)**
32:7;81:13
**Development (1)**
6:3
**diff (1)**
42:13
**differed (1)**
26:7
**difference (8)**
53:20,21,25;54:1,2,
4;69:11;76:8
**differences (4)**
62:6,16,20;74:15
**different (20)**
9:7;16:15;23:5;
54:15;61:1,21,25;
62:9;64:11;67:14;
69:19;74:17,17,18;
75:5,16,17;76:12,13;

90:22
**difficult (1)**
88:23
**Dikman (26)**
26:1,18;33:4;
35:20;50:13,19,23,
23;55:20;57:19;
58:23;59:17;61:5,10;
63:2;64:18;68:19;
70:18;71:25;72:15;
74:12;75:4,5,17,24,
24
**D-I-K-M-A-N (1)**
50:19
**direct (3)**
49:19;50:21;73:19
**directed (3)**
40:11;59:10,10
**direction (2)**
16:12;34:21
**directly (3)**
21:7;25:15;78:20
**directors (2)**
30:7,8
**disclosed (1)**
19:15
**disclosure (12)**
9:8,9;11:20,21,22;
12:2;13:17;14:8;
30:7,21;36:11,12
**discovered (2)**
23:6;58:11
**discovery (23)**
8:20;10:16;22:19,
25;27:4,14;28:1,12,
12,20;33:9;58:11;
67:1,5,17;68:19;
69:1;70:13;76:17;
78:13,21;87:10;90:8
**discrepancies (8)**
55:13;56:4;58:24;
59:23;61:13;62:16;
76:15;78:14
**discrepancy (4)**
69:23;74:25;76:4,8
**discrete (1)**
88:5
**discriminate (1)**
85:2
**discuss (1)**
22:6
**discussed (3)**
37:14;69:8;74:6
**discussing (2)**
39:8;60:2
**dishonest (1)**
51:12
**dishonesty (1)**
51:13
**dispute (1)**
40:14
**disputed (4)**
34:8,9;40:20;79:25

**disrespect (1)**
16:6
**dissenting (4)**
84:25;85:1,3,9
**distributed (4)**
28:15,16,17;71:23
**distribution (4)**
12:12;85:13;86:25;
88:15
**District (1)**
82:11
**docket (3)**
11:25;86:6,7
**document (5)**
11:2,3,4;23:21;
67:22
**documentation (3)**
69:4,6;70:10
**documents (14)**
11:4,6,8;13:13;
22:18;23:1,19;24:4;
45:9,10;51:15;53:16;
58:12;68:1
**dollar (2)**
71:20;74:13
**dollars (23)**
9:22;13:2;18:9,10;
19:22;24:23;28:10,
11;43:13;44:11;45:6;
51:1,20;53:15,23;
54:17;62:13,23;
64:24;65:5,10,13;
66:4
**done (11)**
16:5;19:23;39:24;
43:20;70:21;74:18,
21;77:1;85:25;88:3;
90:1
**door (2)**
66:1;73:23
**dots (1)**
25:13
**down (3)**
8:7;52:1;64:25
**drafting (1)**
49:10
**drawing (1)**
41:21
**drill (1)**
19:2
**dropped (1)**
51:19
**during (3)**
28:3;38:11,24

**E**

**earlier (2)**
71:11;74:14
**easy (1)**
85:21
**Eden (1)**
82:12

**effect (4)**
18:3;25:22;83:15;
84:9
**effective (2)**
10:5;18:3
**efficiently (1)**
27:21
**effort (1)**
89:22
**efforts (2)**
18:20;85:20
**eight (1)**
64:4
**eighth (1)**
73:7
**eighty (1)**
39:17
**either (1)**
30:4
**elastically (1)**
82:15
**electronic (1)**
11:25
**element (7)**
25:7;29:6;30:6,11;
34:9;82:7;84:24
**elements (2)**
10:20;29:8
**else (3)**
9:15;16:18;61:2
**elsewhere (1)**
76:18
**emasculating (1)**
82:17
**Emmmons (2)**
4:12;6:12
**Emmons' (1)**
18:1
**Emmons-Sheepshead (2)**
6:3;17:7
**emphasize (2)**
60:10;61:18
**emphasized (1)**
82:12
**employed (1)**
30:8
**enable (1)**
15:6
**encourage (4)**
34:25;40:10,18;
73:10
**end (2)**
72:6;90:6
**ended (1)**
74:22
**engaged (1)**
8:25
**enquired (1)**
60:7
**entered (1)**
11:19
**Enterprises (1)**
10:25

**entire (7)**
29:12,17;33:20;
46:5;83:2;84:7,12
**entirely (2)**
18:4;35:25
**entitled (2)**
18:5;85:7
**entity (1)**
75:6
**episodes (1)**
60:1
**equitable (3)**
15:2,5;85:9
**equity (2)**
13:3,4
**eScribers (1)**
5:21
**Especially (4)**
6:21;83:3;88:4,13
**ESQ (2)**
4:8,17
**established (1)**
57:14
**estate (2)**
12:20;13:7
**Estates (2)**
4:3;50:13
**estimate (2)**
20:23;47:25
**even (4)**
22:21;46:16;52:24;
90:18
**evening (16)**
8:17;17:11;21:15,
17;50:23;57:4;58:17;
77:13;78:1;79:21,24;
80:21;83:3,18;86:16;
87:2
**event (1)**
18:8
**everyone (2)**
7:14;85:20
**everyone's (1)**
32:19
**evidence (19)**
11:5,11,13;23:3,11,
18,25;24:6;26:15;
27:11,13,13;28:18;
33:6;34:18;80:19,23;
83:3,5
**evidencing (1)**
26:24
**exact (2)**
51:20;64:24
**exactly (1)**
19:11
**examination (7)**
37:10,10;49:8;
50:21;68:17;71:9;
73:19
**examinations (1)**
22:18
**examine (2)**

37:6;78:13
**examined (1)**
63:9
**example (2)**
27:7;51:18
**except (1)**
86:8
**excess (1)**
85:6
**exclusively (1)**
82:22
**Excuse (3)**
16:24;31:23;56:23
**excused (1)**
50:5;70:25;76:23
**Exhibit (2)**
11:12,14
**exhibits (1)**
76:18
**exists (1)**
81:11
**expenses (8)**
30:3;41:2,15;46:4,
23;47:2,6,9
**expert (3)**
56:17;57:6;59:10
**explain (4)**
27:18,19;69:11;
71:14
**explaining (1)**
27:6
**explanation (2)**
68:21;69:8
**explore (1)**
73:10
**expressed (1)**
86:22
**extent (7)**
17:17;30:10;52:13,
22;74:13;84:20;
85:14
**extinguished (1)**
13:5
**extremely (1)**
89:21

**F**

**F2d (1)**
79:3
**face (1)**
83:21
**fact (19)**
15:3;17:20;27:23;
29:13;40:3;43:17;
45:19;47:8,9;52:16;
56:8,21,24;57:7;
59:10,11,14;69:1;
88:14
**factor (2)**
22:24;27:17
**factors (2)**
22:5;32:23

**facts (6)**
36:7;58:9;61:23;
65:1;81:19;86:3
**fair (6)**
15:2;21:11,12;
78:4;82:4;85:9
**fairly (4)**
46:14;81:15,20;
88:4
**faith (70)**
22:7,12;23:20;
24:7;25:9,10,14,18;
27:2;28:16,23,25;
32:7,11;33:12;34:2,
10;35:16,25;36:13,
22;37:19;38:10;39:5,
9;40:4,8,12,16,21;
45:13,16,18;46:8;
49:12;50:24;51:9;
54:2;55:15,23;56:16,
20;57:15;59:24;
62:19;65:23;77:19,
25;78:4,12,15,15,21;
80:1,6,10,11,13,16;
81:1,8,13,24;82:8,13,
13;83:8,18;84:4,15
**false (1)**
40:3
**familiar (4)**
47:12;77:17,17;
80:21
**families (1)**
20:22
**far (5)**
14:24;15:8;22:19;
42:9;75:2
**fast (2)**
15:21,22
**favor (2)**
16:18;85:23
**feasibility (2)**
9:12;31:10
**feasible (2)**
8:8;78:5
**February (1)**
64:2
**fee (2)**
19:24;26:14
**feel (8)**
9:2;22:5;32:13;
55:13,22;56:4,5;
59:24
**feeling (1)**
69:5
**feelings (1)**
57:9
**feels (2)**
7:14;56:24
**fees (11)**
9:22;10:1,6,7;
15:11;18:6,15;26:13;
30:3;31:17,20
**felt (2)**

27:4;32:21
**FEUERSTEIN (20)**
4:11,17;6:11,12;
14:7;15:23;16:1,4,6;
17:13;19:9,10,15;
20:7;26:17;57:21;
73:5,18;90:18;91:3
**few (4)**
53:25;81:25;87:12;
89:23
**file (4)**
7:6;8:18;12:18;
86:24
**filed (16)**
8:15,16,18;9:6,8;
10:23;11:24,24;
13:10,17;28:23,25;
36:1;38:10,10;67:15
**filing (8)**
7:10;12:4;78:1,7,8,
8;82:14;84:10
**filings (1)**
29:22
**final (1)**
49:23
**finalize (1)**
48:15
**finally (2)**
84:25;85:8
**financed (1)**
43:22
**financial (2)**
27:16;31:13
**financials (1)**
28:3
**financing (5)**
36:2;44:17,21,22;
45:7
**find (4)**
31:12;83:10;84:14;
86:9
**finding (1)**
29:18
**finds (1)**
31:25
**fine (2)**
42:4;90:25
**finish (2)**
53:1;71:16
**fire (1)**
19:2
**first (23)**
9:17;10:12;25:23;
32:12,24;33:1,2,18;
34:20;55:2;56:22;
62:2;64:22;67:21;
69:1;77:12,21;79:19;
81:5;82:7,21;83:24;
84:18
**five (3)**
14:21;15:25;16:3
**flexibility (1)**
89:2

**flooding (1)**
14:12
**Floor (2)**
4:5;5:5
**flow (1)**
52:15
**focus (3)**
80:21;82:20,25
**focused (1)**
87:12
**focusing (1)**
73:24
**follow (1)**
16:9
**followed (1)**
31:13
**following (2)**
32:8;66:2
**forbidden (14)**
22:13;35:17;36:23;
37:20;40:12;45:18;
57:16;80:2,8;82:9;
83:9,19;84:5,16
**forced (1)**
15:10
**foreclose (2)**
15:10,16
**foreclosure (1)**
14:20
**foremost (1)**
82:21
**forgoing (1)**
55:22
**form (4)**
13:12;25:19;40:19;
41:25
**formal (1)**
33:22
**formulating (2)**
40:23,23
**forth (12)**
9:2,6;11:15,18;
13:4,10,22;22:3;
28:24;30:9,20;40:6
**forum (1)**
7:17
**forward (4)**
8:9;13:9;14:16;
46:15
**four (2)**
31:9;68:9
**fracture (2)**
58:10;62:25
**frame (1)**
60:13
**Frankel (5)**
54:14;62:4,7,11;
70:8
**Frankel's (1)**
68:9
**frankly (1)**
8:24
**fraudulent (2)**

28:17,19
**front (1)**
84:9
**full (3)**
31:20;77:14;85:12
**fully (1)**
28:25
**fun (1)**
15:11
**functions (1)**
80:12
**fund (8)**
10:7;12:12,16;
13:2;17:17;48:16,18;
71:17
**funded (1)**
12:13
**funding (11)**
7:7;12:11,22;
14:15,18,23;15:11,
12;45:4,5;72:2
**funds (4)**
10:4;12:15;39:10;
71:16
**further (25)**
9:5;12:14;24:3;
27:11;31:13;43:9;
45:6,24;49:5;63:3;
68:15;70:18;71:4,9;
72:9,12;76:20,21,22,
25;78:13,21;79:14;
86:8;87:19
**furtherance (1)**
22:16

## G

**GANFER (2)**
5:2;6:18
**gave (2)**
63:11;67:19
**general (10)**
7:16;15:14;42:1;
59:9,13;62:9;69:3,9;
81:2;82:4
**generally (3)**
59:13;80:18;81:10
**gentlemen (1)**
47:12
**given (3)**
45:19;74:17,23
**gives (1)**
79:23
**giving (1)**
18:14
**glad (1)**
77:14
**goes (7)**
17:21;47:17,19;
52:23;56:16,20;
90:21
**going-forward (2)**
13:16,20

**Good (83)**
6:6,8,11,21,24;
17:6;21:15,15,17;
22:6,12;23:20;24:7;
25:9,10,13,18;27:2;
28:16,23,25;32:7,11;
33:12;34:2,10;35:9,
16,25;36:13,22;
37:19;39:4,9;40:8,12,
16,20;45:13,16,17;
46:8;49:12;50:23,24;
51:9;54:2;55:15,23;
56:16,20;57:15;
59:24;62:19;65:23;
77:19,25;78:3,12,15,
15,16,17,21;80:1,6,
10,11,12,16;81:1,8,
13,24;82:8,13,13;
83:8,18;84:4,15;
86:21;91:1
**good-faith (3)**
37:16;80:25;81:17
**government (1)**
30:15
**granted (1)**
58:14
**grateful (2)**
7:22;18:20
**ground (1)**
79:22
**grounds (6)**
29:18;39:3;40:6;
41:5;56:9;74:1
**Group (1)**
8:18
**guarantee (3)**
18:11,16;20:3
**guaranteed (1)**
13:2
**guess (2)**
32:8;87:15

## H

**hallway (2)**
17:12;34:7
**hand (1)**
79:9
**hands (4)**
13:6,14;67:22,25
**happen (2)**
47:1;54:6
**happened (4)**
19:13;46:11;47:6;
74:21
**happens (2)**
80:13;91:6
**hard (2)**
65:12;85:20
**hate (1)**
86:12
**hear (15)**
6:20,23;7:24;9:17,

18;14:5;16:25;17:2,
8;19:1,7;20:16;
21:20;33:16;34:3
**heard (8)**
9:15;16:18;31:21;
33:8,8;36:20;61:23;
62:5
**hearing (7)**
7:1;12:5;14:3;
15:21,22;27:24;
77:13
**hearsay (6)**
52:2,12,13,14,16,
23
**held (3)**
9:23;84:23;88:15
**help (3)**
15:7;25:13;48:15
**helpful (5)**
29:5;32:18;77:16;
79:21;89:21
**helps (1)**
40:19
**hereby (2)**
11:11,13
**here's (4)**
25:6;34:6;87:15,21
**himself (1)**
74:22
**holders (2)**
12:12;13:4
**holding (2)**
90:10,16
**hole (2)**
19:20,20
**home (1)**
20:22
**honesty (3)**
51:8;78:16,17
**Honor (74)**
6:8,11,17;9:16,20;
10:10,11;11:9;12:8;
14:1,7;15:23;16:2,
20;19:5,10;20:14;
21:12,16,19,25;
22:14;23:19;25:1;
26:17;27:3,17;28:23;
32:13,20;33:17;35:3;
37:7,14,21;38:6,14;
39:8;43:25;45:24;
46:7,12;47:17;49:6,
16;50:12;52:3,20;
56:12;58:2;59:3;
60:19;61:4;63:3,14,
20;64:3;65:22;66:7;
70:20;71:3,5;72:10;
73:18,22;75:11,22;
77:4;78:11,17;79:15;
89:5,15;90:18
**hope (4)**
17:13;46:13;85:24;
90:21
**Hotel (3)**

18:14;5:16;25;17:2,
8;19:1,7;20:16;
21:20;33:16;34:3
18;14:5;16:25;17:2,
8:19:1,7;20:16;
21:20;33:16;34:3

81:3;82:1,5
**hour (5)**
6:22;27:23;34:24;
57:3;86:16
**hours (3)**
19:16;80:22;87:12
**hundred (1)**
42:22
**hundreds (2)**
43:3,6
**Hurricane (2)**
12:24;19:19

## I

**idea (5)**
7:17;42:10,23;
47:16;51:4
**identified (1)**
58:24
**illegally (1)**
39:21
**imagine (1)**
65:12
**immediacy (2)**
22:2,4
**impaired (9)**
11:17;13:3;31:5,8,
9;58:16;84:21,22;
85:11
**impediment (1)**
32:3
**imperfect (1)**
21:6
**implicated (3)**
30:10,13;85:14
**importance (1)**
9:21;82:13
**important (4)**
15:3;77:14;81:14;
87:5
**importantly (2)**
7:1;22:4
**impossible (1)**
51:7
**inappropriately (1)**
7:20
**Inc (1)**
4:3
**includes (1)**
10:3
**including (6)**
12:10;13:24;16:13;
29:24;30:19;81:4
**inconsistency (1)**
41:13
**incorrect (1)**
13:12
**incurred (4)**
43:17,18;45:6,7
**incurring (2)**
44:17;45:5
**indeed (4)**

28:22;31:13;39:22;
83:16
**independent (2)**
49:1;71:18
**independently (1)**
48:17
**indicate (2)**
23:10;44:19
**indicated (8)**
21:9;23:4,6;25:6,
12,18;36:20;45:18
**indicates (2)**
13:11;31:7
**indirectly (1)**
25:15
**indiscernible (15)**
20:23,24,25;21:1,2,
2,3,3;39:12,14,18;
41:13;44:1;47:20;
54:21
**individual (4)**
42:15,16;71:12;
74:21
**indulging (1)**
17:11
**inflate (1)**
51:5
**inflated (1)**
51:2
**information (5)**
58:10,15;64:7;
69:3;70:5
**informed (4)**
25:14;28:25;53:5;
73:2
**informs (2)**
80:13;86:22
**initial (2)**
28:12;77:23
**initially (2)**
27:3;83:14
**inquire (4)**
38:5,7;50:20;89:12
**inquiry (2)**
41:22;81:14
**insiders (2)**
30:8;84:24
**insightful (1)**
85:23
**instance (5)**
27:11,14;28:8;
33:18;51:12
**instances (1)**
27:12
**intent (1)**
42:11
**intention (1)**
14:9
**intentions (2)**
78:16,18
**interest (5)**
14:18,19;15:15;
30:17;40:6

**interested (1)**
14:23
**interests (4)**
12:19;15:13,14;
78:4
**interposed (2)**
52:11,12
**interpretation (1)**
82:10
**interpreted (1)**
81:10
**interrupt (1)**
53:12
**intertwined (1)**
85:5
**into (10)**
11:5,11,13;14:19;
17:11;18:2;19:22;
40:25;80:4,15
**inures (1)**
12:24
**invest (1)**
16:7
**invested (1)**
71:16
**investment (1)**
71:21
**investors (6)**
14:14,14,16;15:19;
16:7,8
**invite (2)**
10:19;24:6
**invites (1)**
82:16
**invoked (1)**
7:23
**involved (4)**
51:13;72:4;88:14;
90:19
**Irrelevant (1)**
66:9
**IRS (1)**
39:11
**issue (12)**
13:9;31:11;32:3;
40:20;45:15,23;
46:17;79:25;86:20;
87:25;88:8,10
**issued (1)**
75:16
**issues (13)**
13:19;14:12;20:20;
77:20;83:6,7,23;
87:14;88:5;90:2,2,7,8
**issuing (1)**
75:3

## J

**Jackson (3)**
50:14;87:16;90:11
**Jacob (4)**
10:24;13:11;37:25;

38:2
**Jeffery (1)**
13:7
**JEROLD (2)**
4:17;6:11
**Johns (1)**
79:1
**Johns-Manville (1)**
78:25
**Judge (39)**
6:6,24,25;7:24;8:2,
22;9:5;10:22,23;
11:15;12:7,18;13:3,
22;17:10;18:22;34:3,
12;35:6,11,14;36:9;
46:5;64:15;68:13,15;
71:7;72:9;76:22;
77:22;78:9;79:17;
81:23;84:8;86:10;
88:6,7,9;89:14
**judicial (2)**
7:17;88:7
**July (1)**
89:2
**juncture (3)**
8:9,24;88:4
**June (3)**
8:12,17;12:2
**junior (1)**
85:12
**jurisdiction (1)**
30:15
**justified (1)**
86:2

## K

**KACHAN (188)**
4:2,8;6:8,8;9:6,16,
19;10:8,9,14,16;11:9;
12:8;17:21;21:13,15,
18,25;22:11,14,16;
23:10,12,13,14,19,
21;24:1,8,17,19,21,
24;25:1,3,5,9,11,21,
25;26:3,11,22;27:3,5,
6,10,20,22,25;29:3;
32:12,13,17,20,24,
25;33:2,4,6,7,10,13,
15,17,23,25;34:19,
22;35:3,10,19;37:7,
13,21;38:4,6,8,12,14,
16,18,20,22;39:8;
40:22;42:25;43:10,
25;44:4;45:14,16,20,
24;46:1,7,12,21;
47:17,19,23;48:2,5,7,
10,11;49:6,16,18,22,
24;50:2,9,10,12,22;
52:3,5,17;53:7,12;
55:7,9,12;56:3,12,14,
16,18,20,21;57:1,8,
10,12,18,24;58:2,4;

59:2,7,12,16,20,22;
60:6;61:2,4,9;63:2,
20,22,23;65:22,25;
66:1,7,9;67:7;68:18;
70:18,20;71:5;72:10,
13;73:6,9,12,15,22;
74:4;75:11,21;76:20;
77:4,8;78:10,11,25;
79:3,5,7,11,13,15;
89:5,10,15
**Kane (1)**
78:25
**keeping (1)**
82:25
**Keren (1)**
5:20
**kind (2)**
55:8;70:10
**kinds (1)**
88:25
**knew (1)**
72:16
**knowledge (15)**
26:4;38:23;46:23;
47:10,11;51:22;52:7,
9;55:21;57:19;58:7,
24;60:11;61:12,19
**knows (1)**
10:11
**KRISS (1)**
4:11

## L

**language (1)**
80:3
**last (11)**
8:17;12:3;19:16;
34:4;38:1;48:2;
80:22;82:7;87:12,18;
88:8
**late (5)**
6:22;17:11;34:24;
57:3;59:3
**lateness (1)**
86:16
**later (4)**
23:7;53:25;72:8;
75:10
**LAW (25)**
4:2;22:13;33:14;
34:11;35:17;36:23;
37:20;39:9,24,25;
40:13;45:18;57:6,16,
20;80:2,8,12;82:9;
83:9,20;84:5,16;86:1,
3
**lawful (3)**
41:1;55:23;56:25
**lawfulness (2)**
56:6,11
**lawyer (8)**
42:4;47:20;54:13;

62:1,2;67:20;69:2;
70:9
**lawyers (1)**
70:21
**learn (1)**
51:24
**learned (3)**
26:16;27:10,18
**least (9)**
19:24;23:1;62:25;
63:19,20,21,25;
84:21;87:5
**led (1)**
84:10
**legal (3)**
56:17;85:2,4
**legally (1)**
85:6
**lender (2)**
36:2,3
**lengthy (1)**
88:13
**less (5)**
18:9;62:23;80:10;
82:3;87:14
**level (1)**
79:23
**Lexington (2)**
4:13;5:4
**lifted (1)**
7:10
**light (6)**
19:17;22:24;23:1;
81:19,22;88:13
**likelihood (1)**
81:11
**likely (2)**
31:12;57:13
**limit (1)**
7:19
**limited (1)**
37:11
**line (3)**
42:12;46:5;62:10
**liquidation (2)**
30:21;31:13
**listen (1)**
60:12;85:25
**litigating (1)**
88:1
**litigation (3)**
72:25;76:10,18
**live (1)**
83:15
**living (1)**
13:1
**LLC (5)**
4:12;5:21;6:12;
44:15,23
**LLP (2)**
4:11;5:2
**loan (1)**
18:11

**locally (1)**
82:10
**Lockshen (21)**
47:13;48:12,14,15,
16,19,25;49:2;54:8,9,
11,17;55:16,18;
62:11,13;71:12,14,
15;72:1,4
**long (6)**
6:22;7:21;21:25;
34:5;77:13;84:9
**longer (4)**
18:3,5,5;47:25
**look (4)**
48:21;58:12;77:6;
90:24
**looks (1)**
81:18
**Lord (1)**
88:6
**Lori (1)**
6:6
**losing (1)**
34:5
**lot (8)**
17:12;63:11,11;
72:7;74:20;76:1;
86:22;88:1
**loud (3)**
6:20,21;7:24
**lower (1)**
20:2

**M**

**Madison (3)**
81:3;82:1,5
**maintenance (1)**
82:14
**major (1)**
43:16
**makes (2)**
10:18;80:3
**making (4)**
36:7;68:20;69:7;
86:1
**manage (1)**
7:21
**managed (1)**
82:1
**management (4)**
9:11;13:6,10,14
**managerial (2)**
13:12,19
**managing (2)**
10:25;45:11
**manner (2)**
12:1;85:3
**Manville (1)**
79:1
**many (18)**
22:5;29:13;54:9;
64:6,7;66:12,12;72:1,

1,4;74:15;80:12;
82:2,5,5,5,5,6
**marketing (1)**
13:20
**Martin (4)**
6:14;14:9;17,20
**Marylou (1)**
6:14
**matter (12)**
7:3;8:20;9:20;
17:20;26:21;30:13;
45:23;57:7;69:1;
80:14;86:13;89:22
**matters (7)**
6:3,25;7:22;29:13;
30:15;36:5;87:1
**matter's (1)**
7:12
**may (41)**
8:17;9:17;12:15;
19:7;31:24;33:24;
34:7;37:13;38:4,7,9,
14;39:19;40:14,17;
42:20;46:9,17;49:19,
25;50:20;53:2;54:3;
55:11;57:17,20;59:7;
60:12,21,24;61:17;
64:14;68:13;72:10;
73:7,13,18;75:11,12;
86:15;87:4
**Maybe (8)**
32:15;63:15,15,17;
65:3;68:9,11;75:9
**Mazarisi (2)**
62:1;67:20
**mean (6)**
8:4;14:24,25;42:7;
78:7;81:10
**meaning (1)**
23:4
**meaningful (1)**
83:13
**means (17)**
22:13;33:14;34:10;
35:16;36:22;37:20;
40:12;45:18;57:16;
78:15;80:2,8;82:9;
83:9,19;84:4,16
**mediating (1)**
88:11
**mediation (4)**
87:25;89:20,23;
90:20
**mediator (1)**
88:7
**medication (1)**
58:17
**member (1)**
10:25
**members (3)**
44:15,23;45:11
**memory (1)**
51:23

**mentioned (2)**
20:19;71:25
**met (5)**
30:19;31:16;32:7,
10;54:9;72:1;84:18;
85:15,18
**Metropolitan (13)**
4:3;6:9;8:4,18,25;
13:11;50:13;65:15,
17,20;67:4;86:14;
88:21
**microphone (1)**
36:19
**might (2)**
7:18;88:5
**million (13)**
18:9,10;28:10,11;
43:13;44:11;45:6;
55:18;62:23;64:24;
65:5,10,13
**millions (2)**
51:1,1
**mind (3)**
60:14;74:19;82:25
**mindful (1)**
73:13
**minute (4)**
34:6;35:5;49:18;
77:5
**minutes (1)**
50:1
**misreading (1)**
9:10
**misspeaking (1)**
57:5
**mistaken (1)**
53:23
**modification (2)**
17:18,19
**modifications (1)**
30:9
**modified (1)**
36:10
**moment (9)**
9:13;17:3;30:1,25;
32:8;59:4;68:13;
74:7;87:22
**Monday (1)**
8:17
**money (20)**
9:23;10:1;14:19;
23:3;24:18;39:18,19,
21,22;45:6;51:6;
53:17,19;55:16,17;
61:20;63:1;65:20;
72:7;88:1
**monies (13)**
10:3;27:6,8;28:15,
17;39:15,19;41:1;
43:21,22,23;44:6;
75:20
**more (22)**
14:19;15:11,11,12;

22:4,21;26:8;32:18;
44:8;45:6;58:14,14;
63:15,16;68:10;
69:10;73:16;75:6;
82:3;85:12;87:14;
88:10
**morning (1)**
9:25
**mortgage (10)**
18:12,16;20:3;
53:18;54:5;55:19;
64:18,21,23;69:3
**most (6)**
7:1;16:12;21:7;
75:2;83:22;88:21
**motion (2)**
8:19;22:20
**motions (1)**
87:10
**move (4)**
7:15;9:4;46:14,14
**moving (3)**
14:16;30:12,22;
31:17
**Mrs (2)**
54:23;62:15
**much (10)**
21:14;38:19;47:25;
49:2;56:22;64:12;
65:20;67:25;71:2;
76:23
**must (7)**
7:19;17:1;22:10;
30:4;52:10;81:21;
85:12
**myself (2)**
46:25;53:18

**N**

**name (7)**
37:24;38:1;47:13;
48:12;50:17;54:7;
62:12
**named (1)**
71:12
**nature (2)**
69:11;76:4
**nece (1)**
86:18
**necessarily (1)**
25:17
**necessary (4)**
19:18;24:24;77:14;
78:13
**need (22)**
16:9,14,21;25:12;
27:19;28:22;34:25;
47:22;57:25;60:13;
61:7;63:6;70:21;
73:11;86:5,8;87:3,8,
17,20;88:2;90:24
**needed (2)**

22:3;4,21;26:8;32:18;
44:8;45:6;58:14,14;
**needs (3)**
16:7;34:16;88:3
**negative (3)**
80:5,6,24
**negotiated (1)**
36:3
**negotiating (1)**
49:10
**negotiation (1)**
54:12
**negotiations (2)**
8:7;36:8
**neither (2)**
32:3;78:17
**net (1)**
18:9
**New (8)**
4:15;5:6,23;9:7;
12:9;14:12;19:20;
22:23;82:11;87:20
**next (12)**
41:12;42:25;47:24;
49:21;57:17;58:22;
60:14;61:1;74:3;
84:21;87:16;89:23
**non (1)**
82:14
**nonaccepting (1)**
85:5
**None (1)**
28:6
**nonparty (2)**
22:17;28:12
**nonvoting (1)**
11:23
**nor (1)**
78:17
**note (8)**
7:16;21:10;29:25;
52:14,19;69:4;84:2;
90:2
**notes (1)**
77:6
**notice (1)**
51:19
**notification (1)**
11:23
**notified (1)**
7:4
**notwithstanding (1)**
22:2
**number (14)**
6:25;11:3,4;42:12;
50:25;51:2,5,20;
52:15;54:18;64:24;
65:4,6;81:2
**Numbers (7)**
6:2;11:2;40:1;
51:3;62:9,14;69:12
**NY (4)**
4:6,15;5:6,23

# O

**oath (2)**
36:25;52:8
**obj (1)**
40:9
**object (2)**
41:25;60:3
**objected (1)**
43:14
**objecting (2)**
8:5;42:6
**objection (52)**
8:11,12,19;9:6,7;
11:7;12:8;13:10;
17:22;22:8;23:17;
29:5,7;38:15;39:2;
40:5,9,17;41:3,18,20,
23;44:24;45:1,12,22;
46:5,13,15;47:15,21;
52:2,11,12,22;55:4,
25;56:7,9;57:21,22,
23;59:19;61:15,16;
65:22;66:7;73:4,5,7;
79:9;84:13
**objectionable (1)**
38:15
**objections (8)**
8:13,21,23;12:4,6;
86:13;87:11,25
**Objection's (1)**
74:2
**objectives (2)**
81:12,16
**objector (3)**
80:23;83:5,23
**obligations (1)**
88:25
**obstruct (1)**
39:23
**obstruction (1)**
39:24
**obtain (3)**
44:13,14,22
**obtaining (2)**
44:21;45:10
**obviously (7)**
8:2;39:10,24;
43:11;87:1;88:22;
90:8
**occasion (1)**
75:16
**occasions (1)**
68:8
**occurred (1)**
19:3
**occurrences (2)**
59:23;61:13
**o'clock (5)**
14:18;15:19;90:17,
23;91:9
**off (9)**
17:4;26:14;47:3,6;
50:3;55:19;71:25;
91:7,8
**offend (1)**
59:24
**offer (2)**
50:12;77:18
**offered (4)**
50:24;56:15;58:25,
25
**Office (7)**
9:18;31:21;54:24;
62:15;68:8,9,11
**officers (1)**
30:7
**OFFICES (1)**
4:2
**offset (3)**
53:17,18;54:5
**often (3)**
52:16,23;81:2
**okayed (1)**
44:12
**omitted (1)**
22:22
**once (5)**
23:6;32:13;47:4;
68:8;73:17
**one (36)**
17:3;21:18;23:1;
24:21;25:7;26:15;
27:7,11,13;29:6;
31:5;48:22;51:18;
53:22;62:10;63:9;
68:9,10,13;69:10;
74:18;75:6,8,12,17;
80:4;81:5,6;84:21,
22;86:12;87:22,24;
88:6;89:2,19
**ones (3)**
20:21;24:9;76:16
**online (1)**
19:4
**only (14)**
7:14;9:20;22:24;
26:15;27:17;29:6;
32:9;34:8;58:6,10;
61:19;65:1;83:5;
89:19
**open (4)**
73:22;77:20;86:13,
19
**opened (1)**
66:1
**operations@escribersnet (1)**
5:25
**opinion (6)**
59:6,7,8,9,15;62:17
**opponents (1)**
20:13
**opportunities (1)**
74:17
**opportunity (6)**

**opposed (1)**
78:8
**opposes (1)**
21:21
**opposition (5)**
21:22;22:22,23;
24:2;54:20
**optimist (1)**
89:16
**order (13)**
11:19,21,22;12:2;
19:23;28:21;32:21,
22;39:23;46:14;
78:13;86:5,6
**ordered (1)**
76:17
**orders (1)**
16:10
**organized (1)**
35:5
**original (2)**
26:5;53:22
**others (1)**
27:18
**Otherwise (3)**
19:25;31:20;82:16
**out (4)**
21:7;28:5;48:18;
89:2
**outer (2)**
46:16,16
**outside (3)**
37:16;73:19;88:20
**over (15)**
19:16,16;21:13;
23:22;45:5;46:25;
65:3;67:1,12,17;
77:6;80:20,22;83:16;
91:8
**overall (1)**
55:20
**overrule (6)**
41:4;46:13,15;
52:14;61:16;73:6
**overruled (9)**
9:8;41:20;52:25;
66:3,10;70:4;74:2;
84:14,14
**overruling (1)**
40:9
**owed (4)**
39:13;40:24;51:1;
72:7
**owes (1)**
9:22
**own (3)**
7:15;47:4;71:16

# P

**page (4)**

**34:17;70:22;77:15,**
18;80:20;83:12
**opposed (1)**

**79:7,10,11,13**
**paid (34)**
23:5,7;24:11,16;
26:7,8,9,9,12;28:5;
30:4;39:20;40:14;
41:1;42:21,22;46:4,
23;47:9;48:18;51:3;
55:16;61:21;64:25;
65:17;71:14,18,20;
72:3,7;75:5,7,9;85:12
**paper (2)**
26:9;79:20
**paragraph (1)**
30:20
**pardon (1)**
35:19
**part (5)**
21:23;37:15;51:6;
55:19;70:12
**partially (1)**
43:14
**participant (1)**
19:4
**particular (4)**
15:8;63:12;75:17;
81:19
**particularly (2)**
21:1;80:22
**parties (15)**
6:3;7:22;8:2,3;
11:24;14:1;15:14;
34:8;86:6;87:5,15;
89:1,13,21;90:3
**parties' (1)**
81:24
**parties-in-interest (1)**
82:23
**party (3)**
7:18;13:16;22:17
**pass (1)**
30:1
**path (2)**
32:8;84:9
**patience (1)**
77:12
**pay (3)**
7:21;26:13;53:20
**paying (2)**
55:19;83:2
**payment (5)**
10:4;12:21;31:17,
20;62:11
**payments (10)**
10:5;12:9,14;
25:14;26:25;28:7;
54:16;55:18;66:21;
85:6
**PC (1)**
4:2
**penalized (1)**
9:3
**pending (2)**
8:21;47:21

**penny (1)**
71:23
**People (2)**
16:9;89:24
**per (2)**
54:17;62:13
**percent (3)**
39:17,17;42:22
**performing (1)**
54:11
**perhaps (7)**
9:24;10:17;16:14;
21:7;35:20;40:13;
88:20
**permission (2)**
44:10,12
**permitted (1)**
73:25
**permitting (1)**
41:21
**person (5)**
26:19,20,20;48:12;
54:7
**personal (9)**
18:11,17;20:3;
52:7,9;55:21;58:6,
24;69:5
**personally (6)**
53:10,11,14;62:1;
69:23;70:5
**persuaded (2)**
30:10;31:16
**persuasive (1)**
83:11
**persuasiveness (1)**
83:13
**ph (4)**
26:22;47:13;54:14;
62:1
**phone (3)**
6:17;17:12;20:15
**phrase (1)**
24:20
**phrased (1)**
56:23
**phrases (1)**
82:3
**physical (2)**
69:13,16
**pick (4)**
16:15;18:20;87:17;
90:22
**picture (2)**
21:23;83:1
**piece (1)**
67:22
**Pinson (44)**
10:24;11:1;13:11,
15;18:4;26:4;30:20;
36:15,18;37:8,25;
38:2,3,23;40:23;
41:24;43:1,11;45:4;
46:2;47:7;48:3;

49:10;50:5;53:9,14;
54:10,12;61:20;62:3,
10;64:7,23;66:8,11;
67:18,20;70:8;71:7,8,
11;72:14;75:15;
83:25
**P-I-N-S-O-N (1)**
38:2
**Pinson's (1)**
18:11
**place (3)**
38:11;63:13;68:7
**placed (2)**
36:25;83:17
**plain (2)**
80:3;82:6
**plainly (1)**
84:2
**plan (148)**
7:6,11;8:11,15;
9:10,12;10:3,5;11:16,
22;12:4,4,7,14,18;
13:4,5,8,13,23;14:2,
15,17,19,21,23,24;
15:1,3,9,13;16:13,14;
17:17,18,23;20:9,19;
22:5,7,10;25:8,17;
27:2;28:22,22,25;
29:1,8,10,15,20;
30:22;31:2,4,6,8,15,
19,19,24,25;32:22,
22;33:12;34:10;
35:16,24;36:1,3,9,9,
12,13,21;37:12,19;
38:10;39:4,7,9,14,15;
40:2,3,8,11,16,20,23;
41:7,9;43:11;45:13,
17;46:6;49:10,11;
50:24;51:5,8,11;
54:3;55:14,21,22;
56:6,25;57:15;58:1,
6;59:25;61:14;62:18,
24;77:24;78:3,12,16,
20,20;80:1,6,7;81:11,
15,15,19,20,21,23;
82:7,8,8,22,22,24;
83:8,16,17;84:4,15,
22;85:1,8,12,13,19
**plans (1)**
8:7
**plausible (1)**
43:6
**play (1)**
18:3
**please (23)**
10:15;11:10;17:3,
3,6;22:15;35:7,9;
37:24;38:1,4,12;
45:3;47:24;50:11,15,
17,18;53:12;54:19;
61:2;74:3;77:11
**pleased (1)**
85:19

**plug (2)**
19:20,20
**plumber (1)**
74:22
**plus (1)**
71:21
**pm (7)**
17:5,5;50:8,8;
77:10,10;91:10
**podium (4)**
32:16;35:10,13;
38:4
**point (16)**
7:4;8:8;14:22;
32:6;43:13;44:13;
51:12;53:23;54:12;
63:9;81:14;82:7;
84:10;85:21;89:1,2
**points (1)**
83:24
**portion (1)**
19:24
**Pose (2)**
47:22;59:18
**posed (2)**
26:4;58:1
**posing (1)**
44:2
**posit (1)**
22:1
**position (7)**
8:22;22:1;24:15;
28:23;36:14;78:11;
81:24
**positive (4)**
62:20;80:5,5,24
**possession (2)**
67:18;68:1
**possibility (1)**
51:5
**possible (7)**
7:16;21:2;27:21;
83:23
**possibly (2)**
28:18;75:19
**Post (2)**
13:5,13
**post-confirmation (2)**
9:11;13:9
**potential (1)**
83:7
**potentially (2)**
15:11,12
**practicable (1)**
87:9
**precise (1)**
23:16
**prep (1)**
34:13
**prepare (4)**
34:7;51:15;58:14;
60:9
**prepared (12)**

8:9;10:20,21;
25:19;34:14;35:6;
51:14,20;58:13;
63:18;69:10;88:6
**preparing (1)**
68:19
**pre-petition (1)**
82:18
**prerogative (1)**
7:20
**presence (4)**
62:1,2;67:19;70:9
**present (6)**
14:1;26:20,23;
28:6;36:15;78:18
**presentation (2)**
18:23;37:15
**presented (2)**
62:7,8
**pressure (1)**
14:9
**presumption (2)**
80:15,16
**pretty (1)**
8:5
**previous (1)**
67:20
**previously (1)**
21:9
**price (8)**
20:2;24:22;38:25;
39:1;42:23;51:19;
65:8,9
**principal (10)**
10:24,25;20:2;
26:23;28:6;36:5;
41:10;50:13;78:19;
83:10
**principle (1)**
31:25
**prior (6)**
9:7;51:19;78:1,7,7,
8
**Priority (4)**
31:1,3,3;85:11
**pro (1)**
88:17
**Probably (3)**
43:8;63:14;87:2
**proceed (13)**
7:13,23;10:15,21,
21;11:10;22:15;
30:23;35:5,7,9;50:9;
86:15
**proceeding (2)**
7:9;43:15
**proceedings (2)**
21:8;91:10
**proceeds (1)**
18:9
**process (10)**
13:1;20:21;22:17,
19,25;45:4;69:2;

70:13;83:5;90:19
**processes (1)**
80:14
**produce (1)**
27:15
**produced (4)**
24:14;28:3;76:16,
17
**product (1)**
58:14
**production (2)**
22:18;24:3
**productive (2)**
18:19;85:22
**proffer (7)**
25:23;33:19,22;
34:1;37:11,16;83:15
**proffered (3)**
40:3;43:18;62:19
**proffering (1)**
43:11
**profit (1)**
71:21
**profoundly (1)**
89:18
**prohibited (4)**
33:14;34:11;57:20;
66:11
**project (10)**
43:23;45:4,5;
48:16;54:11;59:24;
64:4;71:16;72:2,6
**promptly (2)**
7:16;86:7
**proof (1)**
61:24
**proper (1)**
58:11
**properly (3)**
43:24;53:16;58:9
**property (5)**
12:17,23;13:21;
14:11,11,13;19:18,
19,21,22;20:20;
43:16;64:19
**proponent (3)**
15:9;29:20;34:15
**proponents (4)**
14:6;19:2,7;20:11
**proposal (3)**
39:6;58:1;82:22
**proposals (1)**
81:24
**propose (4)**
24:9;78:17;87:23;
90:17
**proposed (48)**
8:6;22:6,12;25:10,
18;27:2;31:14;33:12;
34:10;35:16,24;
36:10,13,22;37:19;
39:9,17;40:2,8,11,16,
20;41:7;45:17;49:12;

51:8,9;55:14,20,23;
57:15;61:14;77:24;
78:3,12,15,16,21;
80:1,6,7;82:8,9;83:8,
16;84:4,15;86:5
**proposing (5)**
36:21;37:12;39:4;
45:12;46:6
**pro-rata (1)**
12:12
**prospect (1)**
52:21
**prospects (1)**
82:17
**prove (1)**
53:24
**proved (1)**
82:15
**provide (6)**
67:9;69:16;70:10;
72:14,18,20
**provided (7)**
43:22;47:2;69:13;
72:22;76:9,10,15
**provides (6)**
12:9,20,21;13:1;
31:19,24
**provisions (5)**
13:24;29:11,15,21,
23
**publically (1)**
69:4
**purpose (1)**
31:25
**purposes (7)**
39:11;52:15;81:12,
13,16;83:19,21
**pursuant (3)**
10:5;11:19,21
**pursue (1)**
7:8
**put (11)**
22:2;23:11;24:6;
34:17;37:9;45:15;
61:2,7;63:6;77:15;
80:23
**putting (4)**
14:9,19;17:14;
19:22

---

## Q

**qu (1)**
44:2
**qua (1)**
82:13
**quarterly (1)**
9:22
**question's (2)**
47:18;74:2
**quickly (1)**
46:14
**quite (6)**

13:13;18:19;29:22;
79:22;80:21;87:12
**quote (2)**
78:24;81:17
**quoting (1)**
79:7

# R

**raise (1)**
62:24
**raised (3)**
17:21;33:11;83:23
**range (1)**
45:21
**rata (1)**
88:17
**rate (1)**
30:14
**rather (1)**
40:25
**ravaged (1)**
19:19
**re (2)**
73:21;81:3
**re- (1)**
17:19
**reach (1)**
8:3
**reached (1)**
17:13
**read (2)**
68:5;79:8
**reading (1)**
13:13
**ready (4)**
7:13;22:2;35:5;
50:9
**real (1)**
13:7;20:20
**realize (1)**
16:1
**really (8)**
9:10;26:8,9;29:1;
40:7;43:17;61:4;72:6
**reason (6)**
27:15;28:1,1;
46:12;53:19;78:22
**reasonable (4)**
15:2;31:15;78:5;
81:11
**reasons (5)**
21:9;30:20;74:17;
75:7;85:16
**rebuttal (3)**
71:6;73:20;76:25
**recall (14)**
43:5;67:4;68:20,
23,25;69:7,13,20;
70:12;71:7,12;72:4;
74:5;75:19
**receive (8)**
8:13;24:4;62:25;

66:20;69:21;70:17;
85:7,13
**received (27)**
8:13;11:11,13;
12:6;23:23;24:10,16;
28:20;33:20;39:1,19;
41:14;54:15,18,20,
22,23;62:14;64:7;
65:4,6,20;66:22;
68:25;69:3,20;70:16
**receives (2)**
18:8;85:6
**receiving (2)**
49:3;69:9
**recent (1)**
16:12
**recently (5)**
22:24;29:22;54:16,
18,19
**Recess (3)**
17:5;50:8;77:10
**recollect (1)**
75:2
**recollection (13)**
51:17;58:16;60:11;
74:8,9,11,19;75:3,15,
23;76:3,7,7
**record (42)**
14:2;17:4,14;
20:10;21:10,22;
29:12,17,23;30:6,9,
19;33:20;34:16;35:1;
36:7,19,24;37:17,24;
50:4,17;52:19;57:4;
77:14,15,17,18;
79:20;80:17,18,21,
23;83:1,2;84:6,7,12;
85:16;86:2;91:7,8
**recross (4)**
49:15;70:19,22,24
**RECROSS-EXAMINATION (1)**
72:12
**redirect (6)**
48:6;49:7,8;68:16,
17;71:9
**reduce (1)**
18:15
**reference (1)**
79:12
**referenced (3)**
66:23;67:10;81:2
**referral (1)**
87:24
**referring (9)**
11:2;42:9,11,23;
65:7,8;74:14;76:2;
78:23
**reflect (3)**
46:3,23;54:16
**reflected (5)**
25:15;28:7;47:9;
48:19;85:16
**reflecting (2)**

11:25;54:18
**refocus (1)**
40:10
**reframe (3)**
40:18;45:3;55:11
**regard (10)**
9:21;10:10,11;
35:20,21;43:22;76:4,
14,14;84:23
**regarding (4)**
6:3;37:13;74:12;
78:1
**registration (1)**
32:1
**regulatory (2)**
30:12,16
**reject (1)**
12:4
**rejected (3)**
13:5;30:24;70:7
**relate (2)**
86:20,25
**relates (2)**
23:20;44:25
**relation (1)**
46:6
**release (4)**
18:11,16;20:2;47:3
**relevance (1)**
44:24
**Relevancy (3)**
39:4;41:6;65:23
**relevant (5)**
41:6;45:12;46:17;
55:14;78:2
**reliance (1)**
11:7
**reluctant (1)**
89:18
**rely (2)**
11:5;26:21
**relying (1)**
40:2
**remain (1)**
86:19
**remaining (1)**
87:14
**remediation (2)**
19:18,25
**remedies (1)**
7:8
**Remember (12)**
44:2;45:14;53:19;
62:12;63:17;64:3,10,
24;68:6,10;74:24;
75:10
**remind (2)**
52:10;79:8
**reminded (1)**
82:5
**reminder (1)**
86:21
**removed (1)**

18:4
**renovations (1)**
15:6
**reorganization (6)**
31:14;49:11;55:14,
21;56:6;82:17
**reorganized (1)**
30:8
**repair (1)**
12:23
**repairs (1)**
42:17
**repeat (2)**
35:1;46:19
**rephrase (5)**
44:13;45:3;56:1;
57:12;75:21
**reply (1)**
79:16
**replying (1)**
67:7
**report (1)**
14:13
**reported (3)**
39:12,13,23
**reporting (2)**
39:11,23
**representative (2)**
7:5;65:15
**representing (2)**
6:14,18
**request (6)**
11:4;14:2;23:15;
24:3;28:13;70:17
**requested (1)**
22:17
**requests (2)**
9:22;23:21
**required (3)**
10:5;29:19;52:6
**requirement (7)**
79:25;80:5,7,25;
81:18;84:3;85:15
**requirements (10)**
13:24;29:23;32:2,
10;80:4;84:18,19;
85:17,18;88:24
**requires (2)**
17:19;31:12
**requiring (1)**
85:11
**residence (3)**
18:12,17;20:3
**residents (2)**
12:25;21:8
**resolution (3)**
8:3;17:13;19:23
**resolve (1)**
89:22
**resolved (1)**
90:7
**respect (50)**
7:21;8:11,19;9:11,

12;10:2;12:15,18;
13:3,9,15,16,19;
14:12;17:23;18:16,
23;20:20;22:9;24:7;
28:20;29:25;30:7;
32:4,6;34:1;35:11,14,
17;36:8,21;45:21;
56:10;71:11;73:19;
77:19,25;78:2;79:24;
80:10,22,24;82:23;
83:4;84:3,9,13;85:9;
86:14;89:17
**Respectfully (1)**
63:24
**respond (1)**
65:24
**response (10)**
8:12;11:10;23:23;
24:5,10;67:12;69:20;
70:16,17;79:18
**responses (1)**
22:20
**responsive (1)**
23:24
**rest (1)**
77:1
**restate (2)**
21:20;44:5
**result (9)**
12:24;14:13;15:13;
19:21;20:7;81:12,15,
20;88:15
**resurrect (1)**
8:8
**retain (1)**
85:13
**retiree (1)**
31:22
**return (1)**
69:2
**review (3)**
10:19;21:22;82:18
**revisions (1)**
20:9
**RICHARD (3)**
5:8;6:17;16:22
**rid (1)**
19:23
**right (73)**
6:5,10,13,22;9:13;
10:8,15,17;14:5;16:1,
10,11,17;17:8;18:18,
18;19:3,3,4,6;20:7,
11,13;21:5,13;22:15;
23:9;25:2;29:2;34:2,
14;35:2,10;36:15;
37:5,8,12,17,22;
42:25;45:25;49:5,15,
20,25;50:14,20;
58:22;63:4;68:16;
70:19,25;71:8;75:14;
76:21,24;77:5;78:6,
10;79:4,14,16,18;

87:10,11,21;89:16;
90:5,6,10;91:5,5,7
**rightful (1)**
44:7
**rights (2)**
85:2,4
**rigid (1)**
90:24
**rigidity (1)**
82:16
**rise (2)**
50:7;77:9
**road (1)**
21:25
**Robinson (1)**
6:7
**role (3)**
8:5;13:12;16:14
**roll (1)**
91:8
**rope (1)**
41:23
**row (2)**
73:8;84:9
**rule (4)**
38:17;52:15;59:21;
85:11
**rules (1)**
54:5
**ruling (3)**
79:24;85:22,24
**run (1)**
29:7

**S**

**sake (1)**
57:3
**sale (5)**
12:17;15:6,6;18:9;
25:15
**sales (3)**
13:16,20;28:9
**same (5)**
37:3;60:9;68:10;
73:8;75:10
**Sandy (2)**
12:24;19:19
**satisfied (20)**
29:12,21;30:5,6,11,
13,18,23;31:1,6;
33:19;83:7,11,23;
84:12,20,24;85:7,14,
17
**satisfy (2)**
22:9;86:6
**satisfying (1)**
15:15
**saved (1)**
19:24
**saw (3)**
49:2;68:5;70:7
**saying (6)**

24:17;43:1;44:8;
54:21;56:14;57:3
**scenario (2)**
87:2;88:19
**scenarios (2)**
8:6;35:25
**schedule (4)**
87:9;88:20,24;
89:23
**scheduled (2)**
12:5;87:16
**scheduling (4)**
11:22;90:1,2;91:7
**SCHWARTZ (87)**
6:6,6,24;7:3,24;
8:2;9:24;10:1,22;
11:15;12:9;13:7,14;
17:10,16;18:1,8,14,
22,25;19:11;22:22;
23:22;34:3,12,14;
35:6,8,11,14,19;36:8,
17;39:2,4;41:3,6,18;
44:24;45:12;46:5,8;
47:15;49:9,14;52:9;
55:4,25;56:7,10;
57:22;60:3;61:15;
64:15,17;66:1;68:13,
15,20;70:2,24;71:7,
10;72:9;73:4,22;
76:22;77:2,22;78:9;
79:17;86:10,12,17,
19,24;87:6,8,18,20;
88:9,13,17,19;89:4,
14;90:4
**Schwartz's (2)**
54:24;62:15
**scope (4)**
37:11,16;41:21;
73:19
**SDF (2)**
18:8;31:7
**SDF17 (5)**
4:12;6:12;11:17;
12:14;18:1
**searching (1)**
83:22
**seat (1)**
84:9
**seated (3)**
17:6;50:11;77:11
**second (14)**
7:14,14;11:20;
28:8;36:12;62:2,3;
75:12;78:14,24;79:7;
81:3,8;83:25
**section (19)**
17:23;29:9,10;
30:1,18;31:11,18;
32:2;35:14;37:18;
80:1,3,4;81:9,14,18;
82:21;84:13,19
**Sections (1)**
13:25

**secured (27)**
6:12;7:5;10:2,6;
11:17;12:10,14,22;
14:7;17:17,24;18:1;
19:11,25;20:8;22:3;
28:10;31:8;36:2,3;
40:24;43:12,12;44:1;
51:1;62:21,22
**Securities (1)**
32:2
**seeing (1)**
55:20
**seeking (3)**
28:13,14,21
**seeks (1)**
56:23
**seem (2)**
7:19;31:22
**seems (7)**
19:20;20:5;34:17;
55:10;56:1;70:3;88:3
**selling (1)**
65:4
**sense (7)**
10:18;29:2,4;42:7;
88:1,5,21
**sensible (1)**
20:5
**sent (4)**
23:14,15,22;69:17
**separate (4)**
35:25;49:1;53:21;
71:17
**separately (1)**
80:9
**serve (1)**
88:7
**served (3)**
11:22;67:4;80:11
**serves (1)**
52:15
**service (2)**
11:24,25
**set (17)**
7:18;9:1,6;11:15,
18;12:2;13:4,10,22;
30:9,20;32:8;40:6;
53:21,22,24;88:5
**sets (1)**
39:15
**settlement (1)**
8:7
**seven (1)**
65:3
**seventh (1)**
73:7
**seventy (1)**
39:16
**several (5)**
8:14;27:17;32:23;
36:10;38:11
**Shall (2)**
18:20;89:12

**Shapiro (3)**
62:3;67:20;70:9
**Shapiro's (1)**
68:11
**Sheepshead (2)**
5:3;6:18
**sheet (3)**
24:22,22;26:6
**SHORE (15)**
5:2,8;6:17,17,18;
16:20,22,22,25;17:2;
19:5;20:14,16,18;
21:12
**short (1)**
50:3
**show (1)**
69:5
**showed (5)**
54:13,14;61:25;
67:22,24
**shows (1)**
27:7
**sic (3)**
58:10,14;62:25
**side (1)**
32:8
**sides (1)**
20:6
**sign (2)**
47:3;71:25
**signed (2)**
47:6;64:22
**significant (3)**
14:12;19:17;79:23
**simply (3)**
13:19;44:19;52:16
**sincere (1)**
89:22
**sine (1)**
82:13
**single (1)**
67:21
**siphoned (4)**
27:7,8;39:10,21
**site (1)**
54:9
**situation (2)**
14:10;89:20
**six (1)**
65:3
**slavish (1)**
82:18
**slightly (1)**
76:12
**small (1)**
42:14
**sold (2)**
65:9,9
**sole (1)**
79:24
**solicitation (1)**
17:20
**somebody (1)**

62:5
**sometimes (4)**
31:10;42:15,17;
75:8
**somewhat (3)**
8:20;74:13;88:23
**soon (1)**
87:9
**sorry (17)**
19:16;34:3;42:2;
46:20;53:23;54:20;
57:2;59:2,2;62:17;
64:3,10;68:4,11;
69:2;73:25;75:21
**sought (1)**
36:2
**sound (1)**
16:19
**sounds (2)**
18:19;40:13
**source (1)**
81:2
**Southern (1)**
82:11
**speak (4)**
10:12;15:19;32:15;
56:22
**specific (11)**
42:15;46:12;69:7;
71:19;74:5,18,23;
75:8;76:6,14;87:13
**specifically (3)**
22:8;70:8;72:16
**specifics (1)**
75:10
**specify (1)**
15:20
**speech (1)**
14:25
**spell (2)**
38:1;50:18
**spend (2)**
53:18;88:1
**spent (1)**
44:10
**spoke (3)**
14:25;22:22;72:1
**stand (4)**
17:3;34:7;37:9;
49:11
**standard (3)**
51:9;78:14;81:1
**standpoint (1)**
90:3
**stands (1)**
14:20
**started (1)**
22:17
**state (8)**
7:9;37:24;43:15;
48:9;50:17;56:9;
59:4;74:1
**stated (2)**

19:9;20:9
**statement (21)**
9:8,9;11:21,21,22;
12:2;13:18;24:13;
26:7,12,19;36:11,12;
47:1,8,19;48:24;
53:16;54:18;62:13;
72:19
**statements (45)**
9:10;27:16,16;
28:2,7;29:12;36:6;
40:1,3;46:3,22;48:20,
21;54:13,14,15,16,
22;55:3;61:25;62:7,
10,14;67:14,15,23,
24,25;68:5;69:22,24;
70:1,6,12;72:14,25;
73:3;75:23;76:1,3,9,
9,15;81:6;83:14
**statement's (1)**
30:21
**States (6)**
6:15;9:18;10:6;
31:18,21;81:25
**stating (1)**
25:5
**status (9)**
9:14,15,15,21;
10:12,13;11:23;
30:24;86:9
**statutory (1)**
85:17
**stay (3)**
7:10;27:5;63:6
**Staying (1)**
9:13
**still (4)**
14:23;23:24;68:2;
72:7
**Street (1)**
5:22
**strictly (1)**
66:11
**structure (1)**
48:17
**subject (10)**
16:11,14;20:1,9;
30:5,9,15;32:6;40:7;
57:13
**subjects (1)**
37:1
**submission (1)**
12:3
**submit (4)**
12:19;24:2;78:3;
86:4
**submits (2)**
13:23;77:24
**submitted (1)**
67:2
**substance (3)**
21:6;36:4;73:16
**substantial (1)**

12:21
**substantially (1)**
73:8
**substantive (1)**
82:2
**subtracted (1)**
65:12
**success (1)**
31:16
**suffered (1)**
12:23
**sufficient (1)**
40:7
**suggest (4)**
7:18;9:5;84:1;
90:11
**Suite (2)**
4:14;5:22
**sum (1)**
77:19
**summarize (1)**
61:5
**summary (1)**
21:11
**supplement (1)**
80:8
**support (9)**
7:8;8:16;10:3;
11:6;20:18;21:2,8,
22;77:23
**supports (3)**
16:13;20:8,18
**suppose (4)**
7:15;15:17;33:18,
20
**supposed (6)**
9:3;39:20;54:4,5;
62:23;69:17
**supposedly (1)**
26:6
**sure (16)**
16:16;23:2;31:20;
32:17;42:8;63:7;
64:20;65:1;66:25;
67:6,8;68:11;69:14;
73:1;85:23;86:1
**surrounding (1)**
81:22
**survive (1)**
15:4
**suspect (1)**
86:8
**suspicion (1)**
55:6
**suspicions (1)**
55:3
**sustain (4)**
40:5;45:1,22;57:23
**sustained (2)**
40:17;55:5
**sustaining (1)**
40:9
**swear (3)**

36:24;37:22;50:14
**sworn (2)**
37:23;50:16

**T**

**table (4)**
23:4;24:18;39:22;
61:21
**talk (1)**
64:8
**talked (1)**
61:19
**talking (3)**
26:23;42:12;58:10
**tax (1)**
10:6;12:10;39:23
**taxes (3)**
31:23;32:1;42:9
**telephone (1)**
6:4
**telephonic (1)**
19:3
**TELEPHONICALLY (1)**
5:8
**tells (1)**
80:11
**tens (1)**
43:3
**term (3)**
30:16;81:8,10
**terms (1)**
36:3
**terrible (2)**
91:6,7
**terribly (1)**
90:25
**test (8)**
15:15;19:2;25:7;
30:17;32:7;58:25;
78:14,15
**testified (4)**
58:23;61:5;65:14;
69:22
**testify (11)**
24:25;25:20;26:19;
36:5,25;52:6,10;
56:10;58:20;59:14;
68:2
**testifying (1)**
52:22
**testimony (25)**
25:23,24;26:3;
36:6,25;37:3;51:14;
52:16;53:1;56:24;
57:14;58:13,25;59:2;
60:10,20;64:11;
66:23;69:8;74:25;
75:20;77:25;79:21;
83:10,15
**Thanks (2)**
50:6;77:7
**therefore (5)**

14:18;15:4;39:13;
78:19,20
**therein (1)**
51:12
**there'll (1)**
15:10
**thereof (2)**
14:13;19:21
**Third (1)**
17:7
**thirty (5)**
50:25;51:1;55:17;
62:23;65:13
**thirty-million-dollar (1)**
58:8
**thirty-million-dollars (1)**
62:21
**thirty-one (1)**
62:23
**thirty-three (3)**
28:11;43:13;44:11
**thorough (2)**
79:21;83:22
**thoroughly (2)**
73:11;79:23
**though (4)**
42:22;81:8;82:21;
91:6
**thousands (4)**
43:3,3,4,7
**three (4)**
52:1;63:15,17;75:9
**threshold (1)**
18:15
**thresholds (1)**
12:17
**Thus (1)**
81:13
**tie (1)**
57:25
**timely (5)**
8:23,23;12:1,5;
37:17
**times (8)**
36:10;42:19;44:22;
54:9;66:12;67:19;
72:1,1
**timing (1)**
88:10
**title (4)**
24:21;29:11,15,21
**today (25)**
7:6,12,13;9:23;
10:21;11:1;12:5;
14:11,18;15:22;
17:18;22:6,7,22;
27:24;28:22;36:13;
58:10,17,23;74:6;
75:24;79:21;84:11;
87:18
**today's (1)**
6:25
**together (2)**

23:22;80:9
**told (5)**
26:8,13;60:12;
62:12;70:8
**tonight (1)**
86:6
**took (1)**
38:11;61:20;68:7
**total (2)**
65:4,6
**totality (1)**
81:22
**touch (1)**
67:23
**transaction (1)**
63:12
**Transcribed (1)**
5:20
**transfer (2)**
43:16,19
**transpired (2)**
32:23;35:22
**treated (3)**
31:2,4;85:3
**treatise (2)**
80:11;81:25
**treatment (2)**
17:24;85:4
**tremendous (1)**
74:22
**tried (1)**
66:12
**trouble (1)**
66:12
**true (1)**
24:23
**trust (2)**
16:16;86:5
**Trustee (8)**
6:15;9:19;10:1,6;
12:11;18:25;31:18,
21
**truth (2)**
26:21;37:1
**try (3)**
8:3;45:2;88:7
**trying (5)**
9:3;58:3;61:4;69:5
**turn (3)**
10:18;82:10;83:1
**turned (4)**
17:11;67:1,12,17
**turns (2)**
85:10;89:2
**twenty (3)**
28:10;65:5,10
**twenty-five (3)**
45:6;64:24;65:12
**twenty-four (1)**
19:16
**twenty-three-and-a-half (1)**
18:10
**twenty-two (1)**

18:9
**two (14)**
34:7;35:5;58:9;
60:1;63:16,19,20,21,
25;64:1;67:19;75:9;
77:6;80:4
**types (1)**
30:15
**typically (1)**
52:12

**U**

**Um-hum (4)**
17:25;48:7;67:16;
69:18
**unavailable (1)**
89:6
**uncontested (2)**
29:14,25
**under (16)**
23:3;24:18;29:3,9,
19;30:24;36:25;
37:18;39:9,22;52:8;
57:20;61:21;81:14;
82:20;85:13
**underlies (1)**
80:13
**undermine (2)**
83:12,24
**Understood (4)**
16:9;20:24;86:17;
88:18
**undertaken (1)**
80:16
**unduly (1)**
35:1
**unfairly (1)**
85:2
**Unfortunately (2)**
51:14;58:13
**unit (6)**
41:2;42:16;47:3;
74:20,21;75:1
**United (4)**
6:14;9:18;10:6;
31:18
**Unites (1)**
31:21
**units (8)**
12:17;15:6,7;21:3;
38:24,24;41:14,16
**unlawful (1)**
58:7
**unless (1)**
31:14
**unnecessary (2)**
34:25;82:16
**unrelated (1)**
8:20
**unreliable (1)**
52:16
**unsecured (12)**

10:4,7;11:18;
12:11,13,16;13:2;
15:16;31:9;40:24;
51:6;62:25
**up (11)**
6:5;18:14,20;38:4;
66:1,2;74:22;77:19;
86:7;88:15;90:10
**upon (4)**
11:7;12:16;14:2;
71:21
**upset (1)**
80:16
**urgency (1)**
7:13
**urgent (1)**
7:3
**usage (1)**
44:7
**use (1)**
24:20
**used (3)**
39:19;81:9;82:2
**usurping (2)**
7:20;14:9

**V**

**vacation (1)**
91:4
**validity (1)**
22:4
**value (1)**
83:21
**vari (1)**
42:18
**variance (1)**
38:25
**variances (1)**
43:2
**variation (1)**
42:20
**variations (2)**
42:14;43:1
**varied (1)**
43:5
**various (7)**
8:5,6;35:22;42:8,
19;66:2;75:7
**verb (1)**
16:15
**verbatim (1)**
82:3
**view (3)**
27:23;81:6;86:16
**viewed (1)**
81:21
**virtually (1)**
51:6
**vision (1)**
68:3
**voice (1)**
34:5

**vote (3)**
8:14;12:3;84:23
**votes (3)**
12:7;84:22,22
**voting (3)**
8:14;28:24;32:22

**W**

**wait (1)**
60:14
**wants (1)**
60:17
**warrant (1)**
29:18
**waterfall (1)**
12:15
**way (11)**
7:16;15:24;32:18;
58:16;59:9,13;82:4;
83:13,13;88:19;90:5
**ways (1)**
81:2
**wee (1)**
91:2
**weeks (3)**
88:24;89:24;90:25
**weight (1)**
52:24
**weren't (1)**
75:8
**West (1)**
5:22
**what's (2)**
19:8;23:3
**whenever (1)**
88:3
**Whereupon (1)**
91:10
**whole (1)**
51:4
**who's (4)**
8:4,4;32:24;33:1
**whose (2)**
85:4;88:14
**wide (2)**
83:4,6
**widely (1)**
81:4
**Wilk (8)**
51:25;53:5;72:15;
74:12;75:4,5,18;
86:14
**Wilk's (1)**
68:8
**willing (2)**
48:16;71:17
**wise (1)**
85:23
**wish (1)**
48:21
**wished (1)**
80:23

**wishes (1)**
16:8
**withdraw (3)**
7:7,7;55:12
**within (1)**
81:4
**without (7)**
7:5;20:24;43:18,
20;44:9;51:19;84:23
**witness (72)**
24:7;25:24,25;
32:12,24;33:1;34:20;
37:4,9,22,23,25;38:2,
13;41:22,25;42:2,3,5,
7;46:19;48:8;49:6,
21,23;50:6,12,15,16,
19;52:5,9,20,22;53:1,
3,13;55:5;56:8,10,13,
21;57:6,7;58:19,21;
59:14;60:7,15,19,21,
24;61:1,3,8;62:4;
63:5,7,14,17,21,25;
64:3,6,10,13;70:23;
71:1,3,6;73:20;83:25
**witness' (1)**
56:24
**witnesses (6)**
24:9;25:19;59:10,
11;71:4;76:25
**words (1)**
82:3
**work (9)**
54:11;67:7;74:18,
20,23;89:17;90:6,8;
91:7
**working (1)**
8:3
**working-class (1)**
20:22
**wrote (1)**
14:25

**Y**

**Yachad (1)**
10:25
**yardstick (1)**
81:7
**year (2)**
20:23;91:6
**years (12)**
63:15,16,19,20,21,
25;64:1,4;65:3,4;
68:9;72:8
**yesterday (1)**
14:11
**yield (1)**
35:10
**York (5)**
4:15;5:6,23;12:10;
82:11

**Z**

**zone (1)**
15:20

**1**

**1,300 (1)**
9:22
**100,000 (1)**
13:2
**100,000-dollar (1)**
12:11
**10017 (2)**
4:15;5:6
**10040 (1)**
5:23
**101 (1)**
6:2
**106 (1)**
6:2
**108 (1)**
11:3
**109 (1)**
11:4
**11 (5)**
25:17;29:11,15,21;
82:14
**1120 (1)**
31:23
**1122 (1)**
13:25
**1123 (1)**
13:25
**11235 (1)**
4:6
**1129 (2)**
13:25;29:9
**1129a (1)**
84:19
**1129a1 (1)**
29:10
**1129a10 (1)**
31:5
**1129a11 (1)**
31:11
**1129a12 (1)**
31:18
**1129a13 (1)**
31:22
**1129a2is (1)**
29:19
**1129a3 (12)**
22:9;30:1;35:15;
37:19;78:3;80:1,4;
81:9,14,18;82:21;
84:13
**1129a3requires (1)**
81:7
**1129a4 (1)**
30:2
**1129a5 (1)**

30:10

**1129a6 (1)**
30:12

**1129a7 (1)**
30:18

**1129a8 (1)**
30:22

**1129a9 (1)**
31:1

**1129b (1)**
32:5

**1129d (1)**
31:24

**1200 (1)**
4:14

**125,000 (2)**
54:17;62:13

**13th (1)**
11:19

**14th (1)**
5:5

**15th (2)**
89:9;91:1

**16th (1)**
89:6

**192nd (1)**
5:22

**1933 (1)**
32:2

**1981 (1)**
82:11

**1988 (1)**
79:5

**1st (5)**
90:11,13,14,15,22

### 2

**2004 (1)**
22:17

**2005 (1)**
64:23

**2011 (1)**
64:2

**2013 (2)**
11:19;12:2

**20th (2)**
8:12;12:2

**22nd (1)**
89:7

**23rd (2)**
89:10,11

**240,000 (1)**
18:14

**24th (2)**
8:17;89:12

**2nd (7)**
4:5;79:5;90:11,12,
16,17,20

### 3

**3 (3)**

11:16;18:1;79:13

**3:30 (2)**
7:4;15:1

**300 (1)**
26:8

**300,000 (4)**
51:20;53:6,15;54:1

**33 (1)**
30:20

**360 (2)**
4:13;5:4

### 4

**4 (2)**
11:17;31:9

**415 (1)**
4:4

### 5

**5 (5)**
13:3;14:17;15:19;
30:24;32:2

**5.1 (1)**
17:23

**5:10 (1)**
17:5

### 6

**6- (1)**
66:4

**6:37 (1)**
17:5

**636 (1)**
79:3

**649 (1)**
79:3

### 7

**7:18 (1)**
50:8

**7:43 (1)**
50:8

**7:52 (1)**
57:4

**700 (1)**
5:22

### 8

**8:19 (1)**
77:10

**8:35 (1)**
77:10

**8:55 (1)**
91:10

**800,000 (1)**
66:4

**843 (1)**
79:3

### 9

**9 (4)**
90:17,23,23;91:9

**900,000 (2)**
24:23;53:23

**973406-2250 (1)**
5:24